UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:25-cv-21113-JAL

WILLIE STANLEY,

    *Plaintiff*,

v.

LOOMIS ARMORED US, LLC,

    *Defendant*.

_____

## DEFENDANT'S LIST OF CASES IT INTENDS TO RELY UPON

1.   *Abrego v. Budget Truck Rental, LLC*, 2018 WL 6220163, at *2 (W.D. Tex. Apr. 23, 2018) ("The Court agrees with Defendant that, since Plaintiff has the legal right to obtain her medical records from her medical providers upon demand, and since Rule 34 requires her to "permit the requesting party ... to inspect [or] copy" those records, she may be compelled to sign a release authorization by which she directs those who maintain custody of the medical records over which she has control to permit the release of those records for copying or inspection.").

2.   *Allen v. Indian Harbor Marine, Inc.*, 1997 WL 666210, at *2 (E.D. La. Oct. 24, 1997) ("The sound reasoning of almost every federal court that has addressed the issue has similarly held that written authorizations may be compelled under Rule 34 because they simply compel parties to disclose documents which are under their control.").

3.   *Cameron v. Supermedia, LLC,* 2016 WL 1572952, at *6 (N.D. Fla. Apr. 19, 2016) ("If Plaintiff means to assert a claim for a more significant emotional or psychological injury, she must provide an amended answer to Interrogatory No. 5 identifying, to the extent she is able to do so, those medical providers which she has seen for diagnosis or treatment for mental, emotional and psychological issues, regardless of the cause, from January 1, 2010, to the present, and physical manifestations of those issues. She must also produce corresponding records within her possession, custody or control.").

4.   *Coleman v. Cedar Hill Indep. Sch. Dist.*, 2022 WL 1470957, at *3 (N.D. Tex. May 10, 2022) (finding that authorization for medical records was relevant and proportional to the needs of the case).

5.   *Cupp v. United States of America*, 2015 WL 510134, at *3 (S.D. Ga. Feb. 6, 2015) (recognizing that courts in the Eleventh Circuit have compelled signed releases, finding that plaintiff put his physical condition at issue by filing the case, and compelling execution of HIPAA release).

6.      *McIntyre v. Delhaize American, Inc., et al*., 2008 WL 11336308 (M.D. Fla. June 26, 2008) ("The case law is clear that when a plaintiff raises an emotional distress damages claim, the plaintiff's medical and psychological history, including the identities of health providers, the dates of treatment and the nature of the treatment are relevant and discoverable.").

7.      *Mir v. L-3 Communications Integrated Systems, L.P*., 319 F.R.D. 220, 226 (N.D. Tex Aug. 22, 2016) (finding "requests for signing and executing written releases or authorizations may be properly made under Rule 34(a)—and then, if necessary, compelled under Rule 37(a)—insofar as they require a responding party to permit the requesting party or its representative to inspect or copy designated documents or electronically stored information in the responding party's control.").

8.      *Morris v. Sequa Corporation, et al.*, 275 F.R.D. 562, 570 (N.A. Ala July 21, 2011) (compelling executed SSA release).

9.      *Newmark v. Rambosk*, 2016 WL 3459428, at *2 (M.D. Fla. Jun 24, 2016) (finding that plaintiff placed mental health at issue by seeking compensatory damages).

10.     *Norris, et al. v. Cornerstone Residential Management, Inc.*, 2009 WL 10644867, at *5 (S.D. Fla. Feb. 27, 2009) (finding discovery of plaintiff's medical information for a five year period before the start of the litigation through the date of production reasonable).

11.     *Scott v. City of Bismarck*, 328 F.R.D. 242, 247-251 (D.N.D. Feb. 17, 2018) (compelling executed releases for health records).

12.     *E.E.O.C. v. Nordstrom, Inc*., 2008 WL 5070145, at *4 (S.D. Fla. Nov. 24, 2008) (compelling disclosure of medical providers because the plaintiff sought damages for emotional pain and suffering, compelling disclosure of unemployment information because "it may lead to discovery of additional witnesses, as well as test the sufficiency of the representations Claimants may have made in an effort to seek unemployment, which has a direct bearing on a Claimant's credibility," and compelling documents showing medical or psychological treatment by any provider over the preceding five years).

**5:17-cv-1045-OLG**

2018 WL 6220163
Only the Westlaw citation is currently available.
United States District Court, W.D. Texas, San Antonio Division.

Viridiana ABREGO, Plaintiff,
v.
BUDGET TRUCK RENTAL, LLC, and Janice Kay Dinsmore, Defendants.

Civil No. 5:17-cv-1045-OLG
|
Signed 04/23/2018

**Attorneys and Law Firms**

Scott Sager, Thomas J. Henry Injury Attorneys, San Antonio, TX, Thomas J. Henry, Thomas J. Henry, Injury Attorneys, Corpus Christi, TX, for Plaintiff.

Andrew James Pratka, Aaron Pool, Donato, Minx, Brown, & Pool, P.C., Houston, TX, for Defendant Budget Truck Rental, LLC.

Curtis J. Kurhajec, Naman, Howell, Smith & Lee PLLC, Austin, TX, for Defendant Janice Kay Dinsmore.

**ORDER**

ORLANDO L. GARCIA, CHIEF UNITED STATES DISTRICT JUDGE

**\*1** This case is before the Court on Defendant's Motion to Compel Plaintiff's Discovery Responses and Signed HIPAA Release Authorization (docket no. 23); Plaintiff's Motion to Compel Production of Defendant's Vehicle for Inspection, Examination, and Photographing (docket no. 37); and Plaintiff's Motion and First Amended Motion to Compel Responses to Plaintiff's Discovery Requests (docket nos. 28, 30). The Court finds that Defendant's motion to compel should be GRANTED IN PART and DENIED IN PART as set forth below; Plaintiff's motion to compel the production of Defendant's vehicle should be GRANTED; Plaintiff's amended motion to compel regarding its interrogatories and requests for production should be DENIED; and Plaintiff's initial motion to compel regarding its interrogatories and requests for production should be DENIED AS MOOT.

**Background**

Plaintiff asserts claims of negligence against Defendants in connection with an automobile collision that occurred on April 29, 2016, and that Plaintiff alleges was caused by a rear axle that separated from a vehicle owned by Defendant Budget Truck Rental, LLC and operated by Defendant Janice Kay Dinsmore along Interstate Highway 10 through Bexar County, Texas. Docket no. 32 at ¶¶ 6-20.

Abrego v. Budget Truck Rental, LLC, Not Reported in Fed. Supp. (2018)

**Defendant's Motion to Compel (docket no. 23)**

In its motion to compel, Defendant Budget Truck Rental, LLC disputes the sufficiency of Plaintiff's answers to its interrogatories and requests for production. Docket no. 23 at ¶ 3. Specifically, Plaintiff objected to Budget's interrogatory number 10 and request for production number 5, which sought information about physical conditions and medical procedures that Plaintiff had experienced in the years preceding the accident, requested Plaintiff to sign and return a HIPAA release authorization that would allow Budget to obtain medical and billing records from Plaintiff's providers, and sought letters of protection and guaranty agreements with treating medical providers securing payment for their services with the proceeds of any settlement or judgment. Docket no. 23 at ¶¶ 4-6. Plaintiff objected to interrogatory 10 on relevance grounds, objected to request for production 5 on the basis that "a party cannot use a request for production to compel an opposing party to sign such an authorization for medical records[,]" and claimed that she had no materials responsive to request for production 7.

The Court agrees with Budget that interrogatory 10, which seeks information regarding Plaintiff's pre-existing illnesses or injuries and medical providers, is relevant and discoverable, and that Defendant's motion should be GRANTED IN PART as to interrogatory 10.

Defendant argues that the use of a request for production to compel the signature of a medical records release form is a "standard procedure" and one that the Fifth Circuit approved in *McKnight v. Blanchard*, 667 F.2d 477, 481-82 (5th Cir. 1982). Docket no. 23 at ¶¶ 5, 11 However, district courts have characterized this suggested use of Rule 34 as dicta, and have divided on the question of whether Rule 34 may be used to compel a party's signature of a medical release. *Compare, e.g., Mir v. L-3 Communications Integrated Sys., L.P.*, 319 F.R.D. 220, 227 (N.D. Tex. 2016) (commenting that "a majority of courts have held that Rule 34 itself does not give courts the power to order a party to sign a release." (internal quotation marks omitted) ) *and Zamora v. GC Services, LP*, EP15CV00048DCGRFC, 2016 WL 8853096, at *4 (W.D. Tex. Aug. 19, 2016) ("the majority of courts have concluded that a party may be so compelled."). On one side of this split, courts have reasoned that, since documents are within a party's "possession, custody, or control" if the party "has the legal right to obtain the documents on demand[,]" and since "[a] party responding to a Rule 34 production request ... 'is under an affirmative duty to seek that information reasonably available to [it] from ... [those] subject to [its] control[,]'" "written authorizations can be compelled under Rule 34 because they simply compel parties to disclose documents which are under their control." *Lear Siegler Services, Inc. v. Ensil Int'l Corp.*, SA-05-CA-679-XR, 2010 WL 11506520, at *5 (W.D. Tex. June 22, 2010); *Lischka v. Tidewater Services, Inc.*, CIV. A. 96-296, 1997 WL 27066, at *3 (E.D. La. Jan. 22, 1997). On the other side of this divide, courts have examined the text of Rule 34 and observed both that "Rule 34(a) does not authorize requiring a party to create a document or sign a form attached to a request for production" and that the records could also be obtained by serving a Rule 45 subpoena upon the medical provider that has custody of the records. *Mir v. L-3 Communications Integrated Sys., L.P.*, 319 F.R.D. 220, 228 (N.D. Tex. 2016).

**\*2** The Court agrees with Defendant that, since Plaintiff has the legal right to obtain her medical records from her medical providers upon demand, and since Rule 34 requires her to "permit the requesting party ... to inspect [or] copy" those records, she may be compelled to sign a release authorization by which she directs those who maintain custody of the medical records over which she has control to permit the release of those records for copying or inspection. As the parties do not appear to dispute, records relating to Plaintiff's medical condition are not privileged because Plaintiff has placed her medical condition at issue by asserting personal injury claims. To the extent that Plaintiff is concerned about the release or use of her medical records beyond the scope of this litigation, the parties may consider seeking the entry of a protective order. The Court finds that Defendant's motion to compel should be GRANTED IN PART as to request for production 5.

Defendant claims that, although Plaintiff claimed that she was not in possession of any records responsive to request for production 7, billing invoices from Plaintiff's treating medical providers list the Law Offices of Thomas J. Henry as Plaintiff's insurance provider. However, the Court notes that request for production 7 sought records regarding the payment of medical services only to the extent those payments are "secured by or promised from the proceeds, if any, of any settlement or judgment obtained in this suit." Docket no. 23-2 at 5-6. The fact that the law firm of Plaintiff's counsel is also listed on her medical billing records as her insurance provider does not necessarily indicate that her medical expenses are "secured by or promised from the proceeds" of any settlement or judgment regarding her claims. Accordingly, the Court finds that Budget has failed to show the existence of records responsive to request for production 7 that Plaintiff failed to

Abrego v. Budget Truck Rental, LLC, Not Reported in Fed. Supp. (2018)

produce, and finds that Defendant's motion to compel should therefore be DENIED IN PART as to request for production 7.

**Plaintiff's Motion to Compel Production of Defendant's Vehicle (docket no. 37)**

Both parties have agreed that Plaintiff should have an opportunity to inspect Defendant's vehicle, but have been unable to agree regarding the scope of that inspection. Docket nos. 37 at 1; 39 at ¶ 3. Plaintiff seeks to "[t]ake photos, and measurements of the vehicle[,] [d]ownload [the] control module, do a diagnostic check, [and] inspect mechanical problems, specifically related to the axel[,]" while Defendant "is opposed to conducting an inspection without a written protocol in place and to any destructive testing of the vehicle or removal of the other tires and wheels not at issue in this case" as well as to "any torque meter testing for the rental van's lug nuts because they are not in the same or substantially same condition as at the time of the incident." Docket nos. 37 at 1; 39 at ¶¶ 6-7.

Rule 34(a)(1)(B) allows a party to request the inspection and testing of any designated tangible thing within the broad scope of relevance under Rule 26(b). Aside from Rule 34(b)(1), which requires only that the requesting party to "describe with reasonable particularity each item or category of items to be inspected" and "specify a reasonable time, place, and manner for the inspection[,]" the rules do not require the parties to conduct the inspection in accordance with any written procedure. All parties operate under a continuing obligation to preserve evidence that they know or should know is relevant to imminent or ongoing litigation, such as the vehicle in question. *Jordan F. Miller Corp. v. Mid-Continent Aircraft Serv., Inc.*, 139 F.3d 912 (10th Cir. 1998); *Dillon v. Nissan Motor Co., Ltd.*, 986 F.2d 263, 267 (8th Cir. 1993) ("both plaintiffs' expert and plaintiffs' attorney knew or should have known that the car was an important piece of evidence which should have been preserved in its entirety"). The Court finds that Defendant's relevance objections lack merit, and that Plaintiff should be permitted to inspect the vehicle, including conducting non-destructive testing as necessary. The parties should be mindful that any damage or alteration to the vehicle may give rise to spoliation sanctions in this or subsequent litigation. It would accordingly be prudent for the parties to prepare a written protocol for the inspection to identify and resolve potential spoliation issues before any damage or alteration occurs—but the lack of such a protocol is not a basis for refusing to comply with a valid Rule 34 request for inspection. The Court finds that Plaintiff's Motion to Compel Production of Defendant's Vehicle for Inspection, Examination, and Photographing (docket no. 37) should be GRANTED.

**Plaintiff's Initial and Amended Motions to Compel (docket nos. 28, 30)**

**\*3** Plaintiff's motion to compel disputes the sufficiency of Defendant's responses to Plaintiff's interrogatory number 12, which asked Defendant to "[d]escribe the pre-trip inspection, and how the malfunction with the subject vehicle was not noticed." Docket no. 30-1 at 7. In response, Defendant objected on the basis that the interrogatory "is premature and such information will not be known until additional discovery is complete" and on the basis that the interrogatory "assumes there was a noticeable or observable 'malfunction with the subject vehicle' prior to the incident[,]" and, subject to those objections, produced a three-page Maintenance and Safety Inspection record dated April 24, 2016. Docket nos. 31-1 at 6.

The Court agrees with Plaintiff that Defendant's objections to this interrogatory lack merit. It is not a proper objection that an interrogatory is "premature:" Unless otherwise ordered by the court, parties are obligated to fully answer interrogatories based on the information available to them at the time the response is required, and to thereafter supplement their answer as additional information becomes available to them. Fed. R. Civ. P. 26(e), 33(b)(2)-(3). Likewise, the "argumentative" character of an interrogatory is not a permissible basis for refusing to respond to it. Fed. R. Civ. P. 33(a)(2). However, Rule 33 permits a responding party to answer an interrogatory by referencing a production of business records, and Plaintiff has not made any showing that responsive records exist beyond those referenced in Defendant's interrogatory response. The Court accordingly finds that Plaintiff's First Amended Motion to Compel Responses to Plaintiff's Discovery Requests should be DENIED.

Plaintiff's initial motion to compel also disputed the sufficiency of Defendant's response to Plaintiff's request for production 6, which sought all investigative reports relating to the incident in question, but Plaintiff's amended motion to compel does

Abrego v. Budget Truck Rental, LLC, Not Reported in Fed. Supp. (2018)

not raise any issues regarding this request. Docket nos. 29; 31. The Court therefore presumes that the parties have resolved their dispute regarding this discovery request or that Plaintiff no longer wishes to pursue this argument, and finds that, upon the resolution of the amended motion, the initial motion should be DENIED AS MOOT.

**Sanctions**

Of the four motions to compel currently before the Court, only Plaintiff's initial motion to compel made any reference to an award of attorney's fees or sanctions for noncompliance with discovery rules. Docket no. 28 at 2. Subject to certain exceptions, Rule 37(a)(5) makes the payment of expenses mandatory if a motion to compel is granted or if the requested discovery is produced after the motion was filed. The Court finds that, given the divided authority regarding whether Rule 34 can be used to compel a responding party to execute a medical records release form, Plaintiff's opposition to that request was substantially justified and no award of expenses is appropriate in connection with this request. Fed. R. Civ. P. 37(a)(5)(ii). Regarding the remaining motions to compel at issue, the Court finds that both parties have taken meritless positions in refusing to produce certain discovery, and that this constitutes other circumstances that make an award of expenses to either party unjust. Fed. R. Civ. P. 37(a)(5)(iii). The Court accordingly declines to make an award of expenses or any other sanction in connection with the parties' motions to compel.

**Conclusion and Order**

It is therefore ORDERED that:

> Defendant's Motion to Compel Plaintiff's Discovery Responses and Signed HIPAA Release Authorization is GRANTED IN PART as to Plaintiff's response to interrogatory 10 and request for production 5, and DENIED IN PART as to Plaintiff's response to request for production 7;

> **\*4** Plaintiff's Motion to Compel Production of Defendant's Vehicle for Inspection, Examination, and Photographing (docket no. 37) is GRANTED as set forth above;

> Plaintiff's First Amended Motion to Compel (docket no. 30) is DENIED; and

> Plaintiff's Motion to Compel (docket no. 28) is DENIED AS MOOT.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 6220163

**End of Document**                                  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# CIV. A. 96–3135

1997 WL 666210
Only the Westlaw citation is currently available.
United States District Court, E.D. Louisiana.

Carl F. ALLEN
v.
INDIAN HARBOR MARINE, INC., et al

No. CIV. A. 96–3135.
|
Oct. 24, 1997.

ORDER AND REASONS

SCHWARTZ, District J.

**\*1** This matter is before the Court on defendants' motion to compel plaintiff to respond their numerous requests for authorizations and/or production of associated records, to wit plaintiff's military records and Social Security disability records, which documents have never been produced and authorizations to obtain such records have never been executed.[1] Plaintiff's response to the defendants' motion to compel admits that plaintiff refuses to make such documents relevant to his medical condition and within his control available to defense counsel either by producing same or executing appropriate authorizations and forwarding same to defense counsel. Plaintiff's counsel argues that defendants have already subpoenaed the records in question from the appropriate authorities and because defense counsel can and has subpoenaed the records no discovery response is due. Of course, it is common knowledge that under no circumstances will non-party authorities in the physical possession of plaintiff's social security and military records release these records to anyone without an authorization to do so executed by the plaintiff.

The matter was noticed for hearing on October 29, 1997, however, no oral hearing was requested or set by the Court in this matter. Accordingly, the matter is deemed submitted for decision this date.

Plaintiff neither invokes any privilege on the information sought or argues that the scope of the discovery sought is too broad. Rather, plaintiff maintains that the Federal Rules of Civil Procedure do not authorize the issuance of an order compelling him to either execute the appropriate authorizations or to produce the requested documents. Plaintiff further argues that an order compelling the plaintiff to either execute authorizations or produce documents amounts to usurpation of legislative power.

Plaintiff's first argument, regarding whether the Federal Rules of Civil Procedure authorize the issuance of an order to execute authorization to obtain or to produce documents is without merit. FRCP Rule 34 covers the production of documents provides in pertinent part:

> (a)Scope. Any party may serve on any other party a request (1) to produce and permit the party making the request, or someone acting on the requestor's behalf, to inspect and copy, any designated documents... which are in the possession, custody, or control of the party upon whom the request is served.

FRCP Rule 34(a).

Counsel for plaintiff essentially argues that the requested documents are not in plaintiff's "possession, custody or control" and the aforesaid rule does not cover authorizations sent by the requesting party that need to be signed and sent back to the requesting party. More specifically, plaintiff contends that Rule 34 entitles defendants to no more than the right to inspect and photocopy documents in plaintiff's physical possession. No authority exists which would support such an attenuated reading of Rule 34(a).

The other side of the coin is that this Court would be no maverick in holding and it does—that for purposes of FRCP Rule 34, a plaintiff is in control of records that can be released via an authorization, because by either granting or withholding consent plaintiff determines who has access to the records or documents requested.[2] Brevity and the obvious answer militates in favor of foregoing the page length string cite consisting of a legion of cases which hold either implicitly or explicitly, that Rule 34 in tandem with Rule 37[3] empowers district courts to compel parties to sign written authorizations consenting to the production of various documents.[4]

**\*2** Plaintiff's tortured argument regarding the availability of the requested documents pursuant to FRCP Rule 45 subpoena merits no discussion. The Court previously noted and any attorney who has ever handled even one case implicating records and documents in the physical possession of non-parties and particularly government entities, including medical records, military records, social security disability records, tax records, and the like, will not be released without the written authorization of the individual to whom such records pertain.

The sound reasoning of almost every federal court that has addressed the issue has similarly held that written authorizations may be compelled under Rule 34 because they simply compel parties to disclose documents which are under their control.

Accordingly and for all of the above and foregoing reasons,

IT IS ORDERED that the defendants' Motion to Compel Production of Documents or Execute Written Authorization to Release such Documents is GRANTED and plaintiff shall produce requested documents or the requested written authorizations FORTHWITH.

IT IS FURTHER ORDERED that plaintiff's failure to comply with the foregoing order will result in the dismissal of any and all of the plaintiff's claims for damages which are in any manner premised upon or touch upon or require consideration of plaintiff's medical condition for their resolution.

**All Citations**

Not Reported in F.Supp., 1997 WL 666210

Footnotes

[1]   Counsel for defendants has informed the Court that on no less than five occasions the subject authorizations and document requests were forwarded to counsel for the plaintiff, including on or about January 9, 1997, March 26, 1997, May 7, 1997, August 14, 1997, and September 18, 1997.

[2]   See, *Lischka v. Tidewater Services, Inc.,* 1997 WL 27066 (E.D.La. January 22, 1997); *Smith v. Maryland Casualty Company,* 42 F.R.D. 587, 589 (E.D.La.1967).

[3]   FRCP Rule 37 empowers the district courts to compel disclosure or discovery items that are properly discoverable under Rule 34. See, FRCP Rule 37(a)(2)(B).

[4]   See e.g., *McKnight v. Blanchard,* 667 F.2d 477, 481–82 (5th Cir.1982); *Phillips v. INA,* 633 F.2d 1165, 1167–68 (5th Cir.1981);

Allen v. Indian Harbor Marine, Inc., Not Reported in F.Supp. (1997)

*United States, ex. rel Woodard v. Tynan,* 776 F.2d 250, 252 (10th Cir.1985).

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

---

**4:15cv315-MW/CAS**

Case 1:25-cv-21113-JAL   Document 37-4   Entered on FLSD Docket 09/09/2025   Page 13 of
126
Cameron v. Supermedia, LLC, Not Reported in Fed. Supp. (2016)

KeyCite Yellow Flag
Distinguished by   In re 3M Combat Arms Earplug Products Liability
Litigation,   N.D.Fla.,   April 28, 2020

2016 WL 1572952
Only the Westlaw citation is currently available.
United States District Court, N.D. Florida,
Tallahassee Division.

Leslee CAMERON, Plaintiff,

v.

SUPERMEDIA, LLC, d/b/a Dex Media, Defendant.

Case No. 4:15cv315-MW/CAS
|
Signed 04/19/2016

**Attorneys and Law Firms**

Marie A. Mattox, James Garrity, Marie A. Mattox PA,
Tallahassee, FL, for Plaintiff.

Kelly Marie Pena, Michael Richard Tricarico, Ogletree
Deakins Nash etc., Miami, FL, for Defendant.

**ORDER RECONSIDERING DISCOVERY MOTIONS**

Mark E. Walker, United States District Judge

**\*1** This is an employment case. Defendant [1] sought to
compel discovery of Plaintiff's five-year medical history
and extend the discovery period to explore that territory.
This Court rejected the wide-ranging journey that Defendant
insisted upon and denied both motions. Defendant is back
with a more appropriate request and asks for reconsideration.
This order partially grants and otherwise denies the
reconsideration motion.

I

The reconsideration motion paints a slightly better—though
probably not yet complete—picture of the essential facts.
In her amended complaint Plaintiff asserts that she began
working for Defendant as a marketing consultant on April
1, 2010. ECF No. 1-3 ¶ 6. Apparently she traveled a lot as
part of the job. She alleges that a regional director began
harassing her in April 2012. ECF No. 1-3 ¶ 7. In December

2012, Plaintiff complained to human resources. ECF No. 1-3
¶ 10. Defendant fired Plaintiff on November 11, 2013. ECF
No. 1-3 ¶ 12.

In this lawsuit Plaintiff claims that Defendant discriminated
against her because of gender and religion and fired her
because she complained about these unlawful practices. ECF
No. 1-3. For all three claims, Plaintiff seeks damages for,
among other things, mental anguish, emotional distress, and
so forth. *Id.* ¶¶ 24, 34, & 41. She did not assert a separate
tort claim founded on a psychological injury, say the tort of
outrage. But she did fairly allege that her emotional injuries
are "permanent and continuing." *Id.*

Once Defendant removed the case from state court, the
discovery period began with the entry of the initial scheduling
order on June 8, 2015. ECF No 3 ¶ 1. Four months later,
in Interrogatory No. 5, dated October 28, 2015, Defendant
asked Plaintiff to identify all medical practitioners "from
whom [Plaintiff] ha[s] received consultation, treatment, and/
or examination *for any physical, mental, or emotional illness,
injury, or condition* from January 1, 2010, to the present,
list the address of each and their specialty of practice; and
describe briefly the reason for the service(s) and the date(s) on
which the service was provided." ECF No. 16, at 2 (emphasis
added). Requests for Production 1 and 3 sought corresponding
documents. Plaintiff's timely response to Interrogatory No. 5
was only this:

> Dr. Nitan Bawa, 155 Crystal
> Beach Drive, #121, Destin, FL;
> 850-424-7320; Area of Practice:
> Internal Medicine; Reason for
> services: he treated me for depression
> anxiety[,] and high blood pressure;
> Dates of service: During my last few
> months of employment.

ECF No. 22, at 3 n.2. Defendant inferred from this response
that Plaintiff was asserting that Defendant had caused that
harm and that harm caused Plaintiff to seek out Dr. Bawa's
treatment. ECF No. 22, at 2. But the record has no other
indication that Plaintiff was making that particular claim.

**\*2** At Defendant's request, Plaintiff signed a medical release
authorizing Defendant to obtain records from Dr. Bawa's
office directly with a subpoena. ECF No. 16. It appears that

Case 1:25-cv-21113-JAL   Document 37-4   Entered on FLSD Docket 09/09/2025   Page 14 of 126

Cameron v. Supermedia, LLC, Not Reported in Fed. Supp. (2016)

Defendant's subpoena went to Dr. Bawa on December 3, 2015, Defendant sent the release to Plaintiff on December 9, and Plaintiff sent back the signed release on December 15. Defendant says it got these records sometime in February 2016. ECF No. 22, at 2.

Defendant says those records show that Plaintiff had been seeing Dr. Bawa for much longer than the "few months" noted in her interrogatory response and that the initial visit to Dr. Bawa was to refill a prescription for two anti-anxiety medications. ECF No. 16, at 3. More specifically, Defendant elaborates (in its reconsideration motion) that the records show that Plaintiff saw Dr. Bawa as early as 2011, after she started working for Defendant but *before* the alleged harassment occurred. ECF No. 22, at 2. [2]

In further support of reconsideration, Defendant points to a February 12 email from Defendant's lawyer to Plaintiff's lawyer stating, in relevant part, the following:

> Jim, it appears that Cameron **lied** in her interrogatory responses about her health care providers. She disclosed only Dr. Bawa, but in her discussions with Bawa she states that she has another doctor in Tallahassee who she sees. Given her multiple problems and medications (anxiety, depression, insomnia, and apparent alcoholism) all of which were present before and during her employment by Dex, it appears to me that she's hiding something. Can you please discuss this with her and get us supplemented interrogatory responses identifying **all** her health care providers ASAP.

ECF No. 22-1, at 2. According to Defendant, Plaintiff's lawyer did not respond. But in response to the initial motion to compel, Plaintiff asserted that she provided an amended answer on February 23. ECF No. 20, at 3. That amended answer is not in the record. In its motion to compel Defendant stated that a March 25 amended answer was dated February 23. Defendant doesn't address the issue in its reconsideration motion.

In a deposition on February 26, 2016, Defendant questioned Plaintiff about her medical history. This is the only exchange in the record:

> A.   Well, it seems that the — my medical records, I didn't provide everything, but —
>
> Q.   Okay.
>
> A.   — I've addressed that since.
>
> Q.   Okay.  So we're missing — we're missing medical records from you.  Is there a reason why you didn't disclose the other — the — your medical providers in your interrogatory responses the first time?
>
> A.   They — they truly just slipped my mind.  I worked seven months in Tallahassee and six months in Destin, so I recalled my doctor — my primary care doctor that I had in Destin, but there are a few occasions, since I was away from home for so many months out of the year, that I had to go to a walk-in clinic in Tallahassee.
>
> Q.   Okay.  So other than — other than the missing medical provider information, is there any other information that you became aware of or recalled after the day you signed these responses that would in any way change or supplement the responses in this Exhibit 1?
>
> A.   Not that I'm aware of.

ECF No. 16-1, at 3. This exchange suggests that Plaintiff did submit an amended answer before the deposition. From its limited nature, this Court cannot say whether Defendant's lawyer inquired further about who treated Plaintiff for depression, anxiety, and high blood pressure, or when. Defendant says that it followed up on March 7 (email), March 11 (phone), and March 28 (email). ECF No. 16, at 5. Only the last of these is in this record (more on this later).

On March 25 a paralegal working for Plaintiff's lawyer provided Defense counsel with amended answers to interrogatories. ECF No. 22-2. Defendant says that Plaintiff listed additional medical providers but "failed to list any other medical provider who treated her for depression, anxiety, or high blood pressure." ECF No. 16, at 5. Defendant also says that in the amended answer Plaintiff maintained that she started seeing Dr. Bawa in the last few months of employment. ECF No. 16, at 5.

The email sending the amended answer is an exhibit to Defendant's reconsideration motion. ECF No. 22-2, at 3. The actual amended answer is not in the record. So it's hard to assess its quality. It's also unclear how Defendant was able to determine that whoever originally treated Plaintiff for these conditions was not included in the amended answer. In an email back to Plaintiff's lawyer's paralegal an hour later, Defendant's lawyer said this:

Case 1:25-cv-21113-JAL Document 37-4 Entered on FLSD Docket 09/09/2025 Page 15 of 126

Cameron v. Supermedia, LLC, Not Reported in Fed. Supp. (2016)

Hi Elizabeth –

Thank you for these. However, they do not appear accurate. Dr. Bawa's records begin with refilling Ms. Cameron's prescription for Xanax and Valium. These drugs had to be prescribed by a physician prior to Plaintiff's first visit with Dr. Bawa. Nothing in Plaintiff's amended interrogatory responses identifies a physician who would have prescribed those medications. Can you please contact Ms. Cameron and ask her who prescribed Xanax and Valium to her, and if she can provide us with the name and address of the health care professional in question.

Thanks!

ECF No. 22-2, at 2. On March 28, at 11:42 a.m., the paralegal wrote back the following:

She believes it may have been Dr. William Kerek who was her family doctor in Akron, Ohio.

**Address:** 75 Arch St #102, Akron, OH 44304
**Phone:**(330) 376-4445

**\*3** ECF No. 22-2, at 2. Less than an hour later, Defendant filed its motion to compel. ECF No. 16.

The relief Defendant requested was broad. Initially Defendant asked "to compel Plaintiff to turn over the names of **all** of her medical providers and to provide Defendant with the appropriate signed medical releases so that Defendant may obtain copies of Plaintiff's medical records." ECF No 16, at 1–2. Later, Defendant restated its request as this:

For the reasons set forth above, and after attempting to seek voluntary compliance, Plaintiff has failed to properly and adequately respond to Defendant's requests for production and interrogatories. As such, Defendant moves this Court to enter an order compelling Plaintiff to (i) identify the health care provider or providers who first treated her for anxiety and/or depression and/or first prescribed to her Xanax, Valium, and/or any other anxiety and/or depression medication; (ii) disclose the names of **all** health care providers who treated her from January 1, 2010, to the present; and (iii) immediately produce signed medical releases to Defendant so that Defendant may subpoena Plaintiff's medical records.

ECF No. 16, at 10.

This Court ordered Plaintiff to file an expedited response identifying what sort of damages she was claiming. ECF No. 19. Plaintiff responded that she was only seeking damages for "garden-variety" emotional distress. ECF No. 20, at 2.

Concerned with the broad scope of the inquiry and the lack of any attempt to narrow it, this Court denied the motion. ECF No. 21. Defendant moves for reconsideration. ECF No. 22.

II

Under Federal Rule of Civil Procedure 26(b)(1), the scope of discovery is "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." A court may issue an order "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense," which implicitly covers privacy interests. See Fed. R. Civ. P. 26(c).

The law governing discovery of a plaintiff's medical records for purposes of emotional distress damages in a case like this is, frankly, all over the map. This is a good summary of the issues:

> When it comes to these cases, courts frequently struggle with what Federal Rule of Civil Procedure applies to their production, the scope of the production, and privilege and waiver issues. Courts often conflate privilege/ waiver with relevancy, medical records with medical examinations, and generic medical records with mental-health-related medical records.

See Megan I. Brennan, *Scalpel Please: Cutting to the Heart of Medical Records Disputes in Employment Law Cases*, 41 Wm. Mitchell L. Rev. 992, 993 & n.4 (2015) (quotation omitted). [3] Most important here, "[c]ourts take vastly different views on what should fall within the substantive scope of discoverable medical records." *Id.* at 1012.

At the risk of stating the obvious, a claim for emotional distress damages (or its various synonyms) could involve a broad range of potential emotional or psychological injuries and physical manifestations of those conditions. What's discoverable depends on what's claimed. "The critical inquiry is the nature and severity of the claimed emotional harm." *See Flowers v. Owens*, 274 F.R.D. 218, 221 n.4 (N.D. Ill. 2011). The scope of that inquiry is "limited to whether, and to what extent, the alleged harassment caused [a plaintiff] to suffer emotional harm," and the defendant "may not engage in a fishing expedition by inquiring into matters totally irrelevant to the issue of emotional distress." *Bridges v. Eastman Kodak Co.*, 850 F. Supp. 216, 223 (S.D.N.Y. 1994). A defendant is entitled to production of medical records that have "a logical connection to the plaintiff's claims of injury." *St. John v. Napolitano*, 274 F.R.D. 12, 17 (D.D.C. 2011). A defendant

Case 1:25-cv-21113-JAL    Document 37-4    Entered on FLSD Docket 09/09/2025    Page 16 of 126

Cameron v. Supermedia, LLC, Not Reported in Fed. Supp. (2016)

is not automatically entitled to "full disclosure all plaintiff's medical records and unrestricted as to time or circumstance" simply because some level of emotional distress is claimed. *See Bottomly v. Leucadia Nat.*, 163 F.R.D. 617, 619 (D. Utah 1995); *see also Sandoval v. Am. Bldg. Maint. Indus., Inc.*, 267 F.R.D. 257, 266 (D. Minn. 2007); *St. Johns*, 274 F.R.D. at 16. The "contention that any physical malady might cause emotional distress ... scarcely gives defendants a license to rummage through all aspects of the plaintiff's life in search of a possible source of stress or distress." *See E.E.O.C. v. Nichols Gas & Oil, Inc.*, 256 F.R.D. 114, 123 (W.D.N.Y. 2009) (quotation omitted).

**\*4** At this Court's order, Plaintiff stated that she was seeking only "garden variety" emotional distress injuries. This is somewhat less specific than this Court had hoped for. That term, which this Court admittedly used in its previous order, is often used to distinguish claims for emotional distress which result in a waiver of the psychotherapist-patient privilege from those that don't result in a waiver. *Stevenson v. Stanley Bostitch, Inc.*, 201 F.R.D. 551, 555 (N.D. Ga. 2001). So far as this Court can tell, there is no claim of privilege in this case. But, apart from questions of privilege, cases discussing the concept are useful for evaluating relevance rather than privilege.

As one court has recognized, there is often a dispute about "what could grow in the garden." *Flowers*, 274 F.R.D. at 220. A plaintiff might only claim the harm of "negative emotions that she experienced essentially as the intrinsic result of the defendant's alleged conduct." *Santelli v. Electro-Motive*, 188 F.R.D. 306, 309 (N.D. Ill. 1999). This is "the distress that any healthy, well-adjusted person would likely feel as a result of being so victimized." *Kunstler v. City of New York*, No. 04CIV1145(RWS)(MHD), 2006 WL 2516625, at \*9 (S.D.N.Y. Aug. 29, 2006). With a claim so limited, medical records concerning other potential causes for emotional distress have only marginal relevance, if any, to the issue of damages. *See Womack v. Wells Fargo Bank, N.A.*, 275 F.R.D. 571, 573 (D. Minn. 2011); *Kennedy v. Cingular Wireless, LLC*, No. 206-cv-0975, 2007 WL 2407044, at \*2 (S.D. Ohio Aug. 20, 2007); *Sanders v. D.C.*, No. CIV.A. 97-2938(PLF), 2002 WL 648965, at \*5 (D.D.C. Apr. 15, 2002); *Fritsch v. City of Chula Vista*, 187 F.R.D. 614, 634–635 (S.D. Cal. 1999).[4]

Up the scale are more significant claims of emotional distress resulting from a defendant's conduct, say, depression, anxiety, or high blood pressure. The primary case cited by Defendant,

*Crawford v. Babbitt*, 186 F.3d 1322 (11th Cir. 1999), stands for the unremarkable point that if a plaintiff claims that a defendant caused emotional distress, then records tending to prove that claim (or the lack of them) might be relevant. *Id.* at 1327.[5] Medical records bearing specifically on the physical or mental manifestations of emotional distress which a plaintiff claims to be suffering as a result of the defendant's conduct are relevant. *See Sandoval, Inc.*, 267 F.R.D. at 269. Discoverable information also includes the identities of medical providers which the plaintiff has seen in the subject time frame for diagnosis or treatment for mental, emotional and psychological issues, regardless of the cause, physical manifestations of those issues, and corresponding documents or testimony not subject to privilege. *See*, *e.g.*, *Holter v. Wells Fargo & Co.*, 281 F.R.D. 340, 343 (D. Minn. 2011); *Kersten v. Old Dominion Freight Line, Inc.*, No. CIV. 11-1036 DSD/JSM, 2011 WL 5373777, at \*2 (D. Minn. Nov. 1, 2011).[6] This is because "a plaintiff should not be permitted to put before the factfinder only those aspects of claimed emotional harm and similar intangible harms that favor his or her position, without revealing that plaintiff already had some preexisting problems that could cast a cloud on the issue of causation." *Puglisi v. Centerpoint Properties*, No. 05C6592, 2008 WL 410636, at \*5 (N.D. Ill. Feb. 13, 2008).[7] But it "cuts both ways ... the aggravation of a preexisting ailment or condition may be taken into account in determining damages." *Id.*[8] Putting aside discoverability, in this Court's experience, folks that try to ride that tiger in front of a jury sometimes end up inside. With that framework in mind, this Court turns back to this case.

## III

**\*5** It's rare to find a legitimate discovery dispute that has but one cause. More often it's a chain of events which ultimately leads to a waste of time and effort. This case is not the rare exception.

For starters, Defendant missed the point of the initial scheduling order by waiting four months to make a discovery request. Ideally, Defendant would have begun by asking Plaintiff to describe what kind of emotional distress damages she was claiming and then made narrowly tailored discovery requests justifiable in time and circumstance to the facts of the case. *See Brennan*, *supra*, at 1024. That would have allowed Defendant to ascertain whether Plaintiff was claiming that Defendant caused her depression, anxiety,

high blood pressure, or other conditions or symptoms, and then make additional discovery requests. Defendant had it backwards, first asking that Plaintiff identify every health care provider for the past five years, and making Requests for Production 1 and 3, which sought corresponding documents. For this kind of case those requests overreach.

For her part, Plaintiff didn't make timely objections to those requests to limit properly their reach. Instead, with the assistance of counsel, she chose to simply respond as though the requests were narrowed in some way. This "just answer to avoid a fight" response is perhaps understandable though not acceptable—it puts the goal of discovering relevant evidence fairly and efficiently farther out of reach. With that said, this Court is more likely to excuse a failure to make a timely objection if the objection is well taken and where the information sought raises privacy concerns, such as medical records.

Another good point is that parties "should try to avoid taking unjustified extreme positions." *See* Brennan, *supra*, at 1031. Some might have suspected Plaintiff's approach, not assumed that a few months of treatment for certain conditions related to emotional distress by one doctor was the whole of a person's five-year medical history, and clarified with opposing counsel as needed. When Defendant got those medical records and it became known that Plaintiff's answer was inaccurate, it looks like Defendant wasn't primarily interested in focusing the request on what matters. From Defendant's representations, it seems that Plaintiff might have failed to say when and where her treatment began, didn't accurately disclose the full time frame of the treatment, or say that she had seen another doctor while on the road. Whether the conclusion that the person "**lied**" is the most likely one is debatable. But Plaintiff probably knew from her lawyer that the records would be turned over to the other side. Instead of making a tailored request Defendant insisted that Plaintiff identify "*__all__*" of her healthcare providers in an apparent effort to find what she was "hiding." Defendant may have caught more flies with honey.

If it wasn't explicit from the previous order, this Court denied the motion to compel because the question actually asked (identify all health care providers and authorize release of records) was overbroad and the record did not disclose that the potentially relevant question (identify which doctor initially prescribed medication for anxiety and depression) had ever been put to Plaintiff.

**\*6** In support of reconsideration, Defendant has now established that it *did* put that question to Plaintiff—in an email to Plaintiff's lawyer's paralegal less than an hour before Defendant filed its motion to compel. That's probably not the best way to make or narrow a discovery request. Nor is it the sort of meaningful conference that the local rules require before bringing a motion to compel. *See* N.D. Fla. Loc. R. 7.1(B) ("An email or other writing sent at or near the time of filing the motion is not a meaningful conference"). And if it turns out that whichever doctor initially prescribed that medication only did so before January 1, 2010, then it's not covered by Interrogatory No. 5 at all and Defendant has no right to compel an answer.

In its reconsideration motion, Defendant says that it "seeks only those records that relate directly to Plaintiff's prior treatment for emotional distress and other psychological issues" presumably back to January 1, 2010. ECF No. 22, at 5. A lingering problem is that neither party ever really explained to this Court what sort of emotional distress Plaintiff claims that Defendant caused her to suffer. If Plaintiff is claiming that Defendant caused her depression, anxiety, high blood pressure, or a similar condition, then, so narrowed, Defendant's request is appropriate. And Defendant's failure to ask the right follow-up question before is partly excused by Plaintiff's failure to respond appropriately to the initial question.

The result is this. If Plaintiff only means to assert a claim for emotional distress limited to the normal embarrassment and humiliation from harassment or losing her job; that is, damages intrinsic to Defendant's conduct, then Plaintiff must so inform Defendant. If Plaintiff makes that choice, she "will be precluded at trial from introducing the fact or details of her treatment; she may not offer evidence through any witness about symptoms or conditions that she suffered (*e.g.,* [depression, anxiety, and high blood pressure] ) and she will not be permitted to offer any evidence regarding a medical or psychological diagnosis." *See Santelli,* 188 F.R.D. at 309.

If Plaintiff means to assert a claim for a more significant emotional or psychological injury, she must provide an amended answer to Interrogatory No. 5 identifying, to the extent she is able to do so, those medical providers which she has seen for diagnosis or treatment for mental, emotional and psychological issues, regardless of the cause, from January 1, 2010, to the present, and physical manifestations of those issues. She must also produce corresponding records within her possession, custody or control.

This order doesn't require Plaintiff to execute medical releases for her medical records. A reasonable argument might be made that medical records are in a person's "control" under Rule 34. Some courts have required persons to sign a medical release. But there is nothing in the Federal Rules of Civil Procedure that expressly authorizes this Court to compel Plaintiff to sign a release authorizing disclosure of her medical records. *See* Fields v. W. Va. State Police, 264 F.R.D. 260, 263 (S.D.W. Va. 2010); *see also* Graham v. Witalec, No. 5:10cv65, 2011 WL 1335808, at *1 (N.D. Fla. Apr. 7, 2011). The practice of providing releases between the parties is more a matter of convenience to simplify the discovery process. [9] This Court declines to order Plaintiff to do so without a meaningful discussion of the issue. It may make no difference, because Plaintiff apparently doesn't object to signing a release. ECF No. 20, at 6.

## IV

**\*7** Defendant also sought to extend the discovery period for several reasons, to extend the deadline for filing summary-judgment motions, and to move the trial date. ECF No. 17. Primarily Defendant pointed to the medical discovery it sought to obtain from Plaintiff and her medical providers. As this Court denied the motion to compel, this was no reason to extend the discovery period.

Additionally, Defendant pointed to Plaintiff's request to depose five non-party witnesses. Plaintiff opposed enlargement. So this Court concluded that she no longer wished to depose these witnesses. This Court denied the motion to change all those deadlines.

Defendant asks for reconsideration of this ruling as well. ECF No. 22. Regarding the medical records, within three days of Plaintiff serving an amended answer to Interrogatory No. 5, if any, Defendant may issue a subpoena to any medical providers identified by Plaintiff with a medical release authorization, should Plaintiff choose to provide one. If Plaintiff does not provide such an authorization, this Court will entertain a request for an appropriate order within the same time period. This Court will also entertain a motion to extend the discovery period for the purpose of deposing Plaintiff or a medical provider about those medical records produced, if any. This medical discovery apparently relates only to emotional distress damages, so it should not impact summary judgment or the trial date.

This Court declines to extend the discovery period for the purpose of deposing the other five witnesses at this time. Though the record is unclear it suggests—and Defendant's initial motion to extend cites as justification, ECF No. 17 ¶ 6—that Plaintiff requested these depositions, or at least the date. The depositions were scheduled for March 2016, the last month of discovery. Defendant canceled on five days' notice. Plaintiff's lawyer was unavailable for the dates Defendant proposed later that month.

Now, on reconsideration, Defendant asserts that it's been "denied the ability to depose several key fact witnesses prior to the close of discovery." ECF No. 22, at 6. This Court can't say who these witnesses are or whether they are important. And perhaps Defendant sought to depose these witnesses all along and accommodated Plaintiff's requested schedule. Defendant should not be penalized if Plaintiff wanted to wait until the end of discovery for depositions. But this Court can't make that finding on this record either. As there is no good cause shown, the discovery period will not be extended for that purpose at this time.

Accordingly,

**IT IS ORDERED:**

1. Defendant's motion for reconsideration, ECF No. 22, is **GRANTED** in part and **DENIED** in part.

2. On or before April 25, 2016, Plaintiff must serve Defendant with either (a) a statement limiting her emotional distress damages; or (b) an amended answer to Interrogatory No. 5 and production of corresponding documents which are within her possession, custody, or control. Within three days of the service of those documents, Defendant may issue appropriate subpoenas or apply for a court order to obtain medical records.

3. On or before April 25, 2016, the parties must confer and file a status report stating whether they stipulate to an amendment to the complaint to correct Defendant's name.

**SO ORDERED on April 19, 2016.**

## All Citations

Not Reported in Fed. Supp., 2016 WL 1572952

---

### Footnotes

1    Defendant suggests that it is incorrectly named in the amended complaint. *E.g.*, ECF No. 22, at 1 n.1. The parties need to confer and file a status report stating whether they stipulate to an amendment to correct Defendant's name.

2    None of these records are in the record of this case.

3    This Court has found Professor Brennan's article very useful in considering this issue.

4    Medical records may of course be relevant for reasons other than emotional distress damages. *See, e.g.*, *Barlow v. Dupree Logistics, LLC*, No. CIV.A. 1:14-BE-1808, 2015 WL 4646812, at *4 (N.D. Ala. Aug. 5, 2015).

5    For example, in *Crawford* the plaintiff claimed that harassment "upset" her and the stress of the harassment led to a bleeding ulcer and other physical problems for which she had seen a doctor, but declined to produce substantiating records to the agency considering that claim. 186 F.3d at 1324.

6    Some courts also allow discovery of medical records concerning other conditions that "the defendant has established, through other discovery, may have caused the plaintiff emotional distress." *St. Johns*, 274 F.R.D. at 17. This Court will address a discovery request of that nature if and when it becomes necessary to do so.

7    The *Puglisi* court was considering admissibility not discoverability, but the point is the same in either context.

8    As noted, there is no claim of privilege in this case. So this Court does not decide any issue of waiver. But a useful starting point might be *Stevenson v. Stanley Bostitch, Inc.*, 201 F.R.D. 551 (N.D. Ga. 2001), where the court said that a litigant places his mental condition in controversy—and thus waives the psychotherapist-patient privilege "when one or more of the following factors are present: (1) a tort claim is asserted for intentional or negligent infliction of emotional distress; (2) an allegation of a specific mental or psychiatric injury or disorder is made; (3) a claim of unusually severe emotional distress is made; (4) plaintiff intends to offer expert testimony in support of claim for emotional distress damages; and/or (5) plaintiff concedes that her mental condition is in controversy within the meaning of Rule 35." *Id.* at 554.

9    If a party refuses to sign a release for discoverable medical records, a requesting party must comply with the procedures set forth in the Health Insurance Portability and Accountability Act ("HIPAA") and implementing regulations, in particular 45 C.F.R. § 164.512(e)(1)(i). A court order under that provision would issue from this Court. *See* Fed. R. Civ. P. 45(a)(2).

---

**End of Document**     © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# 3:21-CV-2080-D

2022 WL 1470957
Only the Westlaw citation is currently available.
United States District Court, N.D. Texas, Dallas Division.

Grinda COLEMAN, Plaintiff,
v.
CEDAR HILL INDEPENDENT SCHOOL DISTRICT, Defendant.

Civil Action No. 3:21-CV-2080-D
|
Signed 05/10/2022

**Attorneys and Law Firms**

N. Sue Allen, Allen Law Firm, Fort Worth, TX, for Plaintiff.

Katie Anderson, Elizabeth Fitzgerald Griffin, Jin Seock Shin, Clark Hill PLC, Dallas, TX, Robert Price Anderson, Fort Worth, TX, for Defendant.

MEMORANDUM OPINION AND ORDER

SIDNEY A. FITZWATER, SENIOR JUDGE

**\*1** In this removed action, plaintiff Grinda Coleman ("Coleman") sues her former employer, defendant Cedar Hill Independent School District ("CHISD"), alleging claims under the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq., Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 794, Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 et seq., and chapter 21 of the Texas Labor Code (the Texas Commission on Human Rights Act), Tex. Lab. Code Ann. §§ 21.001-21.556. CHISD now moves to compel Coleman to amend her responses to CHISD's requests for production ("RFPs"), to produce documents in response to its RFPs, and to sign authorizations allowing CHISD to obtain Coleman's medical and employment records. Coleman opposes the motion. For the reasons that follow, the court grants in part and denies in part CHISD's motion to compel and denies CHISD's request for expenses related to the motion to compel.

I

In 2016, while Coleman was employed as a teacher at CHISD, she began experiencing symptoms related to osteopenia, which affected her musculoskeletal system and made it difficult for her to walk to her classroom. In March 2018 CHISD approved Coleman's request for a leave of absence under the FMLA so that Coleman could receive a total knee replacement. When CHISD discovered that Coleman would not be released to return to work at the beginning of the next school year, CHISD informed her that she had exhausted her FMLA leave. Despite denying her additional FMLA leave, CHISD approved Coleman for Temporary Disability Leave ("TDL"). While Coleman was on TDL, CHISD filled her teaching position on September 12, 2018. Coleman alleges that CHISD also refused to restore her to a comparable position within the district,

despite the fact that she applied for multiple open teaching positions. In February 2019 Coleman resigned from CHISD and began working for the Dallas Independent School District ("DISD").

Coleman filed this lawsuit in state court in April 2020, and CHISD removed the case to this court based on federal question and supplemental jurisdiction. After removal, the court granted Coleman leave to file an amended complaint. In her amended complaint, Coleman seeks compensatory damages in the form, *inter alia*, of lost wages, front pay, vacation pay, and other benefits; damages for past and future pain and suffering; damages for past and future mental anguish; punitive damages; injunctive relief; and attorney's fees and costs.

CHISD now moves to compel Coleman to (1) sign an authorization for the release of her medical records; (2) sign an authorization for the release of her employment records; (3) produce all documents responsive to CHISD's RFPs Nos. 17-19 and 30-33; and (4) supplement her response to CHISD's RFPs to specify whether she is withholding responsive documents based on her objections. CHISD also requests that the court award it attorney's fees and costs associated with preparing the instant motion to compel. Coleman opposes the motion, contending that her objections are proper and that she has produced all relevant documents that are in her possession. The court is deciding the motion on the briefs.

## II

**\*2** Under Fed. R. Civ. P. 26(b)(1), "[u]nless otherwise limited by court order ... [p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case...." A litigant may request the production of documents falling "within the scope of Rule 26(b)" from another party if the documents are in that party's "possession, custody, or control." Rule 34(a)(1). And, under Rule 37(a)(3)(B), "[a] party seeking discovery may move for an order compelling an answer, designation, production, or inspection" when the party from whom discovery is sought fails to produce requested documents or respond to an interrogatory or request for admission.

As the party opposing CHISD's motion to compel, Coleman bears the burden of proof. In the Fifth Circuit, "a party who opposes its opponent's request for production [must] 'show specifically how ... each [request] is not relevant....' " *Merrill v. Waffle House, Inc.*, 227 F.R.D. 475, 477 (N.D. Tex. 2005) (Lynn, J.) (second alteration in original) (quoting *McLeod, Alexander, Powel & Apffel, P.C. v. Quarles*, 894 F.2d 1482, 1485 (5th Cir. 1990)); *see also Orchestratehr, Inc. v. Trombetta*, 178 F.Supp.3d 476, 506 (N.D. Tex. 2016) (Horan, J.) ("[T]he amendments to Rule 26(b) and Rule 26(c)(1) do not alter the basic allocation of the burden on the party resisting discovery to—in order to successfully resist a motion to compel—specifically object and show that the requested discovery does not fall within Rule 26(b)(1)'s scope of relevance (as now amended) or that a discovery request would impose an undue burden or expense or is otherwise objectionable." (citations omitted)).

## III

The court first considers CHISD's motion to compel Coleman to supplement her responses to specify whether she is withholding any responsive documents based on her objections.

CHISD contends that Coleman has several objections to its discovery requests, but she has failed to state whether she is withholding documents based on these objections. The court agrees with CHISD that a party objecting to discovery must state whether any responsive materials are being withheld based on that objection. *See* Rule 34(b)(2)(C) ("An objection must state whether any responsive materials are being withheld on the basis of that objection."); *U.S. Risk, LLC v. Hagger*, 2022 WL 209746, at *3 (N.D. Tex. Jan. 24, 2022) (Godbey, J.) (ordering defendant to supplement discovery responses to specify "whether he is actually withholding any responsive information or documents based on his objections"). Here, some of Coleman's responses to CHISD's RFPs do not specify whether she is withholding documents based on her objections.

Accordingly, the court orders Coleman to review her objections to CHISD's RFPs and to amend her responses as needed to

affirmatively state whether she is withholding any responsive information or documents based on her objections. Coleman must file her amended response within 21 days of the date of this memorandum opinion and order.

IV

The court turns next to CHISD's request that the court compel Coleman to sign authorizations for the release of her medical and employment records.

A

Although the Fifth Circuit has held that a party is not required to sign an authorization to release medical records appended to Rule 33 interrogatories, the court has also suggested in *dicta* that such an authorization may be requested under Rule 34. *See McKnight v. Blanchard*, 667 F.2d 477, 481-82 (5th Cir. 1982) (holding that plaintiff was not required to sign the form and explaining that "the documents or authority to copy them could have been obtained by a request under Rule 34," and that it was "quite possibl[e] (since [the plaintiff's] physical condition was put at issue by his demands) the court upon proper motion could have ordered him to sign such an authorization"). As both parties acknowledge, since *McKnight* was decided, district court decisions in this circuit have split as to the question whether a party may be required to sign an authorization for the release of medical, employment, or other records pursuant to Rule 34. *See Mir v. L-3 Commc'ns Integrated Sys., L.P.*, 319 F.R.D. 220, 227-29 (N.D. Tex. 2016) (Horan, J.) (describing split and collecting cases).

**\*3** Other judges of this district have concluded that a court may compel parties to sign written releases or authorization forms consenting to the production of various documents. *See, e.g., EEOC v. L-3 Commc'ns Integrated Sys., LP*, 2018 WL 3548870, at \*3 (N.D. Tex. July 24, 2018) (Godbey, J.) ("[T]he Court agrees with *Mir* that written authorizations for release may be compelled under Rule 34 because they compel parties to disclose documents that are within their control."); *Mir*, 319 F.R.D. at 229 ("[T]he Court is persuaded to fall in with this second camp of courts that conclude that Rule 34, along with Rule 37, empowers courts to compel parties to sign written releases or authorization forms consenting to the production of various documents."). The court agrees that written authorizations for release of records that otherwise comply with the limits of Rule 26(b) may be requested under Rule 34 and their production compelled under Rule 37. *See S.E.C. v. Cuban*, 798 F.Supp.2d 783, 788 (N.D. Tex. 2011) (Fitzwater, C.J.) ("[T]he undersigned invariably gives serious and respectful consideration to the decisions of other judges of this court on questions of law—and typically follows them because they are usually correct and because predictability in such matters is desirable....").

B

Having decided that Coleman can be required to sign the authorizations, the court now determines whether the authorizations proposed by CHISD are relevant and proportional, as Rule 26(b) requires.

1

With respect to the authorization to release medical records, Coleman maintains that she is willing to sign an authorization that is limited in scope to her physical impairments and restricted by time to records before February 2019. CHISD contends that the medical records authorization is appropriately tailored to the needs of this case because Coleman seeks not only damages related to her physical impairments but also past and future mental anguish.

The court agrees with CHISD that the medical records authorization is relevant and proportional to the needs of this case. CHISD has already limited the authorization so that it can only obtain medical records dating back to January 1, 2016. Given that Coleman pleads that she began experiencing physical symptoms in 2016 and also seeks both past and future damages for her pain and suffering and mental anguish, an authorization to release medical records giving CHISD access to Coleman's medical records from January 1, 2016 to the present is within the scope of Rule 26(b). *Cf. Garza v. AAA Cooper Transp.,* 2021 WL 3777739, at *5 (S.D. Tex. May 18, 2021) (requiring plaintiff to sign authorization to release medical records, but limiting the time period of the authorization because defendant's request was overbroad); *L-3 Commc'ns Integrated Sys.,* 2018 WL 3548870, at *3 (limiting authorization for release of medical records to date that employee began working for defendant).

The court also rejects Coleman's contention that CHISD should only be authorized to obtain medical records related to her *physical* impairment. Coleman has placed her medical records related to her *mental* health at issue by seeking mental anguish damages. Because Coleman has not amended her complaint to remove her claims for mental anguish damages, medical records related to her mental anguish are relevant to this case. *See Merrill v. Waffle House, Inc.,* 227 F.R.D. 467, 472-74 (N.D. Tex. 2005) (Ramirez, J.) (overruling objection to RFP requesting that plaintiffs execute an authorization to release medical records and collecting cases in which courts found that medical records were relevant to claims of mental anguish in discrimination cases); *see also Clewis v. Medco Health Sols., Inc.,* 2013 WL 5354574, at *3 (N.D. Tex. Sept. 25, 2013) (Horan, J.) ("[T]he undersigned notes that medical records relating to Plaintiff's alleged bipolar condition—the disability that Plaintiff put at issue in her lawsuit—are certainly relevant to this litigation.").

The court therefore grants CHISD's motion to compel Coleman to sign its proposed authorization for release of medical records. Coleman must sign and deliver the authorization within 21 days of the date of this memorandum opinion and order.[2]

2

**\*4** With respect to CHISD's request for authorization to obtain employment records, Coleman maintains that she will not sign the release because CHISD has not explained what additional documents it needs from her personnel files. CHISD contends that the limited and redacted documents that Coleman has produced are insufficient, and that the release seeks documents that are relevant to this case because they could reveal, *inter alia,* whether Coleman undertook non-teaching jobs while she was waiting to return to CHISD.

The court holds that CHISD is entitled to compel Coleman to sign an authorization to release employment records, but that the release CHISD proposes is not proportional to the needs of this case. The release CHISD proposes is not time-limited and would allow CHISD to obtain employment records from any of Coleman's previous employers. This proposed release is overbroad because Coleman's employment history prior to her initial request for FMLA leave informs neither her damages calculation nor whether she attempted to mitigate her damages. *See Garza,* 2021 WL 3777739, at *3-4 (limiting scope of employment records authorization form to the date plaintiff began working for defendants to present); *Tijerina v. Guerra,* 2020 WL 1663181, at *11 (S.D. Tex. Apr. 1, 2020) (denying motion to compel with respect to authorization to release employment records that was "virtually unlimited in time and scope," but ordering plaintiff to execute an authorization that contained a limited time frame); *Zamora v. GC Servs., LP,* 2016 WL 8853096, at *5 (W.D. Tex. Aug. 19, 2016) (granting motion to compel plaintiff to sign authorization to release employment records that was limited to employers subsequent to plaintiff's employment with defendant). Accordingly, on the condition that CHISD restricts the scope of the requested release to employment records from March 5, 2018 to the present, the court grants CHISD's motion to compel with respect to the authorization to release employment records.

V

The court next considers CHISD's request that the court compel Coleman to produce documents in response to its RFPs Nos. 17-19 and 30-33.

A

RFPs Nos. 30-32 request that Coleman produce documents that are likely duplicative of the documents CHISD can obtain via the signed authorization to release medical records that the court allows today. This is so because these RFPs seek the production of treatment and billing records related to Coleman's medical and mental condition: documents within the scope of the authorization to release medical records. Accordingly, the court denies without prejudice CHISD's motion to compel with respect to RFPs Nos. 30-32. If CHISD can demonstrate that certain documents cannot be obtained via the authorization to release medical records, it may request that Coleman produce these specific additional documents.

B

RFPs Nos. 18, 19, and 33 request that Coleman produce documents that are likely duplicative of the documents that CHISD will be able to obtain via the signed authorization to release employment records. In particular, RFPs Nos. 18 and 19 ask that Coleman produce all documents reflecting her income and benefits from March 1, 2019 to present. And RFP No. 33 requests that Coleman "produce all documents relating to your employment records with [DISD], including without limitation your application, offer letter, salary, and benefits." D. Br. 23. Because CHISD's employment records release includes pre-employment records, personnel files, and wage and payroll information, it appears that it would be redundant to compel Coleman to both produce these documents and to sign the authorization to release her employment records. Accordingly, the court denies without prejudice CHISD's motion to compel with respect to RFPs Nos. 18, 19, and 33. If CHISD can demonstrate that certain documents cannot be obtained via the authorization to release employment records, it may request that Coleman produce these specific additional documents.

C

**\*5** RFP No. 17, however, does not request documents that are duplicative of the ones that CHISD can request via the authorization to release employment records because it requests documents related to potential employers, including job applications. RFP No. 17 requests that Coleman "produce all documents you sent to or received from potential employers from March 1, 2019 ... including without limitation job applications or job resumes, letters, emails and internet postings." D. Br. 20. CHISD argues that these documents are discoverable because they relate directly to whether Coleman attempted to mitigate her damages by seeking substantively-similar employment. Coleman objects to this request, contending that she is not seeking damages after February 2019, when she began substantially similar employment with DISD. Coleman also asserts that there are no responsive documents to this request.

It is unclear whether Coleman has affirmatively limited her damages to the period prior to March 2019. Some language in Coleman's amended complaint suggests that her damages are limited to "benefits illegally withheld from the date of Plaintiff's termination until the date the Plaintiff is tendered substantially equivalent employment...." Am. Compl. 9 ¶ A. But she also seeks compensatory damages "accrued at the time of the filing of this petition until the date of judgment." *Id.* Given the ambiguity in Coleman's amended complaint, the court overrules her objection, in which she contends that this RFP is not relevant to the claims or defenses of the parties in this suit.

Coleman also responded, however, that there are no documents responsive to this request. "[A] party cannot produce what it does not have, and so, [c]learly, the court cannot compel [a party] to produce non-existent documents." *VeroBlue Farms USA Inc. v. Wulf*, —— F.R.D. ——, at \*—— (N.D. Tex. Nov. 8, 2021) (Horan, J.) (second and third alterations in original) (quoting *Lopez v. Don Herring Ltd.*, 327 F.R.D. 567, 598 (N.D. Tex. 2018) (Horan, J.)). But, if no responsive documents exist, Coleman's responses must be sufficiently detailed so that the court can determine whether she has made a reasonable inquiry and has exercised due diligence, as Rule 26(g)(1)requires. *See Lopez*, 327 F.R.D. at 578 (explaining that "if no

responsive documents or tangible things exist ... the responding party should so state with sufficient specificity to allow the Court to determine whether the party made a reasonable inquiry and exercised due diligence" (citation omitted) (quoting *Heller v. City of Dallas*, 303 F.R.D. 466, 485 (N.D. Tex. 2014) (Horan, J.))). Coleman's response to RFP No. 17 is conclusory and does not allow the court to determine whether she has made a reasonable inquiry and has exercised due diligence.

Accordingly, consistent with the court's discussion above, Coleman must revisit her objection to RFP No. 17 and determine whether any responsive documents are being withheld on the basis of the objection. If no responsive documents exists, Coleman must state this in her updated responses, with sufficient specificity. Assuming Coleman does so and no responsive documents are being withheld, CHISD's motion to compel with respect to RFP No. 17 is denied.

VI

Finally, the court turns to CHISD's request for attorney's fees and costs associated with its motion to compel.

Under Rule 37(a)(5)(A), if a motion to compel is granted,

> the court must, after giving an opportunity to be heard, require the party ... whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees. But the court must not order this payment if: (i) the movant filed the motion before attempting in good faith to obtain the disclosure or discovery without court action; (ii) the opposing party's nondisclosure, response, or objection was substantially justified; or (iii) other circumstances make an award of expenses unjust.

**\*6** In view of such factors as the split in authority as to whether a party can request authorizations to release records under Rule 34, the duplicative nature of some of CHISD's RFPs with respect to documents that it can obtain via the authorizations, and Coleman's response that she is not withholding any responsive documents with respect to RFP No. 17, the court finds that Coleman's nondisclosure, response, and objection was substantially justified. *See L-3 Commc'ns Integrated Sys.*, 2018 WL 3548870, at \*4 (declining to award expenses under Rule 37(a)(5)(A) because, in light of the split in authority over whether a party can obtain authorizations to release records under Rule 34, plaintiff was substantially justified in opposing defendant's motion to compel); *Abrego v. Budget Truck Rental, LLC*, 2018 WL 6220163, at \*3 (W.D. Tex. Apr. 23, 2018) ("The Court finds that, given the divided authority regarding whether Rule 34 can be used to compel a responding party to execute a medical records release form, Plaintiff's opposition to that request was substantially justified and no award of expenses is appropriate in connection with this request.").

\* \* \*

For the reasons explained, the court grants in part and denies in part CHISD's motion to compel, and denies CHISD's request for attorney's fees and costs. Coleman must comply with this memorandum opinion and order according to the dates specified herein.

**SO ORDERED**.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 1470957

Footnotes

1    The parties previously disagreed about how the RFPs should be numbered. For clarity, the court will refer to the RFPs as the parties do in their briefing related to the instant motion.

Coleman v. Cedar Hill Independent School District, Not Reported in Fed. Supp. (2022)

[2]     After the briefing on this motion was completed, the Supreme Court decided *Cummings v. Premier Rehab Keller, P.L.L.C.*, ——— U.S. ———, 142 S.Ct. 1562, ——— L.Ed.2d ——— (U.S. Apr. 28, 2022), holding, in pertinent part, that emotional distress damages are not recoverable under the Rehabilitation Act, *id.* at *10. Because Coleman's claims are not limited to the Rehabilitation Act, *Cummings* does not alter the court's analysis as it relates to her other claims.

---

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

---

# CV512–005

2015 WL 510134
Only the Westlaw citation is currently available.
United States District Court,
S.D. Georgia,
Waycross Division.

## Timothy CUPP and Kathy Cupp, Plaintiffs,
v.
## UNITED STATES of America, Defendant.

Civil Action No. CV512–005.
|
Signed Feb. 6, 2015.

**Attorneys and Law Firms**

John Thomas Clarkson, U.S. Attorney's Office, Savannah, GA, Shannon Heath Statkus U.S. Attorney's Office, Augusta, GA, for Defendant.

*ORDER*

R. STAN BAKER, United States Magistrate Judge.

**\*1** Presently before the Court is Defendant's Motion to Compel seeking a Court order requiring Plaintiffs to provide complete responses to Defendant's discovery requests. (Doc. 75.) For reasons set forth below, Defendant's Motion in **GRANTED IN PART AND DENIED IN PART.**

## BACKGROUND

Plaintiffs filed this action under the Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671–80 (2014), against Defendant on January 19, 2012. (Doc. 1, p. 1.) Plaintiffs allege that Plaintiff Timothy Cupp ("Mr.Cupp") suffered injuries to his lower back when a National Guardsman operating a forklift as part of a Federal Emergency Management Agency project allegedly drove the forklift into Mr. Cupp. (Doc. 16, pp. 1–2.)

This action is set for trial before the Honorable Chief Judge Lisa Godbey Wood on February 11, 2015. (Doc. 68, p. 1.) At a pretrial conference on November 14, 2014, the Court reopened discovery through January 31, 2015. (Doc. 68, p. 1.) Defendant then served Plaintiffs with supplemental interrogatories and supplemental requests for production of documents. (*See* Doc. 75, p. 1.) Therein, Defendant requested information and documentation regarding Mr. Cupp's medical condition and treatment as well as documentation of lost wages. (Doc. 75, pp. 2–3.)

On January 15, 2015, Defendant filed the instant Motion to Compel arguing that despite numerous correspondences from Defendant, Plaintiffs had largely failed to respond to the supplemental interrogatories and requests for production. (*See id.* at p. 3.) On January 27, 2015, Plaintiffs responded that they had responded to the supplemental interrogatories and requests for production and that Plaintiffs' Motion, therefore, should be denied. (Doc. 79, p. 1.) Plaintiffs did not argue that the supplemental interrogatories were objectionable or that they otherwise were not obligated to respond to the discovery requests. (*See id.*) Plaintiffs did ask the Court to sanction Defendant and place the Motion under seal, because Defendant filed, as an attachment to its Motion, a document displaying Mr. Cupp's social security number and birth date. (*Id.*)

On January 28, 2015, Defendant filed a Reply withdrawing its Motion as to certain discovery requests because Plaintiffs had subsequently responded to those requests. (Doc. 83, p. 2.) Defendant's counsel apologized for having failed to redact Mr. Cupp's social security number and birth date from the filed exhibit and assured the Court that the document containing confidential information had since been placed on restricted access. (*Id.* at p. 1 & n. 1.) However, Defendant disagreed that Plaintiffs had fully responded to Defendant's Supplemental Requests for Production of Documents and reiterated its requests that Plaintiffs provide the requested information and documentation. (*Id.* at pp. 2–3.) The Court addresses these discovery requests as well as Plaintiffs' request for sanctions for the release of confidential information in turn.

**DISCUSSION**

**I. Defendant's Discovery Requests**

**\*2** Federal Rule of Civil Procedure 26 provides that a party may obtain discovery of "any nonprivileged matter that is relevant to any party's claim or defense." Fed.R.Civ.P. 26(b)(1). Upon a showing of good cause, a court may order discovery of "any matter relevant to the subject matter involved in the action." *Id.* Relevant information "need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." *Id.* The court, however, must limit discovery when (1) "the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive"; (2) "the party seeking discovery has had ample opportunity to obtain the information"; or (3) "the burden or expense of the proposed discovery outweighs its likely benefit." Fed.R.Civ.P. 26(b)(2) (C).

In its Reply, Defendant states that the only discovery issues remaining before the Court involve its requests for the production of the following: (1) Mr. Cupp's medical records; (2) an authorization for Defendant to obtain Mr. Cupp's medical records from his health care providers ("HIPAA authorization"); and (3) copies of Mr. Cupp's W–2 forms submitted to the Internal Revenue Service ("IRS") during a ten-year period. (Doc. 83, p. 2); *see also* Health Insurance Portability and Accountability Act of 1996, Pub.L. No. 104–191, 110 Stat.1936 (1996) ("HIPAA"). The Court rules as follows:

**A. Mr. Cupp's Medical Records**

Defendant's First Supplemental Request for Production Number One sought

all records, charts, reports, statements, bills, radiological film, documents or other tangible items concerning any medical examination or treatment performed by the individuals and providers identified in [Plaintiffs'] responses to Supplemental Interrogatory Nos. 1 and 2, including, but not limited to, any records, charts, reports, statements, bills, radiological film, documents or other tangible items concerning the treatment or condition of [Mr.] Cupp's neck, back, or legs (including knees, ankles, or feet).

(Doc. 75, p. 2.) Plaintiffs' Responses to Defendant's First Supplemental Requests for Production stated that they "di[d] not have any of those records other than a copy of a deposition taken in [another action] in this Court." (Doc. 79, p. 5.)

Defendant, however, explains that it has received over 150 pages of medical records from Plaintiffs and another 1,200 pages from health care providers but that it nevertheless has been unable to obtain records from certain providers. (Doc. 83, p. 3.) Thus, Defendant requests that Mr. Cupp produce all medical records that are "in his control." (*Id.*)

Mr. Cupp's medical records are, at a minimum, reasonably calculated to lead to the discovery of admissible evidence concerning his alleged injuries for which he seeks compensation through this action. Based on Plaintiffs' representations, however, it appears that Plaintiffs have produced all of the medical records in their possession. While Plaintiffs could request additional documents from their health care providers to provide Defendant with further disclosures, given the time constraints imposed by the imminent trial date in this matter, this process would likely be unproductive. Rather, it would be more convenient and efficient for Defendant to seek any additional medical records directly from the health care providers, pursuant to the HIPAA authorization discussed below.

**\*3** For these reasons, Defendant's Motion to Compel as to Defendant's First Supplemental Request Number One is **GRANTED IN PART AND DENIED IN PART** in the following manner: To the extent that Plaintiffs have any materials in their possession that are responsive to Defendant's First Supplemental Requests for Production Number One that they have not previously provided to Defendant, they are ordered to disclose those materials to Defendant **as soon as possible and in no event later than 5:00 p.m. on Monday, February 9, 2015.** However, given the above-mentioned time constraints and the HIPAA authorization discussed below, Plaintiffs are not required to obtain additional materials from Mr. Cupp's health care providers to provide to Defendant.[1]

### B. HIPAA Authorization

In its Second Supplemental Requests for Production Number One, Defendant requested "one executed original of the medical release attached as Exhibit A to be executed by [Plaintiff] Timothy Cupp." (Doc. 75, p. 3.) While Plaintiffs responded that Mr. Cupp "has previously given the Defendant a HIP[A]A authorization" (Doc. 79, p. 6), Defendant avers that the previous HIPAA authorization was limited to certain health care providers (*see* Doc. 75–2, p. 5.) Accordingly, Defendant is seeking an authorization covering "all of the providers that [Mr. Cupp] has indicated that he may potentially call as witnesses at trial" so that Defendant may "obtain some records on which to evaluate and cross-examine their testimony." (Doc. 83, p. 3.)

There appears to be a split in authority as to whether a party, or a court, may compel another party to sign an authorization for the release of records, on the basis of a discovery request. *See, e.g., McKnight v. Blanchard,* 667 F.2d 477, 481–82 (5th Cir.1982) ("[T]he documents or authority to copy them could have been obtained by a request [for production], and ... since [the plaintiff's] physical condition was put at issue by his demands[,] the court upon proper motion could have ordered him to sign ... an authorization."); *cf. Klugel v. Clough,* 252 F.R.D. 53, 55 (D.D.C.2008) (collecting cases holding that a request for production is not the proper vehicle by which a party, or the court, can compel another party to sign a medical authorization). While the Court of Appeals for the Eleventh Circuit has not addressed this issue, district courts in this Circuit have recognized a party's ability to request the production of a signed HIPAA authorization and the court's ability to order compliance therewith. *See McMullen v. Charter Sch. USA, Inc.,* No. 09–61578, 2011 WL 56065, at \*5 (S.D.Fla. Jan.7, 2011); *Rivers v. Asplundh Tree Expert Co.,* No. 5:08cv61, 2008 WL 5111300, at \*2 (N.D.Fla. Dec.3, 2008); *Zaffis v. City of Altamonte Springs,* No. 6:06–cv–385, 2007 WL 1796255, at \*1 (M.D.Fla. June 20, 2007).

On the present facts, the undersigned joins these other district courts and finds that Mr. Cupp must produce a HIPAA authorization that conforms to Defendant's request for production. Plaintiffs previously agreed to sign a HIPAA authorization—albeit in limited form—and Plaintiffs raised no objection to Defendant's use of a request for production as a vehicle to compel such an authorization. Moreover, Plaintiffs put Mr. Cupp's physical condition at issue by filing this personal injury action, and it appears that Plaintiffs have not otherwise provided Defendant with all of the medical documents relevant to that claim during the discovery period.

**\*4** Under these circumstances, the Court finds that the HIPAA authorization that Defendant seeks is not only reasonably calculated to lead to the discovery of admissible evidence but also the most convenient and least burdensome solution at this stage. For these reasons, Defendant's Motion to Compel as to Defendant's Second Supplemental Request Number One is **GRANTED.** Plaintiffs must provide Defendant with a signed HIPAA authorization complying with Defendant's Second

Supplemental Request Number One **as soon as possible and in no event later than 12:00 p.m. on Monday, February 9, 2015.**

### C. Mr. Cupp's IRS Form W–2s

Defendant's Second Supplemental Requests for Production Number Two asked for "copies of Internal Revenue Service Form W–2s and any documents filed with said IRS Form W–2s submitted by [Mr.] Cupp for the years 2004–2014." (Doc. 75, p. 3.) In their Responses, Plaintiffs represented that "[Mr. Cupp] ha[d] produced all W–2 forms that he ha[d] for the relevant period of time." (Doc. 79, p. 6.) Defendant denies having any record of receiving any W–2 statements. (Doc. 83, p. 3.)

Notably, Plaintiffs do not object to the Form W–2s being relevant and discoverable; rather, Plaintiffs seem to oppose Defendant's request on the basis that Plaintiffs already produced W–2 forms pursuant to an earlier request. Because Defendant apparently has no record of having received those forms, and the forms are relevant to Plaintiffs' damages claims, Plaintiffs must comply with Defendant's discovery request.

The Court, therefore, **GRANTS** Defendant's Motion to Compel as to Defendant's Second Supplemental Requests for Production Number Two and orders that Plaintiffs must provide Defendant with the documents sought in that Request **as soon as possible and in no event later than 5:00 p.m. on Monday, February 9, 2015.**[2]

### B. Plaintiffs' Request for Sanctions and Sealing of the Record

A party may move for appropriate sanctions pursuant to Federal Rule of Civil Procedure 37 if another party fails to cooperate in discovery. *See generally* Fed.R.Civ.P. 37. In their Response, Plaintiffs "move that the Court seal a part of the record in this case and that the Court impose appropriate sanctions," based on Defendant's filing of a document displaying Mr. Cupp's Social Security number and date of birth. (Doc. 79, pp. 1–2.) In response, Defendant's counsel apologizes to the Court and Plaintiffs for this inadvertent error. (Doc. 83, p. 1.) In addition, Defendant's counsel explains that counsel took prompt action to ensure that the filing is now under restricted access and thus accessible only to authorized persons. Consequently, the Court does not find sanctions warranted and does not find it necessary to seal the record. However, counsel is reminded of their important obligation under Federal Rule of Civil Procedure 5.2 to prevent an individual's identifying information from being filed on the Court's publicly available docket.

### CONCLUSION

**\*5** For the reasons and in the manner set forth above, Defendant's Motion to Compel is **GRANTED IN PART AND DENIED IN PART** as to Defendant's First Supplemental Request for Production Number One, **GRANTED** as to Defendant's Second Supplemental Request for Production Number One, and **GRANTED** as to Defendant's Second Supplemental Request for Production Number Two.

**SO ORDERED.**

### All Citations

Not Reported in F.Supp.3d, 2015 WL 510134

**Cupp v. U.S., Not Reported in F.Supp.3d (2015)**

Footnotes

1       As Defendant has not moved for any sanctions in the instant Motion, the Court expresses no opinion in this Order as to whether
        Plaintiffs were previously obligated to obtain and disclose such materials. The Court also issues no opinion in this Order as to the
        admissibility of any of Mr. Cupp's medical records at trial, including any efforts to exclude those records as untimely disclosed.

2       As with Mr. Cupp's medical records, in this Order, the Court issues no opinion as to the admissibility of Mr. Cupp's tax documents
        at trial, including any efforts to exclude those documents as untimely disclosed.

---

**End of Document**                                              © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**8:07–cv–2370–T–30MSS**

2008 WL 11336308
Only the Westlaw citation is currently available.
United States District Court, M.D. Florida,
Tampa Division.

Gabe MCINTYRE, Plaintiff,

v.

DELHAIZE AMERICA, INC. D/b/a Sweetbay Supermarket, Defendant.

Case No.: 8:07–cv–2370–T–30MSS
|
Signed 06/26/2008

**Attorneys and Law Firms**

Christopher D. Gray, Thomas D. Roebig, Jr., Wolfgang M. Florin, Florin Roebig, PA, Palm Harbor, FL, for Plaintiff.

Jay P. Lechner, Peter W. Zinober, Greenberg Traurig, LLP, Tampa, FL, M. Sean Moyles, Langston, Hess, Shepard and Augustine, P.A., Clearwater, FL, for Defendant.

**<u>ORDER</u>**

MARY S. SCRIVEN, United States Magistrate Judge

**\*1 THIS CAUSE** comes before the Court on consideration of Defendant Delhaize America, Inc.'s d/b/a Sweetbay Supermarket (hereinafter "Defendant") Motion to Compel Responses to Discovery from Plaintiff Gabe McIntyre (hereinafter "Plaintiff") (Dkt. 10), and the Plaintiff's response thereto (Dkt. 13). Defendant filed the Motion to Compel on May 30, 2008 (Dkt. 10) and on June 13, 2008, Plaintiff filed its Response to Defendant's Motion. (Dkt. 13)

On or about November 27, 2007, Plaintiff filed suit against Defendant alleging that Plaintiff was terminated in violation of the Florida Private Whistleblower Act. Specifically Plaintiff contends that he was terminated from his employment as a direct result of and in retaliation for his reporting of and opposition to violations of a law, rule or regulation. On March 7, 2008, Defendant served upon Plaintiff its first set of interrogatories and document requests; Plaintiff answered this discovery on April 9, 2008. Defendant, not satisfied with Plaintiff's answers, filed this Motion to Compel asking the Court to enter an order compelling Defendant to provide proper and complete responses to Interrogatory Numbers Seven and Eight and to Request for Production Numbers 56, 57 and 58. Defendant additionally seeks for the Plaintiff to provide a privilege log sufficient to allow its counsel to evaluate Plaintiff's privilege objections asserted in response to Request for Production Numbers 56 and 57.

Pursuant to Federal Rule of Civil Procedure 26(b)(1), "[p]arties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party. ... Relevant information need not be admissible at trial if the discovery appears to be reasonably calculated to lead to the discovery of admissible evidence." As such, the scope of discovery is very broad and the Federal Rules of Civil Procedure place the burden upon the party objecting to the requested discovery to state with particularity the reasons for the objections. See Oleson v. Kmart Corp., 175 F.R.D. 560, 565 (D. Kan. 1997)("The

objecting party has the burden to substantiate its objections.")(internal citations omitted); see also Fed. R. Civ. P. 33(b)(4) and 34(b) (2006).

### A. Defendant's Interrogatory Number 8 and Request for Production Number 58

Defendant moves to compel a more complete response to Interrogatory No. 8 which seeks information concerning Plaintiff's medical and psychological history, including the identity of Plaintiff's medical providers, the nature and length of treatment, medications prescribed, etc., dating back to January 1, 2003. (Dkt. 10, p. 2) Defendant additionally seeks, through its Request for Production Number 58, "all documents relating to any medical, psychological or psychiatric treatment or evaluation of Plaintiff from August 1, 2006 to the present ...." (Dkt. 10) Although Plaintiff admits that he is seeking compensatory damages for emotional/mental distress, Plaintiff argues that the requested medical records are irrelevant and would invade Plaintiff's privacy because he did not seek "treatment for the emotional and mental distress or any other type of mental or emotional harm caused by the Defendant's actions." (Dkt. 13, p.5) Defendant contends that Plaintiff's medical and mental health history and records are relevant regardless of whether the Plaintiff sought treatment because the records "may reveal stressors unrelated to [Defendant] which may have affected [Plaintiff's] emotional well being during the relevant time period." (Dkt. 10)

**\*2** The case law is clear that when a plaintiff raises an emotional distress damages claim, the plaintiff's medical and psychological history, including the identities of health providers, the dates of treatment and the nature of the treatment are relevant and discoverable. See Zaffis v. City of Altamonte Springs, Florida, 2007 WL 646595 at \*2 (M.D. Fla. 2007)(Feb. 27, 2007)(finding that because the plaintiff stated a claim for mental suffering and placed her mental health in issue, the defendant is entitled to discover, within reason, the state of Plaintiff's mental health and the nature of other stressors related to her health during the relevant time period); Lefave v. Symbios, Inc., No. CIV. A. 99–Z–1217, 2000 WL 1644154, at \*2 (D. Colo. Apr. 14, 2000)("[m]edical records information is relevant to plaintiff's claim for emotional distress damages."); Garrett v. Sprint PCS, No. 00–2583–KHV, 2002 WL 181364, a \*2 (D. Kan. Jan. 31 2002)(when a plaintiff seeks damages for mental anguish, medical and psychological information sought through interrogatories and requests for production are relevant as to both causation and the extent of plaintiff's alleged injuries and damages). The fact that a plaintiff has not sought treatment for the alleged emotional distress or does not intend to proffer expert testimony in support of the damages claim does not make the plaintiff's medical history any less relevant to the claim. See Garrett, No. 00–2583–KHV, 2002 WL 181364, at \*2 (D. Kan. Jan. 31, 2002)(stating that "no case law supports Plaintiff's contention that this information is discoverable only if [he] were planning to present expert testimony regarding h[is] mental and emotional condition); Walker v. Northwest Airlines Corp., No. Civ.00–2604 MJD/JGL, 2002 WL 32539635, at \*3 (D. Minn. Oct 28, 2002)("regardless of whether Plaintiff intends to introduce his medical records or offer medical testimony to prove his alleged emotional distress, [defendant] is entitled to determine whether plaintiff's relevant medical history indicates that his alleged emotional distress was caused in part by events and circumstances independent of [defendant's] allegedly adverse employment action").

Against the legal standard set forth above, the Court finds that the Plaintiff's medical and psychological histories are relevant and reasonably calculated to lead to the discovery of admissible evidence. In light of the Defendant's request for general discovery under Rule 26 of the Federal Rules of Civil Procedure (rather than a Rule 35(a) medical examination), the Court finds it unnecessary to distinguish between the type of emotional distress damages claimed by the Plaintiff, i.e., incidental garden variety emotional distress such as humiliation, embarrassment and other similar emotions, or a clinically diagnosable emotional condition or mental illness such as depression, anxiety and sleeplessness.[i] The Plaintiff's claim of "compensatory damages for emotional pain and suffering" (Dkt. 11, p.7, fn.5) places his mental health at issue in this case; therefore, the Defendant is entitled to reasonable discovery concerning the state of Plaintiff's mental health and the nature of other stressors relating to Plaintiff's health during the relevant time period.

Having determined that the Defendant's Interrogatory Number 8 and corresponding Request for Production Number 58 are relevant to the claims and defenses in this case, the Court hereby **GRANTS** the Defendant's Motion to Compel. **Within thirty (30) days of the date of this Order,** the Plaintiff shall serve upon Defendant supplemental answer to Defendant's Interrogatory Number 8 and documents responsive to Defendant's Request for Production Number 58. To the extent the Plaintiff has privacy concerns regarding the production of this information, the Court notes that such can be resolved by the parties' executing a confidentiality stipulation. In advance of the production ordered, the parties shall endeavor to prepare and

GABE McINTYRE, Plaintiff, v. DELHAIZE AMERICA, INC...., Not Reported in Fed....

sign such a stipulation and file it with the Court.

**B. Plaintiff's Request for Production Numbers 56 and 57**

In its Request for Production Numbers 56 and 57, Defendant seeks "witness statements ... and all reports of private investigators, relating to any claims or defenses in this case," and "documents constituting or relating to any statement ... made by or attributed to Defendant, its agents, representatives, employees or former employees." (Dkt. 10, p.8) Plaintiff has objected to Defendant's request arguing that the statements are protected under both the attorney-client and work product privilege as they were compiled in preparation of litigation after Plaintiff had retained counsel. Defendant counters that Plaintiff has waived the privilege because he has not produced a privilege log. Defendant further contends that it has a substantial need for the statements and is unable, without undue hardship, to obtain the statements by other means. (Dkt. 12) Plaintiff opposes this notion, arguing that he has obtained only two witness statements and both witnesses, Mike Butler and Stefan Cohen, along with their contact information were disclosed in his Answers to Defendant's First Set of Interrogatories. Additionally, Mr. Cohen was available for questioning during his deposition. As such, Plaintiff contends that the Defendant had ample opportunity to obtain the witnesses' statements by other means.

**\*3** As an initial matter, the Court would note that an attorney is not required to maintain a litigation privilege log documenting each interview or consultation conducted by or at the attorney's direction during the pendency of a case. Furthermore, the Court finds that Defendant has not met its burden of demonstrating substantial need for the witness statements or undue hardship. Not only is the Defendant privy to the contact information for both witnesses, the Defendant also had the opportunity to inquire of Mr Cohen during his deposition. Accordingly, the Court hereby ORDERS that the Defendant's Request for the Plaintiff to provide witness statements responsive to Request for Production Numbers 56 and 57 is **DENIED.** The subject statements were prepared at the direction of Plaintiff's counsel after litigation ensued and, therefore, are not discoverable by the Defendant.

The Defendant's requests for attorneys fees and costs for bringing this Motion is **DENIED.** Each party shall bear its own costs and expenses unless costs are shifted at the conclusion of the case.

**DONE** and **ORDERED** in Tampa, Florida this 26th day of June 2008.

**All Citations**

Not Reported in Fed. Supp., 2008 WL 11336308

Footnotes

1    See EEOC v. Sheffield Financial LLC, No. 1:06cv0889, 2007 U.S. Dist. LEXIS 43070, at \*11–13 (M.D.N.C. June 13, 2007) (permitting defendant's motion to compel medical records in light of plaintiff's garden variety incidental compensatory damages claim); see also Lefave, 2000 WL 1644154, at \*2 (stating that a plaintiff's medical records were relevant to her claim for emotional distress damages even though plaintiff had only asked for damages for pain and suffering, embarrassment and humiliation and did not assert a separate claim for a specific mental or physical injury, or severe emotional distress).

**End of Document**                                                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**3:15–cv–2766–B**

Mir v. L–3 Communications Integrated Systems, L.P., 319 F.R.D. 220 (2016)
2016 A.D. Cases 272,022

319 F.R.D. 220
United States District Court, N.D. Texas, Dallas Division.

Peter MIR, Plaintiff,
v.
L–3 COMMUNICATIONS INTEGRATED SYSTEMS, L.P., Defendant.

No. 3:15–cv–2766–B
|
Signed 08/22/2016

**Synopsis**

**Background:** Job applicant brought action against federal contractor, alleging that contractor's failure to hire him violated the Rehabilitation Act and Americans with Disabilities Act (ADA). Contractor moved to compel applicant to sign authorizations for release of information relating to his application for and receipt of social security disability insurance benefits (DIB).

**Holdings:** The District Court, David L. Horan, United States Magistrate Judge, held that:

documents sought were within applicant's possession, custody, and control, even though they were maintained by Social Security Administration, and

contractor's discovery requests sought relevant information and were not overbroad.

Motion granted.

**Attorneys and Law Firms**

**\*222** Andrew S. Golub, Dow Golub Remels & Beverly LLP, Houston, TX, Brian P. Sanford, The Sanford Firm, Dallas, TX, for Plaintiff.

Robert E. Sheeder, Clayton McCarthy Davis, Bracewell & Giuliani LLP, Dallas, TX, **\*223** Leslie Selig Byrd, Bracewell & Giuliani LLP, San Antonio, TX, for Defendant.

## MEMORANDUM OPINION AND ORDER

DAVID L. HORAN, UNITED STATES MAGISTRATE JUDGE

Defendant L–3 Communications Integrated Systems, L.P. ("L–3" or "Defendant") has filed a Motion to Compel Signed Releases from Plaintiff Peter Mir ("Mir" or "Plaintiff") [Dkt. No. 26] (the "MTC"), seeking an order under Federal Rule of

Civil Procedure 37(a) to require Mir to complete, execute, and return Form SSA–3288 "Consent for the Release of Information" and an "Authorization for Release of Information" from Allsup Inc. as L–3 has requested pursuant to Federal Rule of Civil Procedure 34(a).

United States District Judge Jane J. Boyle referred Defendant's MTC to the undersigned United States magistrate judge for determination pursuant to 28 U.S.C. § 636(b). *See* Dkt. No. 27.

Mir filed a response, *see* Dkt. No. 30, and L–3 filed a reply, *see* Dkt. No. 31.

For the reasons explained below, the Court GRANTS L–3's Motion to Compel Signed Releases [Dkt. No. 26].


**Background**

Mir, an engineer, applied for a position with L–3. After an interview, L–3 did not award the job to Mir, and Mir filed an Administrative Complaint with the OFCCP, alleging violations of Section 503 of the Rehabilitation Act ("Section 503") and the Americans with Disabilities Act ("ADA") based on L–3's status as a federal contractor. The OFCCP has jurisdiction to investigate discrimination complaints leveled against federal contractors.

During the OFCCP's investigation of Mir's complaint, L–3 provided the OFCCP with a position statement as well as several follow up communications. L–3 contends that it provided these documents under the assurance that, in accordance with the OFCCP's regulations and longstanding practice, L–3's documents would remain confidential.

Following its investigation, the OFCCP issued a finding that there was insufficient evidence to conclude that L–3 violated its obligations under Section 503 and the ADA and issued a right-to-sue letter enabling Mir to bring a lawsuit against L–3 under the ADA within 90 days.

Mir then filed this action against L–3, alleging a violation of the ADA.

On April 25, 2016, L–3 deposed Mir. L–3 explains that Mir submitted his Application for Disability Insurance Benefits to the Social Security Administration on April 12, 2006 and has been receiving Social Security disability benefits from 2006 to the present. According to L–3, during his deposition, Mir admitted that he made misrepresentations to the Social Security Administration in connection with the Social Security benefits that he receives. Specifically, L–3 contends that, in his benefits application, Mir agreed to notify the Social Security Administration if his condition improved and he became able to work; that Mir admitted that statements contained in his application are no longer true because his condition has in fact improved and he is able to work; and that Mir has not updated the Social Security Administration that his condition no longer prevents him from working.

According to L–3, Mir also filled out a questionnaire (the Adult Disability & Work History Report), which was submitted to the Social Security Administration, and Mir admitted that this report also contains information that is incorrect and out-of-date concerning his present condition and that portions of this report were not accurate regarding aspects of his job that he could not perform.

In the MTC, L–3 explains that Mir also stated during his deposition that Allsup Inc. assisted him in making representations to the Social Security Administration, including by preparing the Adult Disability & Work History Report. According to L–3, Mir never informed Allsup Inc. or the Social Security Administration of the inaccuracies in the report, and Mir also testified that he cannot remember whether he talked to Allsup Inc. before submitting his Application for Disability Insurance Benefits to the Social Security Administration on April 12, 2006.

**\*224** L–3 contends that "Mir's Social Security Disability Insurance Benefits are relevant to claims and defenses in this lawsuit," where "Mir's acceptance of disability benefits, and the statements that Mir made to the Social Security Administration, have a direct bearing on whether he is judicially estopped from bringing his claim for disability discrimination under the ADA." Dkt. No. 26 at 2.

2016 A.D. Cases 272,022

Following the deposition, L–3 served its Second Request for Production to Plaintiff Peter Mir, requesting in Request Nos. 1 and 2 that Mir complete, execute, and return Form SSA–3288 "Consent for the Release of Information" and an "Authorization for Release of Information" from Allsup Inc. (collectively, the "Releases"). According to Mir, the Form SSA–3288 release would authorize L–3 to access documents and information relating to (i) Mir's current monthly Social Security benefit amount; (ii) Mir's benefit or payment amounts from May 2005 to present; (iii) Mir's complete medical records from his claims folder(s); (iv) Mir's application(s) for disability benefits; and (v) decisions related to Mir's disability benefits, and the release to Allsup Inc. would give L–3 to access "all information pertaining to [Mir's] claim for Social Security benefits...including relevant medical information." Dkt. No. 26–1 at Def. App. 00005–00006.

Mir objected to these requests and refused to sign and return the Releases. He asserts that the requests exceed the scope of Rule 34, which, according to Mir, only permits L–3 to seek the production of documents that are presently within Mir's possession, custody, or control and does not "require the creation of document that do not presently exist for the purpose of enabling another party to informally obtain the documents outside the boundaries of [Federal Rules of Civil Procedure] 34 and 45." *Id.* at Def. App. 00008–00009. Mir also objected that the requests seek information that is not relevant to the claims and defenses at issue in this lawsuit and that the Releases are overbroad. *See id.*

L–3 now moves to compel Mir to sign the Releases "[b]ased on the relevance of these Releases to claims and defenses in this lawsuit, as well as clear precedent allowing for L–3 to obtain signatures under Rule 34." Dkt. No. 26 at 2.

Mir responds that "L–3's argument is inconsistent with Rule 34's plain language, which only contemplates the production of existing documents in the responding party's custody or control, and is at odds with the majority of case law addressing the issue." Dkt. No. 30 at 1. Mir also contends that "L–3's proposed releases seek information regarding Mir's application for social security benefits in 2006 and his subsequent receipt of those benefits" and that the Releases therefore "are overbroad and seek information that is not relevant to Mir's claim that L–3 discriminated against him in 2011, or to L–3's claim that Mir is estopped from asserting his disability discrimination claim." *Id.*

Mir urges the Court to sustain his objections and deny L–3's MTC because Rule 34 does not provide a basis for compelling Mir to execute L–3's proposed Releases and because, even if it did, the Releases are overbroad and seek irrelevant information.


**Legal Standards**

Federal Rule of Civil Procedure 37(a) governs motions to compel discovery responses. Rule 37(a)(3)(B) provides that a party seeking discovery may move for an order compelling production against another party when the latter has failed to produce documents requested under Federal Rule of Civil Procedure 34. *See* Fed. R. Civ. P. 37(a)(3)(B)(iv).

The party resisting discovery must show specifically how each discovery request is not relevant or otherwise objectionable. *See McLeod, Alexander, Powel & Apffel, P.C. v. Quarles*, 894 F.2d 1482, 1485 (5th Cir. 1990). In response to a Rule 34 request, "[f]or each item or category, the response must either state that inspection and related activities will be permitted as requested or state with specificity the grounds for objecting to the request, including the reasons." Fed. R. Civ. P. 34(b)(2)(B). "An objection must state whether any responsive materials are being withheld on the basis of that objection. An objection to part of a request must specify the part and permit inspection of the rest." Fed. R. Civ. P. 34(b)(2)(C). A party resisting discovery must show how the requested **\*225** discovery was overly broad, burdensome, or oppressive by submitting affidavits or offering evidence revealing the nature of the burden. *See Merrill v. Waffle House, Inc.*, 227 F.R.D. 475, 477 (N.D. Tex. 2005); *see also S.E.C. v. Brady*, 238 F.R.D. 429, 437 (N.D. Tex. 2006) ("A party asserting undue burden typically must present an affidavit or other evidentiary proof of the time or expense involved in responding to the discovery request.").

A party who has objected to a discovery request must, in response to a motion to compel, urge and argue in support of its objection to a request, and, if it does not, it waives the objection. *See Dolquist v. Heartland Presbytery*, 221 F.R.D. 564, 568 (D. Kan. 2004); *Cotracom Commodity Trading Co. v. Seaboard Corp.*, 189 F.R.D. 655, 662 (D. Kan. 1999).

Mir v. L–3 Communications Integrated Systems, L.P., 319 F.R.D. 220 (2016)

2016 A.D. Cases 272,022

Federal Rules of Civil Procedure Rules 26(b) and 26(c) and 34 have been amended, effective December 1, 2015. Rule 26(b)(1) now provides that, "[u]nless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable." Fed. R. Civ. P. 26(b)(1).

The amendments to Rules 26 and 34 govern in all proceedings in civil cases thereafter commenced and, insofar as just and practicable, in all proceedings then pending. The Court finds that applying the standards of Rules 26 and 34, as amended, to Defendant's MTC is both just and practicable.

Further, for the reasons the Court has previously explained, the Court concludes that the amendments to Rule 26 do not alter the burdens imposed on the party resisting discovery discussed above. See Carr v. State Farm Mutual Automobile Insurance Company, 312 F.R.D. 459, 463–69 (N.D. Tex. 2015). Rather, just as was the case before the December 1, 2015 amendments, under Rules 26(b)(1) and 26(b)(2)(C)(iii), a court can—and must—limit proposed discovery that it determines is not proportional to the needs of the case, considering the importance of the issues at stake in the action, the **226** amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit—and the court must do so even in the absence of a motion. See Crosby v. La. Health Serv. & Indem. Co., 647 F.3d 258, 264 (5th Cir. 2011). Thus, as amended, Rule 26(b)(2)(C) provides that, "[o]n motion or on its own, the court must limit the frequency or extent of discovery otherwise allowed by these rules or by local rule if it determines that: (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or (iii) the proposed discovery is outside the scope permitted by Rule 26(b)(1)." Fed. R. Civ. P. 26(b)(2)(C).

But a party seeking to resist discovery on these grounds still bears the burden of making a specific objection and showing that the discovery fails the proportionality calculation mandated by Rule 26(b) by coming forward with specific information to address—insofar as that information is available to it—the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

The party seeking discovery, to prevail on a motion to compel, may well need to make its own showing of many or all of the proportionality factors, including the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, and the importance of the discovery in resolving the issues, in opposition to the resisting party's showing.

And the party seeking discovery is required to comply with Rule 26(b)(1)'s proportionality limits on discovery requests; is subject to Rule 26(g)(1)'s requirement to certify "that to the best of the person's knowledge, information, and belief formed after a reasonable inquiry:...(B) with respect to a discovery request..., it is: (i) consistent with these rules and warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law, or for establishing new law; (ii) not interposed for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; and (iii) neither unreasonable nor unduly burdensome or expensive, considering the needs of the case, prior discovery in the case, the amount in controversy, and the importance of the issues at stake in the action"; and faces Rule 26(g)(3) sanctions "[i]f a certification violates this rule without substantial justification." Fed. R. Civ. P. 26(g)(1)(B), 26(g)(3); see generally Heller v. City of Dallas, 303 F.R.D. 466, 475–77, 493–95 (N.D. Tex. 2014).

But the amendments to Rule 26(b) do not alter the basic allocation of the burden on the party resisting discovery to—in order to successfully resist a motion to compel—specifically object and show that the requested discovery does not fall within Rule 26(b)(1)'s scope of relevance (as now amended) or that a discovery request would impose an undue burden or expense or is otherwise objectionable. See McLeod, 894 F.2d at 1485; Heller, 303 F.R.D. at 483–93.

Federal Rule of Civil Procedure 37(a)(5)(A) provides that, if a motion to compel is granted, or if the requested discovery is provided after the motion was filed, "the court must, after giving an opportunity to be heard, require the party...whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses

incurred in making the motion, including attorney's fees," except that "the court must not order this payment if: (i) the movant filed the motion before attempting in good faith to obtain the disclosure or discovery without court action; (ii) the opposing party's nondisclosure, response, or objection was substantially justified; or (iii) other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(a)(5)(A).

Federal Rule of Civil Procedure 37(a)(5)(B)–(C) further provides in pertinent part that, "[i]f the motion is denied, the court may issue any protective order authorized under Rule 26(c) and must, after giving an opportunity to be heard, require the movant, the attorney filing the motion, or both to pay the party...who opposed the motion its reasonable expenses incurred in opposing the motion, including attorney's fees," "[b]ut the court must not order this payment if the motion was substantially justified or other circumstances make an award of expenses unjust," and that, "[i]f the motion is granted in part and denied in part, the court may issue any protective order authorized under Rule 26(c) and may, after giving an opportunity to be heard, apportion the reasonable expenses for the motion." Fed. R. Civ. P. 37(a)(5)(B)–(C).

**Analysis**

I. Rule 34 is a proper vehicle for obtaining signed releases.

L–3 contends that, "[w]hile there has been some disagreement among courts over whether Rule 34 can be used to require a party to sign a document, the overwhelming majority of courts in the Fifth Circuit have found Rule 34 is a proper mechanism for obtaining signatures" and that "this is particularly the case when the release relates to facts and claims the party has put at issue in a lawsuit. Dkt. No. 26 at 4. Mir responds that he "cannot be compelled under Rule 34 to sign the [Releases]" and that, "[i]f L–3 wants the documents at issue, it needs to subpoena them under Rule 45." Dkt. No. 30 at 8.

Rule 34(a) provides that "[a] party may serve on any other party a request within the scope of Rule 26(b): (1) to produce and permit the requesting party or its representative to inspect, copy, test, or sample the following items in the responding party's possession, **\*227** custody, or control: (A) any designated documents or electronically stored information—including writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations—stored in any medium from which information can be obtained either directly or, if necessary, after translation by the responding party into a reasonably usable form; or (B) any designated tangible things; or (2) to permit entry onto designated land or other property possessed or controlled by the responding party, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it." Fed. R. Civ. P. 34(a).

As a general matter, a party cannot invoke Rule 34(a) to require another party to create or prepare a new or previously non-existent document solely for its production. *See, e.g.*, *Cartel Asset Mgmt. v. Ocwen Fin. Corp.*, No. 01-cv-01644-REB-CBS, 2010 WL 502721, at \*14 (D. Colo. Feb. 8, 2010) (collecting cases); *accord Marchese v. Sec'y, Dep't of the Interior*, Civ. A. No. 03-3082, 2004 WL 2297465, at \*4 (E.D. La. Oct. 12, 2004) ("Rule 34 does not require a party responding to discovery to create responsive materials, only to produce those in its possession, custody or control." (emphasis removed)). Similarly, " Rule 45 'does not contemplate that a non-party will be forced to create documents that do not exist.' " *Georgacarakos v. Wiley*, No. 07-CV-01712-MSK-MEH, 2009 WL 924434, at \*2 (D. Colo. Apr. 3, 2009) (quoting *Insituform Techs., Inc. v. Cat Contracting, Inc.*, 168 F.R.D. 630, 633 (N.D. Ill. 1996)).

L–3 does not ask Mir to create or prepare a new document but rather to sign two authorization forms for release of records. The United States Court of Appeals for the Fifth Circuit has specifically held that a party is not required by a Federal Rule of Civil Procedure 33 interrogatory to sign an authorization form appended to interrogatories. *See McKnight v. Blanchard*, 667 F.2d 477, 481–82 (5th Cir. 1982). But, where defendants sought to have a plaintiff sign "a form...that would authorize the release to the defendants of all of his medical records," the Fifth Circuit panel in *McKnight* also suggested that Federal Rule of Civil Procedure 34 may be an appropriate mechanism by which to require a party to sign an authorization release. *Id.* In that decision, the Court of Appeals noted that, "although the documents or authority to copy them could have been obtained by a request under Rule 34, and while quite possibly (since [the plaintiff's] physical condition was put at issue by his demands) the court upon proper motion could have ordered him to sign such an authorization, in default thereof staying

further proceedings—, [the plaintiff] was not obliged by reason of the requests served upon him, which were based (solely) upon Rule 33 and [Federal Rule of Civil Procedure] 36, to sign the authorization incorrectly appended to the interrogatories as a 'request for admission.' " *Id.* at 482.

But one court in this circuit recently explained that its "research has located no Fifth Circuit case that has *decided* whether a party can be compelled to sign a blank authorization form for medical or other records." *U.S. E.E.O.C. v. Res. for Human Dev., Inc.*, Civ. A. No. 10-3322, 2011 WL 3841066, at *2 (E.D. La. Aug. 31, 2011) (emphasis in original). And, in the 34 years since the *McKnight* decision, district court decisions in this circuit and elsewhere have split as to the issue of whether Rule 34 is a proper vehicle by which a party may be required to sign an authorization for the release of medical, employment, Social Security, or other records, even if those records are relevant to the claims or defenses at issue. *See, e.g.*, *Robinson v. Jackson State Univ.*, No. 3:13-CV-7-HTW-LRA, 2014 WL 11514968, at *2 (S.D. Miss. July 31, 2014) (collecting cases); *Clewis v. Medco Health Sols., Inc.*, No. 3:12-cv-5208-L, 2013 WL 5354574, at *2 (N.D. Tex. Sept. 25, 2013) (collecting cases); *see also Cheshire v. Air Methods Corp*, No. 3:15CV933, 2015 WL 7736649, at *4 (W.D. La. Nov. 30, 2015) ("The Federal Rules of Civil Procedure do not prevent a party from willingly executing a release authorizing a nonparty custodian to produce confidential employment records directly to another party. Some courts allow a party to use a Rule 34 request to force the responding party to provide a release enabling the requesting party to get the records directly from the nonparty custodian. However, a majority of courts have held that **\*228** Rule 34 itself does not give courts the power to order a party to sign a release." (citations omitted)).

In one camp (on which Mir relies), courts have concluded that Rule 34(a) does not give courts the power to order a party to sign an authorization or release because (1) Rule 34(a) does not authorize requiring a party to create a document or sign a form attached to a request for production and (2) because, if the other party is not in possession or custody of the records at issue, the party should first serve a Rule 45 subpoena on the non-party custodian or "request the documents from the party, which then has a duty to collect them from the nonparty custodian to the extent the requested information is within the party's possession, custody, or control." *Cheshire*, 2015 WL 7736649, at *4.[1] These courts have held that "Rule 34 is [not] a vehicle by which a party may be compelled to sign an authorization for the release of records—even where such records have been determined to be relevant –" and that a "strained interpretation of Rule 34 [by which parties urge a contrary conclusion] is inconsistent with the plain language of the rule." *Klugel v. Clough*, 252 F.R.D. 53, 55 (D.D.C. 2008) ("hold[ing] that a request for production of documents pursuant to Rule 34 of the Federal Rules of Civil Procedure cannot be utilized as a vehicle by which to compel a party to sign an authorization for the release of medical records").

Courts have also denied motions to compel requests under Rule 34(a) for signed releases or authorization forms based on a finding that the responding party was not in possession, custody, or control of the requested records. *See, e.g.*, *Clark v. Vega Wholesale Inc.*, 181 F.R.D. 470, 472 (D. Nev. 1998) ("acknowledg[ing] that some courts have ordered a party to sign a medical release, but [explaining that] these courts rely on the conclusion that a compelled medical release is the most expeditious, efficient, or least expensive means of procuring information from medical providers" but concluding, where "it is uncontroverted that medical records are documents or tangible items as defined under Rule 34(a) and that the Plaintiff does not have actual possession or custody of the medical records," and where "medical care providers maintain custody or control of medical records" and "[t]he relationship between the Plaintiff and her doctor is not sufficient to establish control," that "the Defendants can secure copies of the requested documents from the custodian of the records as readily as the Plaintiff," that "the Defendants have complete access to all necessary information through the appropriate discovery provisions of the Federal Rules of Civil Procedure," and that there is "no basis in Rule 34 for [compelling the signing of a release form to obtain the medical records] under these circumstances").

In the other camp (to which L–3 looks for support), courts follow a line of cases that " 'hold, explicitly or implicitly, that Rule 34, along with Rule 37, empowers federal courts to compel parties to sign written authorizations consenting to the production of various documents.' " *Wymore v. Nail*, No. 5:14-CV-3493, 2016 WL 1452437, at *3 (W.D. La. Apr. 13, 2016) (quoting *Lischka v. Tidewater Servs., Inc.*, Civ. A. No. 96-296, 1997 WL 27066, at *2 (E.D. La. Jan. 22, 1997)). Courts have explained that Rule 34(a) "allows for production of documents which are in the possession, custody, or control of the party upon whom the request is served" and "that, for purposes of Rule 34, plaintiffs are in control of records that can be released via an authorization, because, by either granting or **\*229** withholding [their] consent, [they] may determine who shall have access to them." *Lischka*, 1997 WL 27066, at *2 (internal quotation marks omitted). These courts have concluded that "written authorizations may be compelled under Rule 34 because they simply compel parties to disclose documents which are under their control." *Id.* at *3; *see also Gondola v. USMD PPM, LLC*, No. 3:15-cv-411-M, 2016 WL 3031852, at *6 (N.D. Tex. May 27, 2016) ("Plaintiffs report in their response to the MTC that they have already produced some documents

2016 A.D. Cases 272,022

but will also provide an authorization for unemployment records on or before Friday, April 20, 2016. At oral argument, Plaintiffs' counsel reported that Henshaw has since declined to sign the Unemployment Authorization. The Court determines that requiring this authorization is appropriate under Rule 34 and proportional to the needs of the case.").

As to Rule 34's not requiring a responding party to create new or nonexistent documents, courts have concluded that "[i]t simply does not follow that if Rule 34 permits courts to compel parties to sign written authorizations, it must also permit parties to compel their adversaries to create documents (or objects) of their choosing," where "[s]igning an authorization is an act that can be construed as production of a document under a party's control." Lischka, 1997 WL 27066, at *2 (emphasis removed).

Another court in this camp rejected the argument "regarding the availability of the requested documents pursuant to FRCP Rule 45 subpoena" because "any attorney who has ever handled even one case implicating records and documents in the physical possession of non-parties and particularly government entities, including medical records, military records, social security disability records, tax records, and the like, will not be released without the written authorization of the individual to whom such records pertain." Allen v. Indian Harbor Marine, Inc., Civ. A. 96-3135, 1997 WL 666210, at *2 (E.D. La. Oct. 24, 1997).

When interpreting the Federal Rules of Civil Procedure, the Court is to give the rules their plain meaning, and, as with a statute, the inquiry is complete if the Court finds the text of the rules to be clear and unambiguous. See Yesh Music v. Lakewood Church, 727 F.3d 356, 359 (5th Cir. 2013). The Court may also give weight to, and consider as persuasive authority, the construction of a rule offered by the Advisory Committee in its notes. See, e.g., Schiavone v. Fortune, 477 U.S. 21, 31, 106 S.Ct. 2379, 91 L.Ed.2d 18 (1986). And, when interpreting a Federal Rule of Civil Procedure, the United States Supreme Court has also considered the rule's structure and context as well as its purpose and whether an interpretation is the rule's "most natural reading" as well as "an eminently sensible one." Bus. Guides, Inc. v. Chromatic Comm'ns Enters., Inc., 498 U.S. 533, 540–46, 111 S.Ct. 922, 112 L.Ed.2d 1140 (1991).

Within this interpretive framework, the Court is persuaded to fall in with this second camp of courts that conclude that Rule 34, along with Rule 37, empowers courts to compel parties to sign written releases or authorization forms consenting to the production of various documents.

The Court agrees with other courts' observations that a party can seek documents such as Social Security or health records directly from a non-party custodian through a Rule 45(a) subpoena—in response to which the non-party may or may not refuse to release records without the written authorization of the individual to whom such records pertain—and that a party can, using Rule 34(a), request the records directly from the other party and thereby require that party to collect them from non-party custodians to the extent that the requested information is within the responding party's possession, custody, or control.

But those options' availability does not foreclose a party's using Rule 34(a) to seek a signed authorization or release from another party to facilitate disclosure by a non-party custodian of documents that are under the responding party's control but not within that party's possession or custody.

That is because requests for signing and executing written releases or authorizations may be properly made under Rule 34(a)—and then, if necessary, compelled under **230** Rule 37(a)—insofar as they require a responding party to permit the requesting party or its representative to inspect or copy designated documents or electronically stored information in the responding party's control. See Fed. R. Civ. P. 34(a)(1). Reading Rule 34(a) to permissibly require parties to sign and execute written releases and authorization forms, so understood, does not amount to impermissibly requiring a responding party to create a new or non-existent document.

The Court concludes that this is the correct reading of Rule 34(a), consistent with the Fifth Circuit's observation in McKnight that "the documents or authority to copy them could have been obtained by a request under Rule 34, and while quite possibly (since [the plaintiff's] physical condition was put at issue by his demands) the court upon proper motion could have ordered him to sign such an authorization," 667 F.2d at 482, and with Federal Rule of Civil Procedure 1's directive that the Federal Rules of Civil Procedure "should be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding," Fed. R. Civ. P. 1.

Of course, any discovery requests under Rule 34(a) are "still subject to the scope and limitations of Rule 26(b)." *Colsan v. Cincinnati Ins. Co.*, Civ. A. No. 13-495-BAJ-RLB, 2013 WL 6531917, at *3 (M.D. La. Dec. 12, 2013); *accord* Fed. R. Civ. P. 26(b)(1) ("Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the [so-called proportionality factors]. Information within this scope of discovery need not be admissible in evidence to be discoverable."); Fed. R. Civ. P. 34(a) (providing that "[a] party may serve on any other party a request within the scope of Rule 26(b)"); *Matherne v. Schramm*, Civ. A. No. 12-807-JJB-RLB, 2013 WL 5961096, at *3 (M.D. La. Nov. 7, 2013) ("This Court has previously declined to compel a party, over their objection, to sign an authorization to release confidential medical information when the material covered by such a waiver was irrelevant and privileged and thus outside of the scope of discovery.").

And, on this reading of Rule 34(a), the responding party must actually have "control," for Rule 34(a)'s purposes, over the records sought through the releases or authorizations at issue. "Rule 34 is broadly construed and documents within a party's control are subject to discovery, even if owned by a nonparty." *S. Filter Media, LLC v. Halter*, Civ. A. No. 13-116-JJB-RLB, 2014 WL 4278788, at *5 (M.D. La. Aug. 29, 2014) (internal quotation marks omitted). "Rule 34's definition of 'possession, custody, or control,' includes more than actual possession or control of the materials; it also contemplates a party's legal right or practical ability to obtain the materials from a nonparty to the action." *Edwards v. City of Bossier City*, No. CV 15-1822, 2016 WL 3951216, at *3 (W.D. La. July 20, 2016) (internal quotation marks omitted).[2]

**\*231** "The burden, however, is on the party seeking discovery to make a showing that the other party has control over the documents sought." *S. Filter*, 2014 WL 4278788, at *5; *accord Shell Glob.*, 2011 WL 3418396, at *2 ("The party seeking production of documents bears the burden of establishing the opposing party's control over those documents."); *Goh v. Baldor Elec. Co.*, No. 3:98-mc-64-T, 1999 WL 20943, at *2 (N.D. Tex. Jan. 13, 1999) (same).

Mir contends that "[t]he documents L–3 seeks from the Social Security Administration and Allsup are clearly not within Mir's possession or custody, nor are they within his control," and that "L–3 has neither argued nor shown that Mir has 'control' over documents belonging to the Social Security Administration or Allsup." Dkt. No. 30 at 5 n.2. Mir asserts that "L–3 must directly subpoena the documents it seeks from the Social Security Administration and Allsup" "before asking the Court to compel Mir to sign the releases." *Id.* at 6 & n.2.

The Court disagrees and finds that L–3 has shown that, under the circumstances here, the documents sought through the Releases are within Mir's control where, insofar as the records can be released—and perhaps can only be released—via an executed authorization or release, Mir, by either granting or withholding his consent, can determine who may have access to them. On the facts before the Court, the Court finds that Mir has either a legal right or at least a practical ability to obtain the records at issue, as L–3 asserts that he does.

The Court overrules Mir's objections that Rule 34(a) does not authorize L–3's requests that he complete, execute, and return the Releases and turns now to Mir's objections based on the scope of and limitations on discovery under Rule 26(b).

II. The Releases seek relevant information and are not overbroad.

L–3 asserts that the documents that it seeks with the Releases are clearly relevant to this lawsuit where L–3 asserts an affirmative defense that Mir is estopped from bringing his claim in this case because of his Social Security disability benefits claims.

Mir responds that the Releases seek information regarding Mir's application for social security benefits in 2006 and his subsequent receipt of those benefits and that the Releases are overbroad and seek information that is not relevant to Mir's claim that L–3 discriminated against him in 2011 or to L–3's claim that Mir is estopped from asserting his disability discrimination claim. Mir contends that his application for Social Security benefits in 2006 and his communications with Allsup in connection with the preparation of his application are not relevant to Mir's claim that L–3 discriminated against him in 2011 or to L–3's affirmative defense of estoppel. Mir argues that nothing in his 2006 application even remotely precludes the possibility that he would be able to work in October 2011—more than five years later. Mir also explains that he

2016 A.D. Cases 272,022

has already produced a Social Security Administration Disability Update Report for the time frame of June 2011 to June 7, 2013 (which covers the time period when Mir interviewed with L–3 in October 2011), in which he discloses to the Social Security Administration that he has been looking for work for two–and–a–half years.

Mir contends that "the broad categories of information that L–3 seeks by virtue of its proposed releases—'all information pertaining to [Mir's] claim for Social Security benefits ...including relevant medical information' from Allsup as well as all documents and information from the Social Security Administration relating to (i) Mir's current monthly Social Security benefit amount; (ii) **\*232** Mir's benefit or payment amounts from May 2005 to present; (iii) Mir's complete medical records from his claims folder(s); (iv) Mir's application(s) for disability benefits; and (v) decisions related to Mir's disability benefits—are neither relevant nor proportional to the needs of the case, particularly when considering the minimal importance of the requested discovery in resolving the actual claims and defenses at issue in this case—i.e., whether L–3 discriminated against Mir, and whether Mir is estopped from asserting his discrimination claim." Dkt. No. 30 at 8–9.

L–3 replies that Mir waived his relevance and overbreadth objections because he is, for the first time in his response, providing reasons why the disputed requests are irrelevant and overbroad and because his "form" or boilerplate objections failed to comply with the Federal Rules of Civil Procedure.

L–3 also explains that the report that Mir produced "was signed by Mir in August 2013, two years after his October 2011 interview with L–3," and that "[o]ne question on the Report specifically asked Mir 'which best describes your health now as compared to June, 2011' and Mir checked the box indicating his condition was the 'same' as in June 2011." Dkt. No. 31 at 7. According to L–3, "[i]t would appear that Mir submitted a prior update report in June 2011 well before filling out this 2013 update report," and "L–3 simply seeks Releases to obtain this type of relevant information." *Id.* L–3 further asserts that "Mir's original 2006 Benefits Application requires him to update the Social Security Administration if his condition changes"; "[h]is 2013 Update Report references back to 2011"; and, "[c]onsequently, documents from 2006 to the present are relevant because Mir may have very well made representations at any point (before or after 2011) to the Social Security Administration about his condition at the time of his interview with L–3 in 2011." *Id.* L–3 argues that "[n]owhere in his Response does Plaintiff represent that he produced all relevant documents related to L–3's estoppel defense—clearly, Plaintiff has not." *Id.*

Finally, L–3 replies that, although Mir "appears to argue that L–3 must demonstrate that Mir's 'factual descriptions of his disability preclude the possibility of qualification as of a certain date' in order for the Releases to be relevant and not overbroad," "[t]his is not the standard for engaging in discovery." *Id.* L–3 contends that it "does not need to conclusively prove its estoppel defense in order to engage in discovery on that defense" and that "L–3 served the disputed Requests on Mir in order to determine if other documents exist demonstrating that Mir precluded himself from qualifying for the L–3 mechanical design engineer position at the time of the 2011 job interview." *Id.* According to L–3, it "seeks Releases specifically limited to documents related to Mir's Social Security Disability Benefits in order to investigate its estoppel defense." *Id.* at 10.

The possible estoppel effect of a disability benefits determination by the Social Security Administration on an ADA claim involves a fact-specific inquiry. *See Self v. BNSF Ry. Co.*, No. A-14-CA-618-SS, 2016 WL 543245, at *7–*8 (W.D. Tex. Feb. 9, 2016); *McDaniel v. IntegraCare Holdings, Inc.*, 901 F.Supp.2d 863, 869 (N.D. Tex. 2012). The Court determines that the information that L–3 seeks through the Releases is relevant to its judicial estoppel defense and Mir's disability discrimination claim. The scope of information sought through the Releases is not overbroad in light of the claim and defense at issue. And, under Rule 26(b)(1), the Court determines that this discovery is proportional to the needs of the case, considering the importance of the issue of whether Mir is judicially estopped from bringing his ADA disability discrimination claim and the importance of this information sought through the Releases to resolving that fact-specific issue as well as the parties' relative access to relevant information (including the fact that this information may not be accessible from the non-party custodians without Mir's written authorization). Finally, Mir has not shown that any burden or expense of the proposed discovery—which here involves simply signing the Releases—outweighs its likely benefit.

The Court overrules Mir's objections that the requests seek information that is not relevant to the claims and defenses at issue **\*233** in this lawsuit and that the Releases are overbroad.

Mir v. L–3 Communications Integrated Systems, L.P., 319 F.R.D. 220 (2016)

2016 A.D. Cases 272,022

III. The Court will not award expenses under Rule 37(a)(5).

Under Federal Rule of Civil Procedure 37(a)(5), the Court determines that, under all of the circumstances presented here, Mir and L–3 should bear their own expenses, including attorneys' fees, in connection with L–3's MTC.

## Conclusion

For the reasons explained above, the Court GRANTS L–3's Motion to Compel Signed Releases [Dkt. No. 26]. Mir must, by **August 29, 2016**, serve on L–3's counsel the signed Form SSA–3288 "Consent for the Release of Information" and "Authorization for Release of Information" from Allsup Inc., as L–3 has requested in Request Nos. 1 and 2 of its Second Request for Production to Plaintiff Peter Mir.

SO ORDERED.

## All Citations

319 F.R.D. 220, 2016 A.D. Cases 272,022

## Footnotes

1    *See also, e.g.*, *E.E.O.C. v. Thorman & Wright Corp.*, 243 F.R.D. 426, 429 (D. Kan. 2007) ("Apparently, Defendant has not yet attempted to secure copies of the requested documents from the non-party custodian of the records via subpoena. The appropriate procedure to compel a non-party to produce documents is to serve them a subpoena as set forth in Rule 45 of the Federal Rules of Civil Procedure. It is only after the individuals or entities object on grounds of privilege or otherwise fail to produce the documents pursuant to subpoena that the Court will consider a motion requesting (1) the Court compel the entity to produce the documents pursuant to Rule 45; or (2) compel the party to execute appropriate releases pursuant to the Court's general powers to enforce its own orders." (footnote omitted)); *Becker v. Securitas Sec. Servs. USA, Inc.*, No. 06-2226-KHV-DJW, 2007 WL 677711, at *3 (D. Kan. Mar. 2, 2007) ("Rule 34 contains no provision requiring a party to sign a release or authorization so that the requesting party may obtain a document directly from a non-party." (footnote omitted)).

2    *See also* *Benson v. Rosenthal*, No. CV 15-782, 2016 WL 1046126, at *4 (E.D. La. Mar. 16, 2016) ("The concept of 'control'...is often highly fact-specific, [but certainly includes when] the party to whom the request is made has the legal right to obtain the document, even though in fact it has no copy. Factors to consider in determining whether a party has 'control' of materials include whether the litigant...could secure materials from [a] nonparty corporation to meet its own business needs, and whether, by virtue of stock ownership or otherwise, one...effectively controls the other. [U]nder some circumstances courts interpret the control concept to go beyond whether the litigant has a legal right to obtain materials and focus on practical ability to obtain them....[I]f Benson has the legal right or practical ability to obtain 'League documents' responsive to these requests that are not in the actual possession or custody of Benson or the entities that he controls, they are within his control, and he must produce them." (internal quotation marks and citations omitted; emphasis removed)); *Savoy v. Davis*, No. CV 14-700-JJB-EWD, 2016 WL 589696, at *1 (M.D. La. Feb. 11, 2016) ("Although this production obligation may extend to materials that a party has a legal right to obtain, even though it has no copy, and to materials in the possession of employees or related entities, there is no obligation to manufacture documents or other materials in response to a Rule 34 request or to produce materials that are not in the responding party's possession, custody or control." (citation omitted; emphasis removed)); *Shell Glob. Sols. (US) Inc. v. RMS Eng'g, Inc.*, No. 4:09-CV-3778, 2011 WL 3418396, at *2 (S.D. Tex. Aug. 3, 2011) (" 'Control' does not require that a party have legal ownership or actual physical possession of the documents at issue; rather, documents are considered to be under a party's control for discovery purposes when that party has the right, authority, or practical ability to obtain the documents from a nonparty to the suit." (internal quotation marks omitted)); *In re Wells*, 426 B.R. 579, 610 (Bankr. N.D. Tex. 2006) ("In construing the phrase 'possession, custody or control' in [the context of] a request for documents under Federal Rule of Civil Procedure 34, federal courts have universally held that documents are deemed to be within the possession, custody or control of a party for purposes of Rule 34 if the party has actual possession, custody or control of the materials or has the legal right to obtain the documents on demand." (internal quotation marks omitted)).

**Mir v. L–3 Communications Integrated Systems, L.P., 319 F.R.D. 220 (2016)**

2016 A.D. Cases 272,022

---

**End of Document**                                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2:11–cv–0053–SLB

Morris v. Sequa Corp., 275 F.R.D. 562 (2011)

275 F.R.D. 562
United States District Court, N.D. Alabama, Southern Division.

# John Kris MORRIS, Plaintiff,
v.
# SEQUA CORPORATION, d/b/a Precoat Metals, Defendant.

No. 2:11–cv–0053–SLB
|
July 21, 2011.

**Synopsis**
**Background:** Employee brought action against employer alleging violations of the Americans with Disabilities Act (ADA) and state law. Employee moved to quash employer's subpoenas served on nonparties, and employer moved to compel.

**Holdings:** The District Court, Sharon Lovelace Blackburn, Chief Judge, held that:

employer failed to provide proper notice to employee of its non-party subpoenas;

medical records concerning employee's brain surgery, prescribed medication, and treatment for injuries from car accident were discoverable;

employee's counseling records were discoverable;

cost of employee's medical bills from his brain surgery was not discoverable;

medical records from employer's physician were discoverable if physician examined employee;

subpoena on provider that performed drug testing services for employer would be modified;

employee's unemployment compensation records were discoverable; and

employee's application for Social security disability benefits was discoverable.

Ordered accordingly.

**Attorneys and Law Firms**

**\*564** William M. Acker, III, Birmingham, AL, James N. Foster, Jr., Brian C. Hey, McMahon Berger, St. Louis, MO, for Defendant.

Thomas F. Talty, Thomas Talty & Associates, Birmingham, AL, for Plaintiff.

Morris v. Sequa Corp., 275 F.R.D. 562 (2011)

*MEMORANDUM OPINION AND ORDER*

SHARON LOVELACE BLACKBURN, Chief Judge.

This case is currently before the court on plaintiff's Motion to Quash Defendant's Subpoenas. (Doc. 12.)[1] The case is also before the court on defendant's Motion to Compel. (Doc. 16 at 8–9.) For the reasons discussed below, the court finds that plaintiff's Motion to Quash Defendant's Subpoenas, (doc. 12), is due to be granted in part and denied in part, or is moot, and defendant's Motion to Compel, (doc. 16 at 8–9), is due to be granted.


## I. MOTION TO QUASH

Plaintiff is a former employee of defendant. (Doc. 1 ¶ 12.) Plaintiff began working for defendant in July 2007. (Doc. 1 ¶ 14.) A few years prior to his employment with defendant, plaintiff had brain surgery, and had to start taking methadone to prevent headaches and fluid build up. (*Id.* ¶ 15.) Plaintiff claims that, after taking a drug test and bringing his prescription medication to the management of defendant's company, he was told to go home until defendant's doctors cleared him for work. (*Id.* ¶¶ 20–27.) Plaintiff claims that about seven months after he was sent home, he was told by defendant that he had been terminated. (*Id.* ¶¶ 37–38.)

Plaintiff filed suit on January 5, 2011, contending he was subjected to "unlawful discriminatory practices by Sequa Corporation d/b/a Precoat Metals involving termination and other terms and conditions of employment on the basis of a perceived disability" in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, et seq. (*Id.* ¶ 1.) Plaintiff also asserts a negligence claim under Alabama law. (*Id.* at 11–13.)

On April 22, 2011, defendant served subpoenas duces tecum on fourteen nonparties by certified mail seeking plaintiff's medical records (including the results of a drug testing center), employment records, social security application, and unemployment compensation records. (Docs. 14–1 & 14–2, Redacted Subpoenas.) That same day, defendant sent plaintiff copies of the subpoenas via e-mail. (Doc. 12 ¶ 3; Doc. 18–5 at 1.) The parties do not have an agreement to accept service of documents by e-mail as required by Fed.R.Civ.P. 5(b)(2)(E). (Doc. 12 ¶ 3.) The subpoenas asked for production of documents by May 27, 2011. (Docs. 14–1 at 2, 7, 14, 21, 28, 35, 42; Doc. 14–2 at 2, 9, 16, 23, 30, 37, 42.) Plaintiff filed the Motion to Quash on April 25, 2011, arguing that the subpoenas are procedurally defective because defendant failed to give prior notice to plaintiff and that the subpoenas are not reasonably limited in scope. Although a Qualified HIPAA Protective Order, (doc. 11), was in place three days prior to the service of the non-party subpoenas, plaintiff **\*565** objects to service of some of the subpoenas because a general privacy protection order is not yet in place.[2] (Doc. 12 ¶ 7.)

Pursuant to Fed.R.Civ.P. 45(c)(3)(A), "[o]n timely motion, the issuing court must quash or modify a subpoena" that "requires disclosure of privileged or other protected matter, if no exception or waiver applies," or subjects a person to "undue burden." Pursuant to Fed.R.Civ.P. 26(b)(1), parties may obtain discovery regarding any non-privileged matter "that is relevant to any party's claim or defense." Relevant information need not be admissible at trial so long as the discovery sought "appears reasonably calculated to lead to the discovery of admissible evidence." Fed.R.Civ.P. 26(b)(1). All discovery is subject to the limitations of Rule 26(b)(2)(C), which states that the court must limit the extent of discovery if it determines that:

(I) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive;

(ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or

(iii) the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues.

**Subpoenas Issued by the District of Kansas and the District of New Jersey**
Not all of the subpoenas that plaintiff seeks to quash were issued by the Northern District of Alabama. Twelve all of the subpoenas duces tecum were issued by the Northern District of Alabama, one was issued by the District of Kansas, and one was issued by the District of New Jersey.

Plaintiff contends that the subpoenas to T–Mobile Wireless and Sprint Wireless are procedurally defective because they do not state the court of issuance on the face of the subpoenas and were issued by the wrong court. (Doc. 18–1 at 7–11.) Under Rule 45, every subpoena must state the court from which it issued, the title of the action, the court in which it is pending, and its civil action number. Fed.R.Civ.P. 45(a)(1)(A). Defendant's subpoenas for plaintiff's telephone records to T–Mobile Wireless and Sprint Wireless were issued by the Districts of New Jersey and Kansas, respectively. (Doc. 14–2 at 36–37, 41–42.) Contrary to plaintiff's contention, the subpoenas served on T–Mobile Wireless and Sprint Wireless state the issuing district court on the face of each subpoena as required by Rule 45(a)(1)(A). The subpoena to T–Mobile Wireless lists the issuing court as the United States District Court, District of New Jersey, (Doc. 14–2 at 36–37), while the subpoena to Sprint Wireless lists the issuing court as the United States District Court, District of Kansas (*id.* at 41–42).[3]

At oral argument, defendant withdrew its argument that plaintiffs Motion to Quash the subpoenas to T–Mobile Wireless and Sprint ***566** Wireless were filed in the wrong district court. The court finds that the subpoenas to T–Mobile Wireless and Sprint Wireless were issued by the proper courts. *See Managed Care Solutions, Inc. v. Essent Healthcare, Inc.,* 2010 WL 3419420, at *2 (S.D.Fla. Aug. 27, 2010) (holding that nonparty subpoena duces tecum was properly issued by district court in Southern District of Alabama as documents were located there, even though subpoena required that documents be produced to plaintiff's counsel's office in Miami, Florida); *City of St. Petersburg v. Total Containment, Inc.,* 2008 WL 1995298, at *3 (E.D.Pa. May 5, 2008) ("[T]he geographic limitation in Rule 45(a)(2)(C) relates principally to the location *of the documents to be produced,* rather than the specified location on the subpoena."). Only the issuing court can quash or modify a subpoena. Fed.R.Civ.P. 45(c)(3).

Although the court is uncertain whether defendant's withdrawal of its opposition gives the court jurisdiction to rule on the Motion to Quash, the Motion is moot because at oral argument the parties agreed to work together with regard to the documents produced pursuant to the subpoenas to T–Mobile Wireless and Sprint Wireless.

As discussed at oral argument, the parties are **DIRECTED** to work towards an agreed upon use of the telephone records, such as a protective order restricting the use or dissemination of the records. The parties' resolution of an agreed upon use for the records will not delay production of the records.

**Prior Notice**
As to the remaining twelve third party subpoenas issued by the Northern District of Alabama, plaintiff argues that the subpoenas are procedurally defective because defendant did not give plaintiff notice of service prior to issuing them. Rule 45(b)(1) provides that:

> Any person who is at least 18 years old and not a party may serve a subpoena. Serving a subpoena requires delivering a copy to the named person and, if the subpoena requires that person's attendance, tendering the fees for 1 day's attendance and the mileage allowed by law. Fees and mileage need not be tendered when the subpoena issues on behalf of the United States or any of its officers or agencies. *If the subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, then* **before it is served,** *a notice must be served on each party.*

Fed.R.Civ.P. 45(b)(1) (emphasis added). Additionally, the Advisory Committee Note to the 2007 Amendment states in pertinent part that:

> Former Rule 45(b)(1) required "prior notice" to each party of any commanded production of documents and things or inspection of premises. Courts have agreed that notice must be given "prior" to the return date, and have tended to converge on an interpretation that requires notice to the parties before the subpoena is served on the person commanded to produce or permit inspection. That interpretation is adopted in amended Rule 45(b)(1) to give clear notice of general

Morris v. Sequa Corp., 275 F.R.D. 562 (2011)

present practice.
Fed.R.Civ.P. 45 advisory committee's note (2007 Amendment).

Defendant argues that "Rule 45(b)(1) requires nothing more than simultaneous notice." (Doc. 16 at 2.) Some courts have held that simultaneous notice satisfies the notice requirement of Rule 45(b)(1). *See Fla. Media, Inc. v. World Publ'ns, LLC,* 236 F.R.D. 693, 695 (M.D.Fla.2006). However, the Eleventh Circuit has not addressed the issue. This court has previously held that Rule 45(b)(1) requires more than concurrent notice. *See Burch v. P.J. Cheese, Inc.,* No. 2:09–cv–1640–SLB (N.D.Ala. Aug. 20, 2010); *see also Beach v. City of Olathe, Kan.,* 2001 WL 1098032, at *2 (D. Kan. Sept. 17, 2001) (sustaining defendants' objection under Rule 45(b)(1) to subpoena served on non-party where plaintiff had failed to provide notice prior to service). Defendant's counsel's email to plaintiff's counsel sent on April 22, 2011, states, "Attached please find subpoenas that *are being served today* via certified mail." (Doc. 18–5 at 1 (emphasis added).) This does not amount to prior notice of service.

**\*567** At oral argument, at the court's request,[1] plaintiff waived the argument that the subpoenas are procedurally defective due to a lack of prior notice. Therefore, the court will address plaintiff's remaining arguments challenging the scope of the subpoenas.

**Scope of subpoenas**

1. *Medical Records*
Defendant served subpoenas on the following nine non-parties requesting copies of plaintiffs medical records: UAB Hospital (Trauma Center), Dr. William J. Lupinacci, Dr. Leon Campbell, Dr. Marc Husid, Dr. E. Carter Morris, Dr. Elliot Rampula, Dr. Michael Steven Theiss, Wellness Treatment Center, and Concentra Medical Centers. The subpoenas to each of these non-parties contain the same request:

John Kris Morris, SSN: [redacted], DOB: [redacted]:

INFORMATION TO BE RELEASED FOR THE TIME PERIOD BEGINNING January 1, 2004 THROUGH THE PRESENT:

■  ENTIRE MEDICAL RECORD (including ER records, admission and discharge summaries, dictated reports and consults, operative and procedure reports, intraoperative and procedure flow sheets, informed consents, physician orders, progress notes, flow sheets, medication and transfusion records, test results, labs, pictures, pathology reports, EKGs, fetal monitoring strips, office records, immunization records growth charts, telemetry strips, radiology and other diagnostic reports, patient instructions, discharge summary). RECORD ABSTRACT (History and physical, progress notes, lab, radiology, operative report, pathology report, consultation report and diagnostic tests).

■  RADIOLOGY AND OTHER DIAGNOSTIC IMAGING FILM, PICTURES, AND OR CD ROM (x-rays, CT scans, MRI, ultrasound, angiogram, diagnostic procedure, etc.,) unless otherwise specified.

■  ALL MEDICAL AND RELATED BILLS RELATED TO THE ABOVE REQUESTED INFORMATION

■  MEDICATION RECORDS

■  OTHER (SPECIFY CONTENT): medical and counseling records relating to treatment for emotional pain, suffering, humiliation, embarrassment, inconvenience, mental anguish, and loss of enjoyment of life.

If you do not wish to appear for deposition, you should send the responsive records to the Law Offices of William M. Acker, III, 2015 1st Avenue North, Birmingham, AL 35203 or McMahon Berger, P.C., Attorneys at Law, and/or Brian C. Hey, 2730 North Ballas Road, Suite 200, St. Louis, Missouri 63131–3039 prior to May 27, 2011.

(Doc. 14–1 at 9, 16, 23, 30, 37, 44; Doc. 14–2 at 4, 18, 32.)

Under Rule 45(c)(3)(A), if the medical records requested are privileged, the court must quash or modify the subpoenas served on the non-party doctors and medical facilities. Where, as in the instant case, the court's jurisdiction is premised upon a federal question with a pendent state law claim, the federal law of privilege governs the court's determination of whether the requested documents are privileged. *Hancock v. Hobbs,* 967 F.2d 462, 467 (11th Cir.1992) (per curiam).

The Federal Rules of Evidence do not explicitly recognize a doctor-patient privilege and there is no such privilege under federal common law. *See Whalen v. Roe,* 429 U.S. 589, 602, n. 28, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977) ("physician-patient evidentiary privilege is unknown to the common law"); *Ortiz–Carballo v. Ellspermann,* 2009 WL 961131, at *3 (M.D.Fla. Apr. 7, 2009) (granting defendant's Motion to Compel medical records from plaintiffs internal medicine doctor and noting that there is no doctor-patient privilege under federal law and that the requested records were relevant to the case); *see also Jaffee v. Redmond,* 518 U.S. 1, 9–11, 116 S.Ct. 1923, 135 L.Ed.2d 337 (1996) (recognizing **\*568** a federal psychotherapist-patient privilege and noting that, unlike the physician-patient relationship, the psychotherapist-patient relationship is dependent upon an atmosphere of confidence and trust). Accordingly, the court need only determine whether each set of medical records is relevant to the claims in the case.

In defendant's First Set of Interrogatories to Plaintiff, defendant asked plaintiff to identify "each and every physician, therapist, psychologist, health care facility, or other medical practitioner that has provided you with services in relation to your allegations set forth in your Complaint." (Doc. 16–1 at 25.) In response, plaintiff stated, "I am not sure what you mean by provided services in relation to my allegations set forth in my Complaint, but here is a list of doctors and medical facilities I have used that I know of," listing Dr. Rampula, Dr. Campbell, Dr. Husid, Dr. E. Carter Morris, Dr. Michael Steven Theiss, UAB Hospital, and UAB Trauma Center. (*Id.* at 25–28.)

UAB Hospital, Wellness Treatment Center, and Dr. Theiss treated plaintiff after a February 2009 motor vehicle accident which plaintiff claims left him disabled. (Doc. 1 ¶ 49; Doc. 18–1 at 18.) Dr. Leon Campbell and Dr. Elliot Rampula are plaintiffs treating physicians. (Doc. 18–1 at 18–19.) Dr. Marc Husid and Dr. E. Carter Morris performed brain surgery on plaintiff in 2004. (Doc. 18–1 at 17; Doc. 16–1 at 33–34.) Dr. William J. Lupinacci is the defendant's company doctor. (Doc. 18–1 at 18.) Concentra Medical Center performed drug testing services for defendant on defendant's employees. (*Id.* at 19.)

The court finds that the above-referenced non-parties who were issued a subpoena for medical records are likely to have information relevant to plaintiff's claims. The Complaint mentions plaintiff's 2004 brain surgery, (doc. 1 ¶ 15), that his prescribed medication for the brain surgery caused him to be sent home from work, (*id.* ¶ 23–27), that he was asked to take drug tests, (*id.* ¶ 20–22), that his doctor was in communication with defendant's doctor, (*id.* ¶ 28–32), and that he became disabled after a 2009 automobile accident (*id.* ¶ 49). Accordingly, medical records relevant to each of these incidents are discoverable.

Plaintiff acknowledges that information related to his health is relevant, and objects to the scope of the requests. (Doc. 12 ¶ 12; Doc. 18–1 at 15.) Plaintiff claims that some of the information requested by the subpoenas is "clearly not relevant" to the present action. (Doc. 12 ¶ 12.) Plaintiff also contends that defendant's request in the subpoenas for "medical and counseling records relating to treatment for ... humiliation, embarrassment, inconvenience ... and loss of enjoyment of life," is vague and ambiguous and amounts to a fishing expedition beyond the scope of the Qualified HIPAA Protective Order. (*Id.*) Defendant argues in response that such information is relevant because plaintiff claims damages in the form of loss of wages, loss of benefits, pain and suffering, mental anguish, emotional distress, embarrassment, and loss of reputation. (Doc. 16 at 3–4; *see* Doc. 1 at 11, 13.) The court agrees with defendant that this information is relevant.

Plaintiff claims that he has already produced many medical records related to his 2004 surgery and his use of methadone to defendant (Doc. 18–1 at 15; Doc. 18–7 at 1–7.) Plaintiff argues that the cost of plaintiff's medical bills from the 2004 surgery is irrelevant. (Doc. 18–1 at 18.) The court agrees. The subpoenas to Dr. Husid and Dr. Morris shall be modified to not require disclosure of plaintiffs medical bills.

Plaintiff argues that, other than the communications between Dr. Lupinacci and plaintiff's treating physician Dr. Rampula, "it appears that little of the remaining requested information [from his treating physicians and Dr. Lupinacci] has a chance of being relevant in this case." (Doc. 18–1 at 19.) The court disagrees. Medical records from plaintiff's treating physicians are highly relevant to the claims in this case, which involve plaintiff's prescription drug use, ability to work, and alleged

disability resulting from a car accident. Accordingly, the court will not modify the subpoenas to Dr. Rampula and Dr. Campbell. It is unclear from the record whether Dr. Lupinacci treated plaintiff or **569** whether he only communicated with plaintiff's doctor, Dr. Rampula. (Doc. 18–1 at 19.) Plaintiff claims that Dr. Rampula told Dr. Lupinacci in 2008 that plaintiff could return to work without restrictions and that Dr. Lupinacci agreed. (*Id.*) Plaintiff contends, therefore, that only the communications between Dr. Rampula and Dr. Lupinacci should be discoverable. (*Id.*) If Dr. Lupinacci examined plaintiff regarding his ability to return to work, those medical records are relevant and discoverable.

Plaintiff notes that, while the subpoena to Concentra Medical Center requests records going back to 2004, plaintiff was not employed by defendant until 2007. (Doc. 18–1 at 19.) Plaintiff states that "Concentra did not treat the Plaintiff but only performed drug testing for the Defendant, therefore the information provided by Concentra should be limited to drug testing results, procedures, reporting, [and] communications." (*Id.*) The court agrees. The subpoena to Concentra should be modified so as only to request drug testing results, procedures, reporting, and communications and only go back to 2007.

Finally, plaintiff requests that the subpoenas to UAB Hospital, Wellness Treatment Center, and Dr. Michael Steven Theiss be modified to request only records related to his 2009 accident. (Doc. 18–1 at 18.) The court finds that all medical records from UAB Hospital, Wellness Treatment Center, and Dr. Michael Steven Theiss are reasonably calculated to lead to the discovery of admissible evidence and are therefore discoverable. Fed.R.Civ.P. 26(b)(1). The subpoenas to UAB Hospital, Wellness Treatment Center, and Dr. Michael Steven Theiss will not be modified.

### 2. *Jeffrey D. Parsons*
Defendant's subpoena to Jeffrey D. Parsons contains the following request:

John Kris Morris, SSN: [redacted], DOB: [redacted]:

John Kris Morris' employment application for employment, salary/wage information, employment history, payroll records, internal reviews, fringe benefits, vacation, health care benefits, retirement plan benefits, profit sharing benefits, pension benefits, insurance benefits, workers' compensation claims and/or benefits, anticipated raises, anticipated bonuses and other job related benefits as well as a copy of John Kris Morris' personnel file.

If you do not wish to appear for deposition, you should send the responsive records to the Law Offices of William M. Acker, III, 2015 1st Avenue North, Birmingham, AL 35203 or McMahon Berger, P.C., Attorneys at Law, and/or Brian C. Hey, 2730 North Ballas Road, Suite 200, St. Louis, Missouri 63131–3039 prior to May 27, 2011.

(Doc. 14–1 at 5.)

Jeffrey Parsons employed plaintiff after plaintiff was terminated by defendant. (Doc. 12 ¶ 16.) At oral argument, defendant withdrew its subpoena to Jeffrey Parsons. Therefore, the Motion to Quash the subpoena issued to Jeffrey Parsons is moot.

### 3. *Unemployment Compensation Records*
Defendant's subpoena asks for the following to be provided:

John Kris Morris, SSN: [redacted], DOB: [redacted], Claim date: 9–14–2008

John Kris Morris' unemployment application and unemployment file, as well as any records in your possession concerning John Kris Morris' unemployment claim.

If you do not wish to appear for deposition, you should send the responsive records to the Law Offices of William M. Acker, III, 2015 1st Avenue North, Birmingham, AL 35203 or McMahon Berger, P.C., Attorneys at Law, and/or Brian C. Hey, 2730 North Ballas Road, Suite 200, St. Louis, Missouri 63131–3039 prior to May 27, 2011.

(Doc. 14–2 at 25.)

Plaintiff argues that the subpoena to the Unemployment Compensation Office is "not reasonably limited in scope" and seeks discovery of personal information which is "largely irrelevant to this action." (Doc. 12 ¶ 20.) Plaintiff requests that the unemployment records be limited to those related to plaintiffs employment with defendant and requests that the court require the defendant's **\*570** unemployment records and communications regarding the plaintiff be released to plaintiff. (Doc. 18–1 at 20.) Defendant argues that plaintiff's unemployment compensation records are relevant because plaintiff alleges wrongful termination, and any unemployment benefits will offset plaintiffs lost wages and may affect his eligibility under defendant's disability policies; further, defendant argues that plaintiffs application for unemployment benefits may contain impeachment evidence regarding when plaintiff learned he was terminated. (Doc. 16 at 4–5.)

The court agrees with defendant that plaintiff's unemployment records are relevant and discoverable. The subpoena shall be modified so that it only seeks plaintiff's unemployment compensation file for the time period since 2007, when plaintiff's employment with defendant began.

4. *Social Security Administration*
Defendant's subpoena to the Social Security Administration seeks the following:

John Kris Morris, SSN: [redacted] DOB: [redacted]

John Kris Morris' application for disability benefits under the Social Security Act and the Social Security Act's file(s) maintained for John Kris Morris' application for disability benefits.

If you do not wish to appear for deposition, you should send the responsive records to the Law Offices of William M. Acker, III, 2015 1st Avenue North, Birmingham, AL 35203 or McMahon Berger, P.C., Attorneys at Law, and/or Brian C. Hey, 2730 North Ballas Road, Suite 200, St. Louis, Missouri 63131–3039 prior to May 27, 2011.
(Doc. 14–2 at 11.)

Plaintiff argues that the subpoena is "not reasonably limited in scope" and seeks "personal and private information about the plaintiff which is largely irrelevant to the action." (Doc. 12 at 9–10.) Plaintiff also argues that he has already provided information about his social security application in his responses to Interrogatory Nos. 2 and 17, in which plaintiff stated that he has applied for social security disability, his claim was denied, he is reapplying, and he is not currently receiving social security benefits. (Doc. 18–1 at 22; *see* Doc. 16–1 at 3, 32, 34.) Defendant argues that the social security disability file is relevant because plaintiff alleges he is entitled to benefits under defendant's short-term and long-term disability policy, and plaintiff's "application and re-application for benefits not only affects his eligibility under Defendant's policy, but also will provide sworn statements as to Plaintiff's perception of the exact nature of his alleged disability as well as the on-set date of his alleged disability, thereby also affecting Plaintiff's claim for past and future wages." (Doc. 16 at 6.) The court agrees with defendant that plaintiff's social security application is relevant and therefore discoverable.

Accordingly, the court **ORDERS** that Plaintiff's Motion to Quash Defendant's Subpoenas, (doc. 12), is **GRANTED IN PART** and **DENIED IN PART** as set forth in this Memorandum Opinion.

## II. MOTION TO COMPEL

In a two-paragraph addendum to defendant's Response to Plaintiff's Motion to Quash Defendant's Subpoenas, defendant moves the court to compel Plaintiff to execute Social Security Administration Form SSA–3288. (Doc. 16 at 8.) Defendant asserts that, "[w]ithout Plaintiff's consent, the Social Security Administration may not release his file." (*Id.* at 8–9.) In plaintiff's response to Defendant's First Request of Production for Documents, plaintiff objected to defendant's request that he sign the release for his social security administration records. (Doc. 16–4 at 29–30.) Defendant's counsel certifies that he

Morris v. Sequa Corp., 275 F.R.D. 562 (2011)

has attempted in good faith to confer with Plaintiff's counsel to resolve these discovery issues prior to filing the Motion to Compel. (Doc. 16 at 9.)

The Motion to Compel, (doc. 16), is **GRANTED.** Plaintiff is **DIRECTED** to complete Form SSA–3288 authorizing the release of his social security administration records and return it to defendant within seven days.

**All Citations**

275 F.R.D. 562

Footnotes

1    Reference to a document number, ["Doc. _____"], refers to the number assigned to each document as it is filed in the court's record.

2    The Qualified HIPAA Protective Order, (doc. 11), grants the parties "the right, upon compliance with the applicable discovery provisions of the Federal Rules of Civil Procedure and the orders of this court, to obtain from any health care provider, health plan, or other entity covered by the Health Insurance Portability and Accountability Act of 1996, ... any and all information relating to the past, present, or future medical condition of any individual who is a party to this action ..., as well as any and all information relating to the provision of health care to such individual and payment for the provision of such health care." (Doc. 11 at 1.) The Order also "authorizes any third-party who is provided with a subpoena requesting the production of documents or commanding attendance at a deposition or trial to disclose the Protected Health Information in response to such a request or subpoena. This order is intended to authorize such disclosures under the privacy regulations issued pursuant to HIPAA. 45 C.F.R. § 164.512(e)(1)(I)." (Doc. 11 at 2.)

3    Plaintiff states that "the District of New Jersey and [ ] the District of Kansas ... were not identified by the Defendant on these subpoenas as required ..., and therefore Plaintiff does not know which court allegedly issued the subpoenas...." (Doc. 18–1 ¶ 3(a).) Both New Jersey and Kansas are one-district states; therefore, the districts were properly identified on the subpoenas.

4    The court requested that plaintiff waive the procedural objection regarding lack of prior notice because it would cause an unnecessary delay in discovery to quash the subpoenas, require the defendant to give prior notice, and then reissue the subpoenas.

---

**End of Document**                                        © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**2:15-cv-263-FtM-29CM**

2016 WL 3459428
Only the Westlaw citation is currently available.
United States District Court, M.D. Florida,
Fort Myers Division.

## Benjamin NEWMARK, Plaintiff,

v.

## Kevin RAMBOSK, Defendant.

Case No: 2:15-cv-263-FtM-29CM
|
Signed 06/24/2016

**Attorneys and Law Firms**

Douglas L. Wilson, Wilson Law Firm, Adria Lynn Silva, Naples, FL, Nancy Gbana Abudu, ACLU Foundation of Florida, Inc., Miami, FL, for Plaintiff.

David J. Stefany, Nicolette Laleh Bidarian, Allen, Norton & Blue, PA, Tampa, FL, for Defendant.

<u>ORDER</u>

CAROL MIRANDO, United States Magistrate Judge

**\*1** Before the Court are Defendant's Motion to Compel Discovery and Memorandum of Law in Support Thereof ("Motion to Compel," Doc. 23) and Defendant's Amended Motion for Conditional Extension of the Discovery Deadline Pending Resolution of Defendant's Motion to Compel ("Motion for Extension," Doc. 29). The undersigned heard argument on both motions at a hearing on June 23, 2016. For the reasons stated on the record and below, the Motion to Compel is granted in part and denied in part, and the Motion for Extension is granted.

Defendant seeks information related to Plaintiff's medical and mental health treatment. Doc. 23. Defendant states, among other things, that Plaintiff has put his mental health at issue by seeking compensatory damages for "indignation and humiliation of being discriminated and retaliated against," and therefore, information related to Plaintiff's mental health is discoverable. Id. at 8. Plaintiff objects to the production of this discovery because Plaintiff alleges that he has not put his mental health at issue because his claims of emotional distress are "garden variety." Doc. 25 at 3, 8. Additionally, Plaintiff states that Defendant failed to raise the affirmative defenses of pre-existing stressor or pre-existing condition, and therefore, Defendant is precluded from introducing or admitting any evidence in support of that defense at trial. Id. at 10.

"Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). Relevance, for purposes of discovery, does not hinge on admissibility at trial and is construed broadly to include any matter that reasonably could lead to the discovery of admissible evidence. Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351 (1978). A written response to a request for production or interrogatory is due within thirty days after the service. Fed. R. Civ. P. 33(b)(2), 34(b)(2) When a party fails to respond within the requisite time frame, the party seeking discovery may move to compel the responses. Id. at 37(a)(3)(A). An

evasive or incomplete disclosure, answer or response must be treated as a failure to disclose, answer or respond. Id. at 37(a)(4). Here, Defendant alleges that the responses are insufficient and requests complete responses to its Interrogatory No. 19 and Request for Production No. 18.

Plaintiff relies upon a case from the Northern District of Georgia for the proposition that when a Plaintiff is seeking damages for indignation, his mental health records are not relevant to the case because it is a dignitary issue rather than a psychiatric one. Doc. 25 at 7 (citing Stevenson v. Stanley Bostich, 201 F.R.D. 551, 53-54 (N.D. Ga. 2001)). In Stevenson, however, the court analyzed whether a plaintiff placed his mental condition "in controversy" for purposes of authorizing a mental examination of a Plaintiff under Federal Rule of Civil Procedure 35(a), not for purposes of general discovery. 201 F.R.D at 553. In this case, Defendant is not requesting that Plaintiff submit to a mental examination. Defendant is seeking information and documentation related to Plaintiff's claim for damages for indignation and humiliation. Doc. 23 at 8.

**\*2** This Court previously has held that a plaintiff places his mental health at issue when he makes claims for mental anguish, depression, anxiety and fear. Johnson v. Scott, No. 2:13-cv-500-FtM-38CM, 2014 WL 4322320, at 3 (M.D. Fla. Sept. 2, 2014). In Johnson, the plaintiff filed a civil rights claim under 42 U.S.C. § 1983, and alleged that he suffered "shame, embarrassment, mortification and disgrace, great mental anguish including depression, anxiety, fear and loss of capacity for the enjoyment of life." Id. at 1. The defendant in Johnson sought discovery related to the identification of mental health professionals Plaintiff had visited, and the production of medical and psychological records. Id. at 2. Relying upon Walker v. City of Orlando, No. 6:07-cv-651-Orl-19DAB, 2007 WL 3407409 (M.D. Fla. Nov. 13, 2007), which stated that when a plaintiff makes a claim for damages for mental anguish, that plaintiff has placed his mental health at issue, the undersigned found that the plaintiff in Johnson also had placed his mental health at issue. Id. at \*3. The Court found that the documents and information sought by the defendant were relevant to the claims and defenses, and therefore discoverable. Id.

Similarly, here, the Court finds that Plaintiff has placed his mental health at issue by making a compensatory damages claim for indignation and humiliation, and the information requested by Defendant is related to that claim. Plaintiff argues that the information is not relevant because "Defendant failed to raise the affirmative defense of pre-existing stressor in an attempt to diminish the amount of compensatory damages caused by the defendant's retaliation and failure to accommodate. As a result, defendant is precluded from introducing and admitting any evidence in support of that claim or defense at trial." Doc. 25 at 10. The Court, however, reminds Plaintiff that admissibility at trial is not the standard for determining whether information is discoverable. Information is discoverable when it relates to "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). Additionally, "[t]he discovery process is designed to fully inform the parties of the relevant facts involved in their case." Johnson, 2014 WL 4322320, at \*2 (internal citations omitted). Here, Defendant's request relates to Plaintiff's claim for compensatory damages. Accordingly, the Court finds that the information requested by Defendant is discoverable.

Additionally, to allow Plaintiff sufficient time to produce the requested information, the Court will grant Defendant's Amended Motion for Conditional Extension of the Discovery Deadline Pending Resolution of Defendant's Motion to Compel (Doc. 29). The Court will extend the Case Management and Scheduling Order (Doc. 15), beginning with the discovery deadline, by 60 days.

The Court notes that Defendant requested attorney's fees associated with the cost of pursuing the motion to compel. Doc. 23 at 9. Plaintiff also requests that the Court award attorney's fees for being forced to respond to Defendant's request for an extension. Doc. 30 at 8. The Court denies both parties' requests for sanctions.

ACCORDINGLY, it is hereby

**ORDERED:**

1. Defendant's Motion to Compel Discovery and Memorandum of Law in Support Thereof (Doc. 23) is **GRANTED in part and DENIED in part.**

2. On or before **July 25, 2016,** Plaintiff is directed to provide the information requested in Defendant's Interrogatory No. 19

and Defendant's Request to Produce No. 18, or state that no information exists.

3. Defendant's request for attorney's fees is **DENIED.**

4. Defendant's Amended Motion for Conditional Extension of the Discovery Deadline Pending Resolution of Defendant's Motion to Compel (Doc. 29) is **GRANTED.**

5. The Clerk is directed to issue an Amended Case Management and Scheduling Order.

6. All other directives set forth in the Case Management and Scheduling Order (Doc. 15) remain unchanged.

**\*3** 7. Plaintiff's request for attorney's fees is **DENIED. DONE** and **ORDERED** in Fort Myers, Florida on this 24th day of June, 2016.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 3459428

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# 05-80280-CIV-MARRA/JOHNSON

2009 WL 10644867
Only the Westlaw citation is currently available.
United States District Court, S.D. Florida.

NORRIS, Head, Lolitha Head, Derrick Pinder, Norris Head III and Nyjah Head, Plaintiffs
v.
CORNERSTONE RESIDENTIAL MANAGEMENT, INC. and Portofino Associates Ltd.,
d/b/a Portofino Apartments, Defendants.

CASE NO. 05-80280-CIV-MARRA/JOHNSON
|
Signed 02/27/2009

**Attorneys and Law Firms**

Matthew Wilson Dietz, Miami, FL, Stephanie Langer, Langer Law, P.A., Coral Gables, FL, for Plaintiffs.

Leslie W. Langbein, Langbein & Langbein, Miami Lakes, FL, for Defendants.

**ORDER GRANTING DEFENDANT'S MOTION TO COMPEL**

LINNEA R. JOHNSON, UNITED STATES MAGISTRATE JUDGE

**\*1 THIS CAUSE** is before the court on Defendant Portofino Associates, Ltd.'s Motion to Compel (DE 51), which is now ripe for adjudication. In this action requesting injunctive and declaratory relief under the Federal Fair Housing Act, along with compensatory and punitive damages, Defendant seeks judicial relief in connection with responses to its Requests for Production numbered 4, 11, and 12, addressed to Plaintiff Lolitha Head on December 19, 2008.[1] After considering the parties' arguments, the court grants Defendant's Motion.

**I. DISCOVERY STANDARD**

The Federal Rules of Civil Procedure strongly favor a full and broad scope of discovery whenever possible, allowing a party to obtain discovery of "any matter, not privileged, that is relevant to the claim or defense of any party." Fed. R. Civ. P. 26(b)(1); Farnsworth v. Procter & Gamble Co., 758 F.2d 1545, 1547 (11ᵗʰ Cir. 1985).[2] "Relevancy" under Rule 26(b)(1) is "construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351 (1978) (citation omitted).

Indeed, "discovery is not limited to issues raised by the pleadings, for discovery itself is designed to help define and clarify the issues — Nor is discovery limited to the merits of a case, for a variety of fact-oriented issues may arise during litigation that are not related to the merits." Oppenheimer Fund. 437 U.S. at 351. "Discovery itself is designed to help define and clarify the issues." Id. In short, information can be relevant and, therefore, discoverable, even if not admissible at trial, so long as the information is reasonably calculated to lead to the discovery of admissible evidence. Dunbar v. United States, 502

Norris v. Cornerstone Residential Management, Inc., Not Reported in Fed. Supp. (2009)

F.2d 506, 509-10 (5th Cir. 1974) (citations omitted).[3] Additionally, the United States Supreme Court remarked in Oppenheimer Fund that "it is proper to deny discovery o f ... events that occurred before a applicable limitations period unless the information is otherwise relevant to the issues in the case ...." 437 U.S. at 352.

Furthermore, under Fed. R. Civ. P. 34(a) a party may request production of documents in another party's possession as long as the documents are within the scope of Fed. R. Civ. P. 26(b). A party objecting to a motion to compel under Fed. R. Civ. P. 37 bears the heavy onus of showing by way of sufficiently specific objections why discovery should not be permitted. Panola Land Buyers Ass'n v. Shuman, 762 F.2d 1550, 1559 (11th Cir. 1985); Donahay v. Palm Beach Tours & Transp., Inc., 242 F.R.D. 685, 687 (S.D. Fla. 2007) (citing Coker v. Duke & Co., 177 F.R.D. 682, 686 (M.D. Ala. 1998) (citations omitted)). Similarly, Fed. R. Civ. P. 33(b)(4) requires that objections to answering interrogatories "be stated with specificity."

**\*2** Moreover, the Federal Rules of Civil Procedure make it very clear that a party claiming a privilege to material sought through discovery "shall describe the nature of the documents, communications, or things not produced or disclosed in a manner that, without revealing information itself privileged or protected will enable other parties to assess the applicability of the privilege or protection." Fed. R. Civ. P. 26(b)(5). Further, the Local Rules for the Southern District of Florida also provide guidance in the preparation of a privilege log. See S.D. Fla. L.R. 26.1 (G)(3)(b) &(c) (outlining generally proper identification of withheld data, privilege log contents).

In addition, the United States Supreme Court defines the attorney-client privilege as "the oldest of the privileges for confidential communications known to the common law," noting that "[i]ts purpose is to encourage full and frank communication between attorneys and their clients," and that the "privilege recognizes that sound legal advice or advocacy serves public ends and ... depends upon the lawyer's being fully informed by the client." Upjohn Co. v. United States, 449 U.S. 383, 389 (1981) (citation omitted). The privilege extends to a client corporation "which in theory is an artificial creature of the law, and not an individual." Id. at 389-90. The party invoking the attorney-client privilege bears the burden of proving that such relationship existed and that particular communications were made in confidence. Bogle v. McClure, 332 F.2d 1347, 1358 (11th Cir. 2003) (citing United States v. Schaltenbrand, 930 F.2d 1554, 1562 (11th Cir. 1991)).[4]

Further, the work product doctrine protects the disclosure of materials prepared in anticipation of litigation by a party or by its representative, which includes its attorney. Fed. R. Civ. P. 26(b)(3). The work product doctrine "reflects the strong 'public policy underlying the orderly prosecution and defense of legal claims.' " United Kingdom v. United States, 238 F 3d 1312, 1321 (11th Cir. 2001) (citing Hickman v. Taylor, 329 U.S. 495. 510(1947)). In performing his duties it is essential for a lawyer to work "with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel," to and including assembling information and sifting through facts to separate what the lawyer considers to be relevant and irrelevant, to prepare a legal theory, and to plan strategy. Hickman v. Taylor, 329 U.S. at 510-11. An attorney's thoughts, therefore, must remain "inviolate." Id. at 511. Nonetheless, "[w]here relevant and non-privileged facts remain hidden in an attorney's file and where production of those facts is essential to the preparation of [a] case, discovery may be properly ... had. Such written statements and documents might, under certain circumstances, be admissible in evidence or give clues as to the existence or location of relevant facts .... [o]r they might be useful for purposes of impeachment or corroboration." Id. In such instances, "production might be justified where the witnesses are no longer available or can be reached only with difficulty." Id. If production of such material were to be precluded, "the liberal ideas of the deposition-discovery portions of the Federal Rules of Civil Procedure would be stripped of much of their meaning." Id. at 510-11. To overcome the protection afforded by the work product doctrine a petitioner "must show both a substantial need for the information" and that it cannot be obtained by other means. Id. (other citation omitted).

## II. DISCUSSION

**\*3** Request No. 4 seeks "[c]opies of all diaries, notes, calendars, journals, and/or chronologies made by [Lolitha Head] which support the allegations of this lawsuit. (DE 51 at 4.) Defendant indicates to the court that Plaintiff objected to this Request alleging protection under the attorney-client privilege, stating that "all requested documents were created for attorneys in anticipation of litigation."[5] (Id.) Defendant goes on to allege that Plaintiff did not provide a privilege log as required by Fed. R. Civ. P. 26(b)(5) when invoking the attorney-client privilege. Id. Plaintiff equivocates in her Response, contending that no documents exist "outside of those created specifically for [Plaintiff's counsel] in litigation as [Plaintiff's counsel] was

retained following the eviction proceedings." (DE 57 at 3.) Plaintiff goes on to aver that S.D. Fla. L.R. 26.1 (G)(3)(c) protects "communications between a party and its counsel after commencement of the action and work product created after commencement do not need to be included in a privilege log." (Id.)

First of all, Plaintiff apparently uses the concepts of attorney-client privilege and the work product doctrine interchangeably. As earlier noted, Plaintiff did not invoke the work product doctrine in her response to Request No. 4 as set forth by Defendant, nor does she deny that Defendant correctly states her original stated position in responding to the Request. Further, a plain reading of Plaintiff's Response to the Motion at bar shows that she makes a new assertion then, i.e., that she retained counsel "following the eviction proceedings." (DE 57 at 3.) There is no averment of the date of Plaintiff's engaging her attorney, but a review of the record shows filing of the eviction proceedings on March 25, 2005, and an April 4, 2005, filing date for the Complaint in this matter. (DE 57-4; DE 1.) The proximity of the eviction proceedings to the commencement of this action, would arguably allow consideration of Plaintiff's argument. A credibility problem arises, however, as a result of the fact that Plaintiff did not present the argument now appearing in her Response at the time of objecting to Request No. 4. Compare DE 51 at 4 with DE 57 at 3 (reflecting conflict between Plaintiff's earlier and later allegations). Having observed the afore stated discrepancy, Defendant correctly argues that Plaintiff "did not specify the dates the documents were created or tie them to Local Rule 26.1 (G)(3)'s bright line test." (DE 58 at 4.) Moreover, apparently in February of 2005 the record shows the filing of a housing discrimination complaint with The Palm Beach County Office of Equal Opportunity.[6] (DE 58-3.) Defendant logically argues that it "is entitled to see [sic] know whether those dates or events were contemporaneously recorded, including whether Plaintiff scribbled notes during conversations with [Defendants'] managers in late December, 2004 and early 2005." (DE 58 at 4.) Additionally, the court finds that it is counterintuitive that Plaintiff would proceed with a housing discrimination complaint and deal with an eviction proceeding without referencing contemporaneously noted documentation of events, which would also have facilitated apprising her counsel of all facts closely connected thereto. Any documents pertaining to the housing discrimination allegations and the defense of the eviction, in turn, would conceivably also have an equal relationship to the foregoing action. Consequently, because the creation of any such documents may well have occurred at a date prior to the commencement of the case at bar, the court is persuaded that Plaintiff must provide a privilege log in compliance with the provisions of Fed. R. Civ. P. 26(b)(5) and S.D. Fla. L.R. 26.1 (G)(3)(b)(ii)(A).[7]

**\*4** Request No. 11 asks for copies of Plaintiff's federal income tax returns, along with all schedules and attachments, for the years 2005, 2006, and 2007. (DE 51 at 4.) Plaintiff contends compliance with this Request, adding that she did produce the items "that were in her possession." (Id.; DE 57 at 3.) Defendant points out that the production was incomplete, evasive and in derogation of the requirements of Fed. R. Civ. P. 37(a)(3) because Plaintiff only provided "a single page from her tax returns." (DE 51 at 6.) Defendant also avers that tax returns are relevant to allegations of housing discrimination, and that the Southern District of Florida has previously required their production.[8] (DE 51 at 5.) Plaintiff does not deny that the tax returns are relevant to this action, arguing only that she "produced all the documents within her possession and control," and taking the position that "[i]f Defendants believe there are additional tax return papers outside of those within the possession and control of Ms. Head then they must file a subpoena against the party that has control and possession of those documents." (DE 57 at 4.) As a result, the court finds that Defendant is entitled to complete copies of Plaintiff's tax returns for the years 2005, 2006, and 2007.

As to Plaintiff's position that she has produced everything within "her possession and control," and that it is Defendant who must obtain anything else related thereto, Plaintiff is mistaken. Controlling precedent supports that it is her responsibility to provide Defendant complete copies of the tax returns. Not only does Plaintiff concede the right to Defendant's access to the tax returns, which is supported by Eleventh Circuit relevancy standard, Maddow v. Procter & Gamble Co., Inc., 107 F.3d 846, 853 (11th Cir. 1997), but case law also supports Defendant's position that Plaintiff must obtain complete copies of the tax returns. The issue here is "control," the definition of which "for purposes of production means a legal right of access." Bankatlantic v. Blyth Eastman Paine Webber, Inc., 127 F.R.D. 224, 230 (S.D. Fla. 1989) (citing Searock v. Stripling, 736 F.2d 650 (11th Cir. 1984)).[9] Hence, the court finds that Plaintiff's argument that it is up to Defendant to obtain complete copies of the tax returns at issue cannot stand.

Request No. 12 seeks all medical records of Plaintiff for a five year period before filing this lawsuit, along with medical records created after the start of this action, including those related to Plaintiff's pregnancy with her daughter Nyjah Head. (DE 51 at 4.) Plaintiff objected to this Request alleging it is "overly broad and unduly burdensome," and that it seeks irrelevant information "not reasonably calculated to lead to the discovery of admissible evidence." (DE 51 at 4-5.) As a result, she has not produced any documents responsive to this Request. Plaintiff's Response, once again, presents an

Norris v. Cornerstone Residential Management, Inc., Not Reported in Fed. Supp. (2009)

equivocal argument that she has not made a claim "that the mental and psychological distress caused by the Defendants' actions manifested in physical symptoms that required treatment by a physician."[10] (DE 57 at 5.) That contention has no bearing on Defendant's position. What Defendant is arguing is that Plaintiff placed her medical history at issue by claiming that she suffers and continues to suffer "humiliation, embarrassment, emotional distress" directly related to Defendant's actions. (DE 51 at 6.) Defendant quotes from the Complaint in this action alleging that "Plaintiffs have suffered actual **damages, psychological distress, mental anguish, grievous emotional distress** ... [which] losses are **either permanent or continuing** and Plaintiffs will suffer these losses in the future." (DE 51 at 6 (emphasis in Motion).) Further, a review of the Complaint herein reflects that Plaintiff seeks punitive damages resulting from "humiliation, embarrassment and emotional distress," and that she claims "actual damages, psychological distress, mental anguish, grievous emotional distress, embarrassment, shame, worry, frustration, and humiliation, [and] loss of capacity for the enjoyment of life." (DE 1 at 12, ¶ d; at 16, ¶ 79.)

**\*5** It is true that merely alleging damages for "emotional distress" does not suffice to place a plaintiff's mental condition at issue for purposes of discovery under Fed. R. Civ. P. 35. Ali v. Wang Laboratories, Inc., 162 F.R.D. 165, 167 (M.D. Fla. 1995) Here, nonetheless, Plaintiff emphasizes her mental condition and seeks actual and punitive damages as a result thereof. Moreover, the court finds Defendant's point is well taken about determining the presence of "superseding or intervening causes for the extreme emotional distress" alleged in support of damages. There are indications in this record that Plaintiff has had credit difficulties, which included debts to a prior landlord. (DE 51 at 3.) Indeed, according to Defendant, the credit worthiness issue was brought to Plaintiff's attention during her tenancy at Defendant's property, and there was agreement by her of resolving the debts and improvement of her credit status, about which she allegedly later changed her mind, apparently resulting in the eviction action. (Id.) Plaintiff does not deny in her Response Defendant's credit/debt allegations. In addition, Defendant is entitled to determine whether or not post partum depression following the birth of Nyjah Head affected Plaintiff (DE 58 at 6 & n.3) because, arguably, such mental condition would not be attributable to recoverable mental distress damages in this action. As a result, it is conceivable, and possibly relevant to her claims at bar, that Plaintiff's medical records could divulge previous or subsequent deleterious emotional effects resulting from her purported debt/credit problems or the birth of her child. Consequently, the court finds that Plaintiff has placed her mental condition at issue and that Defendant has shown good cause that her medical records related thereto are pertinent to, and discoverable in, this litigation.[11]

Finally, Defendant seeks Plaintiff's medical records for five years before the start of this litigation through the date of production. Even though a case cited by Defendant (Owens v. Spring/United Mgmt. Co., 221 F.R.D. 649 (D. Kan. 2004)) is not controlling law in the Eleventh Circuit, the undersigned is persuaded that the Owens decisional rationale supports Defendant's position. Owens involved Title VII discrimination, and the defendant therein attempted to limit the temporal scope of discovery to a two year period. 221 F.R.D. at 655. The Owens court found it reasonable to "balance the clear relevance of the information against the burden on the [producing party]." The Owens decision reviewed time frames allowed in other cases, which ranged from four years before filing suit being reasonable to eight years prior to a liability period being excessive, and noting the "emergence of a 'five-year rule' " as early as 1978. 221 F.R.D. at 655 n.29. Id. Based on the foregoing analysis leading to the finding of discoverability of Plaintiff's medical records, the court further finds that the time period of five years before filing suit to the time of production is not "a broad sweep for evidence" as alleged by Plaintiff (DE 57 at 5), but a reasonable period of time for production of Plaintiff's medical records.


## III. CONCLUSION

Based on the foregoing analysis, the court finds proper to grant the relief sought in Defendant's Motion, to and including the award of attorney's fees in the amount of $150.00 because the court finds that Plaintiff did not display a spirit of cooperation in resolving the discovery disputes at bar. Furthermore, the court recognizes the potential privacy concerns in divulging Plaintiffs financial and medical information. To protect any such sensitive interests, the undersigned will enter a confidentiality order, if requested to do so. If the parties wish to protect Plaintiff's records in that manner, they shall confer and submit a joint proposed confidentiality order to the court. It is, therefore

**ORDERED AND ADJUDGED** that:

1. Defendant's Motion (DE 51) is **GRANTED;**

Norris v. Cornerstone Residential Management, Inc., Not Reported in Fed. Supp. (2009)

2. Within thirty (30) days of the date of this Order[12] Plaintiff shall produce:

a. A privilege log in compliance with Fed. R. Civ. P. 26(b)(5) and S.D. Fla. L.R. 26.1(G)(3)(b)(ii)(A);

b. Complete copies of her tax returns for the years 2005, 2006, and 2007;

c. Her medical records for five years before the filing of this action through the date of production, to and including any records pertaining to the birth of her daughter Nyjah Head;

3. Plaintiff shall pay to Defendant the sum of $150.00 in attorney's fees within thirty (30) days of the date of this Order;

4. If the parties wish to have a confidentiality order entered in connection with the production of Plaintiff's tax returns and her medical records, they shall confer in a spirit of cooperation and submit a proposed order to the undersigned in that regard.

**\*6 DONE AND ORDERED** in Chambers at West Palm Beach, Florida, this 27th day of February, 2009.

**All Citations**

Not Reported in Fed. Supp., 2009 WL 10644867

Footnotes

1    Defendant granted Plaintiff an extension of time until January 9, 2009, and the responses were served on January 5, 2009. (DE 51 at 1, ¶ 1.) On January 13 and January 21, 2009, Plaintiff supplemented her responses, (id. at 2, ¶¶ 2 & 3.)

2    It is a basic tenet that "[m]utual knowledge of all the relevant facts gathered by both parties is essential to proper litigation." Hickman v. Taylor, 329 U.S. 495, 507-08 (1947).

3    Fifth Circuit decisions as they existed as of the close of business on September 30,1981, are binding precedent on all federal courts within the Eleventh Circuit. Bonner v. City of Prichard, Alabama, 661 F.2d 1206, 1207 (11th Cir. 1981).

4    The party asserting the privilege must show that the communication was "(1) intended to remain confidential *and* (2) under the circumstances was *reasonably* expected and understood to be confidential." Bogle v. McClure, 332 F.3d at 1358 (citing United States v. Bell, 776 F.2d 965, 971 (11th Cir. 1985)) (emphasis in original).

5    The court notes that Plaintiff does not invoke the work product doctrine in the stated objection.

6    Despite the fact that the housing discrimination complaint bears a heading of Feb ruary 11, 2004 (DE 53-3 at 2), the court concludes that said complaint was filed in February of 2005 because of the sworn statement at the end of that document bearing the date of February 15, 2005, and references events from February of 2004 through January 31, 2005 (DE 58-3 at 3).

7    The court is cognizant of the Southern District of Florida's precedent that a post litigation privilege log is not in keeping with S.D. Fla. L.R. 26.1(G)(3)(c). Stern v. O'Quinn, 253 F.R.D. 663, 688-89 (S.D. Fla. 2008); Cherenfant v. Nationwide Credit, Inc., 2004 WL 5315889, at \*2 (S.D. Fla. 2004). The creation of post litigation documents protected from inclusion in a privilege log, however, remains to be established in this particular instance.

8       Defendant cites to an August 28, 2006, Order (DE 258) entered by the Honorable Barry S. Seltzer, United States Magistrate Judge, in the case of <u>Milsap v. Cornerstone Residential Management, Inc.</u>, Southern District of Florida Case No. 05-60033-CIV-Marra, which Defendant misidentifies as being dated August 25, 2006, also incorrectly referencing the Order as bearing two docket entry numbers (156 and 256) not assigned to it. (DE 51 at 5 & n.2.)

9       The <u>Searock</u> court defined control "not only as possession, but as the legal right to obtain the documents requested upon demand." 736 F.2d at 653.

10      For the sake of judicial economy, the court will not address the case upon which Plaintiff relies (Fla. Dep't of Corr. v. Abril, 969 So.2d 201 (Fla. 2007)), since the undersigned agrees with Defendant's argument that the Florida case is not controlling, or even apposite or persuasive, to Plaintiffs position.

11      As a result, Plaintiff's request that Defendant show cause regarding the production of Plaintiffs medical records (DE 57 at 5) is obviated.

12      The undersigned notes that as of the date of entry of this Order neither a trial date nor a discovery cutoff exists in this matter.

---

**End of Document**                                                  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# 1:17-cv-059

328 F.R.D. 242
United States District Court, D. North Dakota.

Jamie SCOTT, individually and as Personal Representative for the Wrongful Death Estate of James Anthony Scott, deceased, Plaintiff,

v.

CITY OF BISMARCK, North Dakota, a Municipal Corporation; Dan Donlin, in his official capacity as Chief of Police for the City of Bismarck, North Dakota; Shaun Burkhartsmeier, in his official and individual capacity; Justin Antonovich, in his official and individual capacity; John Does 1-5, in their individual and official capacities, Defendants.

Case No. 1:17-cv-059
|
Signed 09/17/2018

**Synopsis**

**Background:** Suspect's widow brought action on behalf of herself, suspect's estate, and suspect's survivors, asserting claims for violations of civil rights under the federal and state constitutions and state law claims for wrongful death, negligence, and gross negligence. Defendants moved to compel discovery.

**Holdings:** The District Court, Charles S. Miller, Jr., United States Magistrate Judge, held that:

widow was required to make good faith effort to obtain information from suspect's two adult children with respect to suspect's prior residences and past employment;

interrogatories requesting information and documents about suspect's past treatment by medical care providers were overbroad and unduly burdensome;

rule governing requests for production allowed district court to compel widow to execute releases for records held by non-parties;

widow would be compelled to execute and provide to defendants releases for suspect's medical, pharmacy, mental health, and alcohol treatment records;

widow would not be compelled to execute and provide to defendants releases for her Social Security earnings statement or any claim for disability on her part;

widow would be compelled provide releases for copies of all documents generated as a result of her having seen mental health professional within five years preceding suspect's death;

widow would be compelled to produce statements or admissions against interest made by named defendants; and

widow be compelled to produce supplemental answer to interrogatory seeking information on suspect's past illicit drug use.

Motion granted in part and denied in part.

**Procedural Posture(s):** Motion to Compel Discovery.

**Attorneys and Law Firms**

**\*244** Noah W. Drew, John Graham, Mel C. Orchard, III, Spence Law Firm LLC, Jackson, WY, Tyrone Jay Turner, Larson Latham Huettl LLP, Bismarck, ND, for Plaintiff

Lawrence E. King, Zuger Kirmis & Smith, Bradley Neuman Wiederholt, Randall J. Bakke, Shawn A. Grinolds, Wade Anthony Davison, Bismarck, ND, for Defendant

**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO COMPEL**

Charles S. Miller, Jr., Magistrate Judge

Before the court is defendants' Motion to Compel Discovery (Doc. No. 34). For the reasons set forth below, the motion is granted in part and denied in part.

## I. BACKGROUND

On March 6, 2016, multiple Bismarck Police Department officers were dispatched to an apartment building in Bismarck, North Dakota to investigate reports of an intoxicated man roaming the neighborhood with a shotgun and threatening to kill one of the apartment's residents. Upon arriving, they encountered James Anthony Scott ("Scott"). Scott fled when confronted by law enforcement, leaving his shotgun behind. One of the officers in pursuit—defendant Antonovich—yelled repeated warnings about a gun, although he never saw Scott with a gun as Scott was fleeing. Exactly what Officer Antonovich said and how many times he repeated it are disputed. After one or more of the warnings about a gun, another officer—defendant Burkhartsmeier—fired his rifle at Scott three times. Two rounds struck Scott in the back, mortally wounding him. Scott was unarmed at the time.

On March 31, 2017, plaintiff, Scott's widow, initiated the above action on behalf of herself as well as Scott's estate and his survivors. Plaintiff asserts in the complaint claims for violations of civil rights under the federal and state constitutions and state law claims for wrongful death, negligence, and gross negligence. Presently before the court is a motion to compel brought by all of the named defendants with the exception of defendant Antonovich, who was added as a party defendant subsequent to the filing of the instant motion.

## II. DISCUSSION

### A. Interrogatory Nos. 1, 2, 3, 17, and 18

Defendants' Interrogatory Nos. 1, 2, 3, 17, and 18 seek background information with respect to Scott's past residences, employment, education, and lawsuits initiated by or brought against Scott. Plaintiff responded to defendants' interrogatories by providing what information she personally has. This is limited to her first hand knowledge dating back to about 2009 when she first met Scott before she married him in November 2011, and information Scott may have shared with her about

his past, *e.g.*, where he was from, the fact he graduated from high school, some of the past places he lived, and who some of his relatives were.

Defendants contend that plaintiff's responses are inadequate, arguing that she, as the personal representative of Scott's estate, is under an obligation to provide full and complete information to the interrogatories, which variously request information dating back fifteen years, twenty years, or for an unlimited amount of time. Plaintiff responds, contending the information she has provided is adequate and any further information would be of little assistance and disproportionate to the needs of the case.

The court has carefully reviewed both plaintiff's interrogatory answers and the deposition testimony she has given. The information defendants seek beyond what has been provided with respect to these interrogatories and during plaintiff's deposition testimony would be of marginal, if any, assistance, particularly given the information defendants already have with respect to Scott. **\*245** The only exceptions might be past locations where Scott has lived (at least in terms of the city if not the exact address) and his past employment. This information might assist defendants in locating additional medical records.

It appears from the interrogatory answers that plaintiff relied primarily upon her own information in answering, although there is some suggestion she may have queried Scott's elderly stepfather in response to defendants' complaints of inadequacy. There is no suggestion, however, that she made any inquiry of Scott's two adult children.

The court concludes with respect to Interrogatory Nos. 1 and 2 that plaintiff must make a good faith effort to obtain whatever information the two adult children have with respect to Scott's prior residences and past employment dating back fifteen years from the date of Scott's death, but only if damages are going to be requested in this action on behalf of the two adult children or if they are "takers" of any amount that may be recovered by Scott's estate. If neither are the case, then no effort need be made to elicit the information from them, and, if defendants think it is worth the additional costs (which the court doubts), they may depose these individuals to obtain it.

Beyond this, while defendants have the right to discover at least some of the information requested by the interrogatories, there is no right to receive the same information in multiple ways. In exercise of the court's authority under Fed. R. Civ. P. 26(b)(2)&(c)(1) to control the manner and sequence of discovery, including prescribing a discovery method other than what a party may select, the remainder of defendants' motion to compel with respect to Interrogatory Nos. 1, 2, 3, 17, and 18 is denied for the reasons set forth above.

### B. Interrogatory Nos. 10–12 and Request for Production No. 1

#### 1. Introduction

Defendants seek in these discovery requests information and documents about Scott's past treatment by medical care providers, psychologists, psychiatrists, pharmacists, drug and alcohol treatment providers, and marital counselors. For some of the information and documents requested, defendants seek information for Scott's entire life. For others, the time period is more limited. Also, in Request for Production No.1, defendants request that plaintiff sign releases for information from all of the foregoing treatment and service providers so that defendants can obtain the records directly from them.

Defendants contend that plaintiff's responses to these discovery requests are deficient. With respect to the interrogatory answers, defendants state that plaintiff has provided only limited information as to where and from whom Scott obtained medical treatment during his life. With respect to the document requests, defendants contend plaintiff is required to execute the releases but has refused to do so. Further, defendants state that, even for the medical records that plaintiff agreed to provide in lieu of releases, not all have been provided, including none of the alcohol treatment or mental health records.

In response, plaintiff states with respect to the interrogatories that she has provided all the information she has and that the

questions seeking information for Scott's entire life are unduly burdensome and unlikely to produce relevant information. As
for the medical and other treatment records, plaintiff states she has obtained and produced some of the *known* records and is
in the process of obtaining the remaining known records, including Scott's recent alcohol treatment records. She states she
will produce the remaining records when received. Finally, plaintiff refuses to execute the tendered releases for treatment
records, claiming there is nothing in the federal discovery rules that requires she must do so.

### 2. Interrogatory Nos. 10–12

The court agrees that a number of the interrogatories served upon plaintiff in defendants' First Set of Interrogatories are
overbroad and unduly burdensome. For example, of those at issue now, Interrogatory No. 11 asks plaintiff to list the dates of
each medical prescription and refill for the ten years preceding Scott's death. Really?

**\*246** While the court is tempted to simply deny the clearly overbroad requests rather than attempt to edit them, plaintiff shall
respond with the information she has and shall also make inquiry of Scott's adult children for any other information that they
might possess (if any), but limited as follows:

• Interrogatory No. 10 - limited to fifteen years preceding Scott's death and only to the names of the facilities or
providers for medical care related to Scott's physical health.

• Interrogatory No. 11 - limited to ten years preceding Scott's death and only to the names of the pharmacies and the
location.

• Interrogatory No. 12 - limited to seven years preceding Scott's death and only to the names of the facilities, the
locations, and the reason for treatment or service if known.

### 3. Releases for records held by non-parties

#### a. Whether the court has authority to require execution of records releases

The court will address first the issue of whether it can compel a party to execute releases for records held by a non-parties
(*e.g.*, releases for medical, employment, education, social security, and cell phone records) when a request for execution of
releases has been made as part of a request for documents pursuant to Fed. R. Civ. P. 34 and the party refuses to execute the
releases. Unfortunately, the courts are seriously divided over this issue.

A number of courts have concluded that Rule 34 does not provide for execution of releases that would enable the requesting
party to obtain directly from a non-party documents that are subject to the control of the party to whom the Rule 34 request is
made. According to these courts, any authority to compel execution of releases arises only if the records in the possession of
the non-party cannot be obtained by other means and then only as a possible sanction. See, e.g., Cheshire v. Air Methods
Corp., No. 3:15-cv-933, 2015 WL 7736649, at \*4 (W.D. La. November 30, 2015) ("Cheshire") (employment records); Fields
v. West Virginia State Police, 264 F.R.D. 260, 261–64 (S.D. W. Va. 2010) (medical records); Klugel v. Clough, 252 F.R.D.
53, 55 & n.3 (D.D.C. 2008) (medical records); Becker v. Securitas Security Services, USA, Inc, No. 06-2226, 2007 WL
677711, at \*3 (D. Kan. Mar. 2, 2007) (medical, employment, and educational records); Moody v. Honda of Am. Mfg., Inc.,
No. 2:05-cv-0880, 2006 WL 1785464, at \*\*4–5 (S.D. Ohio June 26, 2006) ("Moody") (medical records); Clark v. Vega
Wholesale, Inc., 181 F.R.D. 470, 471–72 (D. Nev. 1998) (medical records); see generally J. Grenig & J. Kinsler, Handbook
Fed. Civ. Discovery & Disclosure § 9:12 & n.10 (4th ed. July 2018 update) ("Rule 34 may not be used to compel a party to
sign a release or authorization so that the requesting party may obtain a document directly from a non-party."). The reasons
most often given by these courts for why releases cannot be requested as matter of course pursuant to Rule 34 are: (1) the
language of Fed. R. Civ. P. 34 requiring the party to whom a request for documents is made to either allow the inspection of

Scott v. City of Bismarck, 328 F.R.D. 242 (2018)

or produce the documents that are within that party's possession, custody, or control,[1] and (2) the lack of any **\*247** express provision in Rule 34 for records releases. See id.

Other courts, however, have taken the position that requests for execution of releases can be made pursuant to Rule 34 such as would enable the requesting party to obtain directly from non-parties records that are subject to the control of the party to whom the Rule 34 request has been made. See, e.g., Prado-Guajardo v. Perez, No. 2:16-cv-00546, 2017 WL 3130420, at \*\*5–6 (D. Nev. July 24, 2017) ("Prado-Guajardo") (employment, worker's compensation, insurance, and Medicare-related records); Mir v. L-3 Communications Integrated Systems, L.P., 319 F.R.D. 220, 226–30 (N.D. Tex. 2016) ("Mir") (SSA disability records); Matherne v. Schramm, No. 12-807, 2013 WL 5961096, at \*\*2–3 (M.D. La. Nov. 7, 2013) (medical, employment, SSA, and tax records); E.E.O.C. v. Princeton Healthcare System, No. 10-4126, 2012 WL 1623870, at \*\*19, 22–23 (D.N.J. May 9, 2012) (medical and SSA records); Lischka v. Tidewater Servs., Inc., No. Civ. A. 96-296, 1997 WL 27066, at \*2 (E.D. La. Jan. 22, 1997) ("cases almost universally hold, explicitly or implicitly, that Rule 34 empowers federal courts to compel parties to sign written authorizations consenting to the production of various documents").[2]

One court required the execution of releases as a matter of expediency in a case where there were some ninety non-party medical providers. Cutting v. United States, No. 07-cv-02053, 2008 WL 1775278, at \*2 (D. Colo. Apr. 14, 2008). But, in subsequent cases, the same court has held that, while it has the authority to require execution of releases in unusual cases such as the one just cited, this is not the normal course under Rule 34 and the execution of releases would not be required absent an inability to obtain the documents by subpoena. See Miller v. Kastelic, No. 12-cv-02677, 2013 WL 4431102, at \*3 (D. Colo. Aug. 16, 2013). Another court recently elected to punt in view of the uncertainty over the court's authority under Rule 34(a) and gave the party to whom the request for production of documents was directed the option of either signing the releases or obtaining the records from the non-parties and providing them to the requesting party. Vasquez v. Conquest Completion Services, LLC, No. MO:15-cv-188, 2018 WL 3611891, at \*3 (W.D. Tex. Jan. 10, 2018) ("The court will not pitch its tent either way [in terms of the competing positions]. Instead, Defendant may choose to either sign the authorization enabling Plaintiff to obtain the cell-phone records from the non-party custodian or Defendant may obtain the records himself from the non-party custodian and produce the records.").

The parties in this case have not cited to any federal court of appeals decision that has squarely decided the issue. The closest case cited by other courts is McKnight v. Blanchard, 667 F.2d 477, 481–82 (5th Cir. 1982) where the Fifth Circuit held that a party was not required to execute medical authorizations submitted pursuant to Fed. R. Civ. P. 33 & 36 but stated in *dicta* the result might be different had they been submitted as part of a Rule 34 request for documents. Id. at 481–82. The Eighth Circuit has upheld the dismissal of cases in two MDL actions where the plaintiffs failed to comply with the district courts' orders to provide signed releases **\*248** for medical records, but the issue of the district courts' authority to require signed releases does not appear to have been raised in either case and courts in MDL cases sometimes employ procedures that differ from the normal course. Freeman v. Wyeth, 764 F.3d 806, 809 (8th Cir. 2014); In re Prempro Products Liability Litigation, 423 Fed.Appx. 659, 660-61 (8th Cir. 2011).

Within the Eighth Circuit, a number of the district courts have ordered the execution of releases, albeit with little or no discussion about the court's authority to do so. See, e.g., Shikapwashya v. Urban League of Metropolitan St. Louis, No. 4:17-cv-01961, 2018 WL 3575113 (E.D. Mo. July 25, 2018) (psychiatric and general records); Damgaard v. Avera Health, No. 13-2192, 2014 WL 12608147, at \*1 (D. Minn. June 5, 2014) (medical and mental health records); J.J.C. v. Fridell, 165 F.R.D. 513, 517 (D. Minn. 1995) ("Fridell") ("Requests for authorizations for the release of medical records can be properly ordered pursuant to Rule 34 but authorizations are not mandated[,]"); Brown v. Eli Lilly and Co., 131 F.R.D. 176, 178 (D. Neb.1988) (medical records). The same is true for this court, although without explicit consideration of the court's authority. Wetzel v. Brown, No. 1:09-cv-053, 2014 WL 684693, at \*5 (D.N.D. Feb. 21, 2014) (ordering *pro se* prisoner to execute releases for mental health and general medical records); Nord v. Walsh County, No. 2:10-cv-114, 2012 WL 12859722, at \*2 (D.N.D. March 3, 2012) (physical and mental health records).

Looking to the text of Rule 34, a request for execution of releases for documents held by non-parties can be viewed as being a "request" to the party having control to "produce and permit the requesting parties to inspect" as provided for in subdivision (a)(1). Broadly speaking, a party having control, but not physical possession, can "produce" and "permit inspection" of the documents by allowing the non-party to produce them. With respect to subdivisions (b)(1)(A)-(B), the request for execution of the proposed releases is the requesting party's specified "manner of inspection" and the requirement that the request "describe with reasonable particularity each item or category" is satisfied with a sufficient description of the documents to be obtained in the proposed releases appended to the Rule 34 request. Further, with the appending of the releases to the Rule 34

request, the responding party has the opportunity under subdivision (b)(2) to object to the scope and terms of the proposed releases in a manner that allows for court review. Finally, there is also the opportunity to object to the use of releases and argue that another method of production is more appropriate.

Granted, there is language in Rule 34 that does not fit neatly with the use of releases. For example, subdivision (b)(1)(B) requires the requesting party to specify the time and place of the inspection. Also, there is the language in (b)(2)(B) giving the responding party the opportunity to produce the documents rather than allow inspection. However, reading Rule 34 expansively, these provisions could be viewed as applying only to the most common situation that Rule 34 was intended to address, that being when the documents are in the possession of the party to whom the request is made, and not the less frequent situation where the documents are not in the possession of the party but arguably subject to its control.

In short, an expansive reading of Rule 34 arguably does not foreclose the use of releases as an alternative means of obtaining production of documents that are not in the possession of the party to whom the request is directed but are under its control—at least when the proposed releases are made a part of the Rule 34 request.[3]

**\*249** Moving beyond the text of Rule 34, the expediency in many cases of employing signed releases to gather information from non-parties cannot be denied given their widespread use as evidenced by the cases cited above as well as this court's understanding of their frequent use in this District. See also Beyoglides, Jr. v. Montgomery County Sheriff, No. 3:14-cv-158, 2015 WL 6859114, at \*1 (S.D. Ohio Sept. 8, 2015) ("Traditionally, in this jurisdiction, plaintiff's counsel submits executed medical release authorizations to defense counsel and defense counsel subsequently sends those executed releases to medical care providers."); Britton v. Dallas Airmotive, Inc., No. 07-547, 2008 WL 11348474, at \*3 (D. Idaho Sept. 24, 2008) (noting that the use of records releases is often the most efficient and expeditious means for obtaining medical information from health care providers; Nuskey v. Lambright, 251 F.R.D. 3, 8 (D.D.C. 2008) ("Courts regularly order plaintiffs to sign authorizations for the release of medical information from health care providers where, as here, those records are relevant to the plaintiff's claims; this procedure has been viewed as the most expeditious and efficient way for the opposing party to obtain pertinent medical records."). More particularly, the use of releases likely reduces the number of arguments over the scope of production with the shifting of the burden and costs of obtaining the records to the party requesting them. In addition, the use of releases for the most part eliminates resource-wasting arguments over whether the documents are actually under the control of the party to whom the request is made and what means of obtaining production is appropriate depending upon how the "control" question is resolved. Finally, the use of releases facilities the production of documents in those cases where a subpoena pursuant to Fed. R. Civ. P. 45 is not enough.[4]

While expediency alone cannot be grounds for construing Rule 34 to permit requests for signed releases, it does provide support for an expansive reading of Rule 34 to allow for such use consistent with Fed. R. Civ. P. 1. In relevant part, Rule 1 commands that the federal court rules are to "be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding." See also 8B Fed. Prac. & Proc. Civ. § 2202 (3d ed. Sept. 2018 update) (Rule 34 "is to be liberally, rather than narrowly, construed.").

Plaintiff argues that Rule 34 contemplates that the party from whom records are sought has the right to vet its own documents—including those that it controls but are in the hands of a non-party. If the court requires use of releases, plaintiff argues she loses this right, including the ability to withhold from anyone's view documents that are privileged or otherwise highly personal or sensitive and not admissible for any purpose.

**\*250** Whatever right a party may have to not turnover documents without the opportunity for some court review, it is doubtful that Rule 34 is its source. Moreover, a party to whom a Rule 34 request for releases is directed does have the opportunity to object and seek relief from the court. In fact, that is what is happening now. And, in those instances where circumstances broker for using a different method of production, it is well within the court's authority under Fed. R. Civ. P. 26(b)(2),(c)(1),&(d)(3) to order it. For example, the court can order that the party to whom the Rule 34 request for releases is directed be given the opportunity to obtain and produce the documents instead of requiring the releases to be signed. See, e.g., Fridell, 165 F.R.D. at 517 (while concluding that requests for medical releases are a proper form of discovery under Rule 34, denying request of signed releases for medical records bearing upon plaintiff's mental and emotional health in favor of permitting plaintiff's counsel obtaining the documents and performing an initial screening of them). The court also could order that the proposed releases be revised so as to require the non-parties to produce the documents to the attorney for the party to whom the Rule 34 request was directed for initial screening rather than the attorney for the party seeking the documents. Also, in one case, a court ordered that the attorney for the party who obtained the documents pursuant to the

releases to (1) provide one copy of the documents to the attorney for the party that provided the releases and (2) place the produced set of documents in an envelope, without first examining or reviewing them, until the court could rule on the claims of privilege. Pedersen v. Bio-Medical Applications of Minnesota, No. 12-2649, 2013 WL 12305034, at **1, 4-5 (D. Minn. Sept. 20, 2013).

Upon consideration of the foregoing, plaintiff's objection that the court lacks the authority to compel execution of releases requested pursuant to Rule 34 is overruled. While it is a close question, the undersigned concludes that an expansive reading of Rule 34 allows for (but does mandate) the use of proposed releases as a means of obtaining production of documents if the proposed releases are made a part of the Rule 34 request.[5] And, with this conclusion, the court's authority to compel execution of releases is no different from its authority to compel compliance with Rule 34 generally. See, e.g. Prado-Guajardo, 2017 WL 3130420, at *4; Mir, 319 F.R.D. at 239–40; Fed. R. Civ. P. 37(a)(3)(B)(iv).[6]

### b. The requests for signed releases pursuant to Request No. 1

After balancing the interests of the parties, including the fact Scott is deceased (thereby lessening the privacy concerns) and plaintiff's limited knowledge of where Scott has received treatment or been provided other services, the court will require that plaintiff, in her capacity as the personal representative of Scott's estate, execute and provide **251 to defendants releases for Scott's medical, pharmacy, mental health, and alcohol treatment records, but not for any records generated from the marital counseling that both Scott and plaintiff participated in as identified in response to Interrogatory No. 12.

With respect to the marital counseling records, the court will give plaintiff the opportunity to obtain and produce any responsive records in lieu of having to provide signed releases. For any documents that plaintiff withholds or redacts, plaintiff shall (1) submit that material to the court for *in camera* inspection and (2) file a brief setting forth the grounds for any withheld or redacted information.

The court will not set any particular date limitation on the records to be produced bearing upon Scott's general physical health. The circumstances of the case are likely to limit the production as a practical matter. Further, the burden and cost of securing the records has now been shifted to the defendants. However, for Scott's mental health and alcohol treatment records, the limit shall be seven years prior to Scott's death. And, for the marital counseling records, the limit shall be five year prior to Scott's death.

Defendants shall promptly forward copies of any records obtained pursuant to the releases to the attorneys for plaintiff—in this case free of cost. Further, defendants shall not use the documents as received for any purpose unless they have been first provided to plaintiff at least 48 hours in advance. The court concludes it unfortunately needs to include this additional proviso because of disputes between the parties relating to documents that were secured pursuant to signed releases.

Documents obtained pursuant to the releases that address Scott's mental health or alcohol treatment shall not be disclosed by counsel for either party to any other person; that is, the documents shall be for "attorney's eyes only." The same shall be true for any marital counseling documents that plaintiff produces or the court orders be produced after an *in camera* inspection. An exception is that counsel for each party can designate one staff person who can have access for administrative handling but subject to the same requirements of non-disclosure imposed on counsel. All other documents obtained pursuant to the releases shall be treated as "confidential" pursuant to the court's protective order at Doc. No. 22. And, if any of the foregoing documents ("attorney's eyes only" or "confidential") need to be used or filed in connection with any motion or proceeding before this court, the parties shall file the documents under seal.

Finally, while it appears that proposed releases were appended to defendants' Rule 34 requests, they were not made a part of the record here. If plaintiff has objections to the terms of the releases other than what the court has ruled on, plaintiff shall immediately request a conference with the court so that a ruling can be made but only after plaintiff has first made a good faith effort to resolve any differences with the defendants.

**C. Requests for Production 3, 4, 5, and 6**

Defendants' Requests for Production 3, 4, 5, and 6 seek signed releases of records for: claims by Scott for worker's compensation (No. 3) and disability insurance (No. 4); claims by both Scott and plaintiff for Social Security benefits and Social Security Disability (No. 5); and Social Security earnings statements for both Scott and plaintiff (No. 6).

The court overrules plaintiff's objection that the court lacks the authority to compel execution of releases for the reasons already articulated. With respect to Scott, the court requires that plaintiff, in her capacity as personal representative of Scott's estate, execute signed releases for the above record as they pertain to him subject to the same caveat of the court not having seen the proposed releases and that plaintiff may have additional objections to the terms of the releases.

With respect to the plaintiff, she has already executed a release for her Social Security survivor benefits according to her brief. As for plaintiff's Social Security earnings statement or any claim for disability on her part, the court denies the request for releases for these records. Defendants have failed **\*252** to demonstrate how any of that information is either relevant to this action or realistically might lead to relevant information beyond what defendants are already entitled to obtain.

**D. Request for Production No. 32**

Request for Production No. 32 requests copies of all documents generated as a result of plaintiff having seen any counselor, psychologist, therapist, or mental health professional within five years preceding Scott's death and at anytime since. Defendants' brief claims that it also requested that plaintiff sign releases for these records as part of their request for production of documents, but the only requests referenced in the briefing on the current motion is Request No. 1, which relates only to Scott, and Request No. 32, which is not a request for signed releases. But, even if a request for signed releases was properly made, the court would not order signed releases with respect to these highly personal and confidential records.

Putting aside the manner of production, plaintiff objects to having to provide any of the records on the grounds that they are irrelevant because she will not be seeking damages for emotional loss greater than what would be suffered by another other person in her circumstances having suffered the loss of a spouse. She contends this renders the requested documents irrelevant and not subject to production for this reason, citing this court's decision in Auer v. City of Minot, 178 F.Supp.3d 835 (D.N.D. 2016).

Auer, however, was a different case. In that case, the plaintiff stated she was restricting her claim for non-economic loss suffered as a result of an alleged wrongful discharge from employment to the hurt feelings, humiliation, anger, and embarrassment that would be suffered by any person that was similarly involuntarily terminated. The court held in Auer that the plaintiff was not required to produce her mental health and counseling records so long as she: (1) limited her claim for non-economic loss to that just described (which necessarily would result in a jury instruction limiting what is recoverable); (2) did not call an expert to testify about her emotional distress; and (3) did not call any layperson witnesses to testify about what they observed with respect to the impacts of the termination upon her. Auer, 178 F.Supp.3d at 840–47. In this case, even if the mental distress that plaintiff is claiming could be compared to that of the plaintiff in Auer (which the court need not decide now), it is not at all clear from reviewing plaintiff's complaint and her discovery responses that she is limiting her claims for mental distress to the same extent as the plaintiff in Auer, notwithstanding the somewhat vague assurances in her brief that her claims and evidence will be so limited.

As this court noted in Auer and in Magelky v. BNSF Ry. Co., No. 1:06-cv-025, 2008 WL 238451, at \*\*2–5 (D.N.D. Jan. 28, 2008) ("Magelky"), a plaintiff can put her mental health at issue depending upon the evidence that is offered, including waiving any psychotherapist-patient privilege under Jaffee v. Redmond, 518 U.S. 1, 116 S.Ct. 1923, 135 L.Ed.2d 337 (1996) when federal common law governs, or under N.D. R. Evid. 503(d)(3) when state law supplies the rule of decision. See Fed. R. Evid. 501. At this point, the court is not prepared to conclude plaintiff has not put her mental health at issue.

In addition, this case is also different from Auer in that the plaintiff here is claiming loss of consortium and economic loss extending far into the future and there is concrete, non-speculative evidence that she and Scott were having marital difficulties, including that Scott had been physically abusive to her. The records that are being sought with respect to these requests might very well contain evidence that would bear upon the claims of loss of consortium and economic loss, apart

from the claim of emotional loss.

In short, the court for now overrules plaintiff's blanket objection that none of the information that is the subject of Request No. 32 need be produced based on Auer. Plaintiff shall be required to obtain the information that is the subject of Request No. 32 and then produce documents are responsive unless there are specific objections, *e.g.*, a renewed claim of privilege, lack of relevancy, a Fed. R. Evid. 403 objection, or lack of defendants' legitimate need for the particular information in light of other information defendants **\*253** already possesses. For any information that plaintiff withholds or redacts based upon these grounds, plaintiff shall (1) submit that material to the court for *in camera* inspection, and (2) file a brief setting forth the grounds for why any of the withheld or redacted information need not be produced. For any information that is turned over or that the court orders be produced, it shall be treated as "attorney's eyes only" in the same manner as discussed earlier with respect to certain of Scott's records. The ultimate admissibility of the evidence in this instance will be for the trial judge to decide.

### E. Interrogatory No. 9

Interrogatory No. 9 number reads as follows:

> **INTERROGATORY NO. 9:** If it will be claimed that at any time the defendants Dan Donlin, Shaun Burkhartsmeier and/or the City of Bismarck, their agents, representatives, and/or employees, have been heard to make any statements or admissions against interest concerning the cause of the subject incident and/or any circumstances surrounding the subject incident please provide the substances of each statement or admission, the time and place when made, the person who made it, the person to whom it was made, and state who was present when the statement or admissions was made.

Plaintiff objects to this interrogatory: (1) as being overbroad and unduly burdensome in that it could be interpreted as requiring disclosure of virtually all impeachment material and it being difficult to know in advance of the highly dynamic situation at trial when and how certain information might be used; (2) unfairly calling for the disclosure of counsel's trial strategies and work product; (3) requiring recitation of a large volume of information already in the hands of defendants; and (4) being premature, in any event, until discovery is completed or near completion.

The court agrees that the interrogatory as drafted is overbroad, burdensome, and, at least in part, inappropriately requires disclosure of attorney work product. Although, perhaps, not what defendants intended, the interrogatory as written could be construed as requiring plaintiffs to identify and provide the substance of any "statements" regarding the "cause" or "circumstances of the subject incident"—even those set forth in the City's own official reports of the shooting.

Further, even apart from that, there could be substantial uncertainty with respect to what might be considered a declaration against interest in any particular situation. What about a statement made by one of the officers at the scene of the shooting that is already contained in the official police reports that may suggest he or she did or failed to do something for which there is an argument that it amounted to a violation of department procedures or good practice? Is the statement by that officer one that is against his or her interest since it could potentially result in discipline? Does plaintiff have to parse through all of the investigation material generated by defendants, decide whether any statements might theoretically qualify as a statement against interest, and then regurgitate that back to defendants? What if plaintiff intends to use a particular statement that arguably might be a declaration against interest for purposes of impeachment only?

On the other hand, the purpose for discovery is to eliminate unfair surprise. And, for example, if plaintiff was to claim at trial that defendant Burkhartsmeier admitted to her in a private conversation he should not have shot Scott, it seems this is the sort of thing that ought to be discoverable.

Under Fed. R Civ. P. 26(a)(1)(A)(i) both parties are obligated to provide without any demand being made:

> (i) the name and, if known, the address and telephone number of each individual likely to have discoverable information--along with the subjects of that information--that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment[.]

In terms of this particular case, keeping in mind Fed. R Civ. P. 26(a)(1)(A)(i)'s requirements and without deciding what

might be an appropriate interrogatory in other cases if phrased differently, plaintiff shall provide a supplemental answer that is limited to any **254** statement that plaintiff or her attorneys have knowledge of that is (1) made by a named defendant and (2) rises to the level of being an admission (and not just evidence) of fault or liability. In case of defendant City of Bismarck, this would include a statement by a person that plaintiff contends amounts to an admission of fault or liability on the part of the City because of that person's position or authority. If plaintiff is not aware of any such statements as the court as redefined what must be answered, plaintiff can respond stating she has no information with respect to any such admission as of the current time, keeping in mind her obligation to timely supplement the answer should the situation change.[7]

### F. Interrogatory No. 14 and Requests for Production Nos. 23 and 29

Interrogatory No. 14 requires that plaintiff state all past illicit drug use by Scott including what drugs he has used, the quantities, and the time frames. Plaintiff objects to the interrogatory on the grounds of lack of relevancy, overbreadth (no limitation as to time), and lack of knowledge to be able to provide fully responsive information. Plaintiff cites to this court's decision in Magelky, supra, as support for why Scott's past illicit drug use would not be admissible in this case.

In ruling on a motion in limine in Magelky (a "slip and fall" FELA case), this court did exclude evidence of the plaintiff's drug use (prescription pain medication before the accident and addiction to hydrocodone afterwards) as it might bear upon her claim for economic damages. 2008 WL 238451, at *5. What plaintiff ignores, however, is that the court did so on Fed. R. Evid. 403 grounds—not lack of relevancy. In this case, the court might very well balance the Rule 403 factors differently and conclude that some of the evidence of Scott's prior drug use is relevant with respect to the issue of damages, *e.g.*, what impact it may have had upon his projected life span as well as his ability to produce a steady stream of income in the future. Further, plaintiff conveniently overlooks the fact that the court also stated in Magelky that it was leaving open the question of whether the evidence of plaintiff's drug use might be admissible with respect to her claim for non-economic loss. Id. Consequently, plaintiff's objection of lack of relevancy is not grounds at this point for not responding to defendant's interrogatory.

That being said, plaintiff's personal knowledge with respect to the matters covered by Interrogatory 14 was explored thoroughly in her deposition. Hence, the court will not require in this particular instance a supplementation of her answer with respect to her own knowledge. However, plaintiff shall make an inquiry of Scott's two adult children if evidence as to their loss is going to be presented at trial or if they are takers in Scott's estate. For any illicit drug use by Scott that they have observed or are otherwise familiar with, information as to the type of drug, the **255** approximate time frames of use (if known), and the relative frequency (if known), should be provided in a supplemental answer to Interrogatory No. 14 but limited to ten years preceding his death.

Document Request No. 23 requires production of documents of any accusations, charges, or convictions for any misdemeanor or felony offenses. Plaintiff shall produce responsive documents if she or Scott's Estate are in possession of any. To the extent this request can be construed as attempting to impose an affirmative obligation to seek out such material in the hands of the others (which some of the wording of the Request No. 23 appears to suggest, *i.e.*, "[b]e sure the documents provided include the following information ....), the request is denied.

Document Request No. 29 seeks the same information as requested by Interrogatory No. 14 but contained in documents. Plaintiff shall provide responsive documents in her or the Estate's possession, if there are any, but is under no obligation to seek out that information from others.

### III. ORDER

Defendants' motion to compel discovery is **GRANTED IN PART** and **DENIED IN PART**. Plaintiff shall supplement her discovery responses and execute releases in accordance with the foregoing discussion within twenty days. Otherwise, defendants' motion to compel discovery is denied.

Given the foregoing disposition of defendants' motion to compel, the court will not award fees or costs to either party.

**IT IS SO ORDERED.**

**All Citations**

328 F.R.D. 242

Footnotes

[1]    Courts have taken different positions with respect to whether particular non-party records are under the "control" of a party such that the party is required to obtain copies of the records from the non-party in order to comply with a Rule 34 request for production of documents. For example, with respect to medical records, some courts have concluded that records in the possession of non-party treatment providers are generally not within the control of the party from whom the records are sought within the meaning of Rule 34(a). Clark, 181 F.R.D. at 472 ("The relationship between the Plaintiff and her doctor is not sufficient to establish control."). Other courts, however, have concluded that medical records are usually within the party's control based on the ability in most instances of the party being able to obtain copies from the treatment providers. See, e.g., Moody, 2006 WL 1785464, at *5 ("Medical records in the hands of a health care provider, while not technically in the possession of a party who has placed his or her medical condition at issue, are within the control of that party because the party can compel the medical provider to release them. Consequently, they should be treated just like any other document which is requested under Rule 34."). The same disagreement exists with respect to employment records. Compare E.E.O.C. v. Randall Ford, 298 F.R.D. 573, 575 (W.D. Ark. 2014) (holding that the employment records of the person upon whose behalf EEOC was suing were not under the control of either the EEOC or the person on whose behalf suit was brought and, for that reason, denying an order to compel execution of releases for employment records) with Prado-Guajardo v. Perez, No. 2:16-cv-00546, 2017 WL 3130420, at **5–6 (D. Nev. July 24, 2017) (concluding that a party had control of employment and other records within the meaning of Rule 34 based on an expansive reading of "control" to include not only documents to which the party has the legal right but also the practical ability to obtain).

[2]    Even within the same court, there is not always agreement with respect to whether the court can order the execution of releases as a matter of course. For example, plaintiff cites to Moody, 2006 WL 1785464, supra, for her argument that the Federal Rules do not authorize the court to compel execution of releases for treatment records. However, at least one other judge in the Southern District of Ohio has since reached a different conclusion. Langenfeld v. Armstrong World Industries, Inc., 299 F.R.D. 547, 555–56 (S.D. Ohio 2014); see also Jones-McNamara v. Holzer Health Systems, Inc., No. 2:13-cv-616, 2015 WL 196415, at *2 (S.D. Ohio Jan. 15, 2015).

[3]    This interpretation is not inconsistent with subdivision (c) of Rule 34, which states that Rule 45 may be used to obtain records in the possession of non-parties. Subdivision (c) and Rule 45 speak to documents in the possession of non-parties generally and not those (or not just those, depending one's reading) that are within the control of a party to the litigation. See also Prado-Guajardo, 2017 WL 3130420, at **5–6 (the availability of other options for obtaining records that are in the possession of a non-party but subject to control of the party to whom the request is made is not reason to foreclose the ability of securing the documents by requesting signed releases); Mir, 319 F.R.D. at 229 (same).

[4]    As discussed in note 1 supra, courts have disagreed over whether certain non-party records are subject to the control of the party to whom a Rule 34 request for production has been made, including, for example, medical and employment records. Further, that is not the end of the disagreement. For records that are deemed to be under the control of the party, some courts take the position that only a Rule 34 request for production of documents is appropriate. See, e.g., Cheshire, 2015 WL 7736649, at *4; Moody, 2006 WL 1785464, at **4-5. Other courts, however, appear to be of the view that a subpoena pursuant to Fed. R. Civ. P. 45 can also be used. See, e.g., Prado-Guajardo, 2017 WL 3130420, at *5; Mir, 319 F.R.D. at 229. If it is determined that the records are not under the control of a party, then the only means of obtaining the records under the federal rules would be by a Rule 45 subpoena. But, for certain records, a Rule 45 subpoena is often ineffectual because the non-parties refuse to comply with a Rule 45 subpoena, irrespective of the question of control, unless there is a signed release or possibly a separate court order. This is true for number of governmental records because of additional statutory or regulatory requirements. See, e.g., Prado-Guajardo, 2017 WL 3130420, at *5; Allen v. Indian Harbor Marine, Inc., No. Civ. A. 96-3135, 1997 WL 666210, at *2 (E.D. La. Oct. 24, 1997). It is true for most

medical records in light of HIPAA. See, e.g., Fields, 264 F.R.D. at 261–62. It also appears to be true for most, if not all, records that are subject to the Stored Communications Act. See, e.g., Lucas v. Jolin, No. 1:15-cv-108, 2016 WL 2853576, at *5 (S.D. Ohio May 16, 2016) (stating that "courts have overwhelming held that the SCA prevents a provider from releasing the 'contents' of a user's stored communications in response to a civil subpoena from a third party" but that a provider can release communications if the subscriber gives consent to the release).

[5]    To be clear, while the undersigned rejects plaintiff's argument that the court lacks the authority to compel execution of releases submitted as part of a Rule 34 request in appropriate cases, the court similarly rejects the following unsupported hyperbole in defendants' brief:

> In objecting and refusing to provide discovery, Plaintiff has decided she is entitled to be the gatekeeper, especially as it pertains to her own and to Tony Scott's medical, mental health, and addiction/drug use history. She refuses to sign medical and other authorizations that would allow Defendants to obtain relevant records direct from the source. Instead, Plaintiff's counsel has offered to "prescreen" records, redact them, and then produce them to the Defendants, which is a practice Plaintiff's counsel has stated is their "standard practice". This practice is unusual, prejudicial, and inefficient, virtually never appropriate or allowed, and certainly does not comport with full, fair and liberal discovery. Gatekeeping is the Court's role at trial, and is not the role of Plaintiff's counsel in discovery. It also effectively allows Plaintiff to determine what discovery is allowable and what evidence will be available for trial. This is improper and should not be allowed.

(Doc. No. 38). A different method of production may be appropriate in cases where there appear to be a serious question with respect to privilege, there are legitimate privacy concerns, or the information is otherwise particularly sensitive (*e.g.*, involving trade or commercial secrets) and a confidentiality order is deemed insufficient to address the concerns.

[6]    Given the prevalence of the use of signed releases and the differing conclusions that courts have come to with respect to when and how they may be used, it may be time to consider revising Rule 34 to resolve the issue one way or the other.

[7]    The only case cited by either party with respect to the appropriateness of Interrogatory No. 9 is plaintiff's reference to Folz v. Union Pac. R. R. Co., No. 13-cv-00579, 2014 WL 357929, at *3 & n.1 (S.D. Cal. Jan. 31, 2014). To the extent that decision can be read as being contrary to what the court has ruled, the court respectfully disagrees. Notably, the work-product doctrine, to the extent it might apply, is not absolute and the need of a party to obtain in advance of trial information with respect to any claimed admission of liability is substantial. Arguably, it is no less than the perceived need for allowing discovery of prior written or recorded statements of a party under Fed. R. Civ. P. 26(b)(3)(C) as expressed in the commentary to Rule 26. See Advisory Committee Notes to 1970 Amendments to Fed. R. Civ. P. 26. Further, the fact that subdivision Rule 26(b)(3)(C) does not extend to oral statements of a party does not in the undersigned's view foreclose the ability to seek information with respect to statements that rise to the level of being an admission of fault or liability. But cf. Bohannon v. Honda Motor Co., Inc., 127 F.R.D. 536, 540 (D. Kan. 1989). Finally, the court notes that authors of several practice guides have recommended the use of interrogatories to elicit information about claimed admissions or declarations against interest by a "party." See 2 Lane's Goldstein Litigation Forms § 26:42 (Aug. 2018 update) (sample interrogatories); S. Allen, 42 N.J. Prac., Discovery § 2.79 (Nov. 2017 update) (suggesting that an interrogatory requesting information about claimed admissions or declarations against interest by a "party" is one of a handful of questions that should be posed in almost every case). However, it appears that the interrogatories contemplated by these authors are more limited. Also, there was no discussion about any of the issues raised here. Id.

---

**End of Document**    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# 07–80894–CIV

U.S. E.E.O.C. v. Nordstrom, Inc., Not Reported in F.Supp.2d (2008)

2008 WL 5070145

2008 WL 5070145
Only the Westlaw citation is currently available.
United States District Court,
S.D. Florida.

UNITED STATES EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION, Plaintiff,
v.
NORDSTROM, INC., Defendant.

No. 07–80894–CIV.
|
Nov. 24, 2008.

West KeySummary

1    **Federal Civil Procedure**  🔑 Sufficiency;
     supplementation of answers

Equal Employment Opportunity Commission
(EEOC) was required to supplement its answer
to an interrogatory seeking the past medical
history of employees or abandon its claims
for damages based on pain and suffering. The
EEOC claimed damages for emotional pain and
suffering which stemmed from alleged unlawful
employment practices on the basis of race and
national origin in violation of the Civil Rights
Act. The employer wished to review the medical
history of each employee to determine if they
suffered from any pre-existing conditions that
also could have contributed to any pain and
suffering. The information sought was therefore
relevant to a potential damages award. Fed.Rules
Civ.Proc.Rule 26(b)(1), 28 U.S.C.A.

3 Cases that cite this headnote

**Attorneys and Law Firms**

Aarrin Benatra Golson, Public Defender's Office, Diana
Vizcaino, Maria Kate Boehringer, Nora E. Curtin, U.S.
Equal Employment Opportunity Commission, Miami, FL,
Ana Isabel Segura, Fort Lauderdale, FL, for Plaintiff.

Elizabeth Pryor Johnson, Michael Lewis Elkins, Fowler
White Burnett, Miami, FL, for Defendant.

*ORDER ON MOTION TO COMPEL*

KENNETH L. RYSKAMP, District Judge.

**\*1** THIS CAUSE comes before the Court pursuant to
Defendant's Motion to Compel Responses to Defendant's
First Set of Interrogatories and Defendant's First Request for
Production, filed July 18, 2008 **[DE 37].** Plaintiff responded
on August 4, 2008 **[DE 39].** Defendant replied on August 13,
2008 **[DE 40].** This motion is ripe for adjudication.

The EEOC has filed an action against Defendant, alleging
violations of Title VII of the Civil Rights Act of 1964 and
Title I of the Civil Rights Act of 1991. The EEOC filed
this action on behalf of Gloria Pimental and other similarly
situated, alleging that Defendant used unlawful employment
practices on the basis of the claimant's race and national
origin, which is Hispanic. The EEOC alleges that one of
Defendant's managers harassed the claimants and created
an intimidating, hostile and offensive work environment.
Despite complaints, the EEOC asserts that Defendant took
no action to stop the harassment or to prevent its occurrence
in the future. The EEOC further alleges that Pimental and
others were retaliated against because they engaged in the
protected activity of reporting the manager's harassment.
This retaliation supposedly included increased hostility,
harassment, false accusations of performance problems,
constructive discharge and termination.

Defendant has filed the instant motion to compel. Prior to
addressing the merits of the motion, the Court will address
whether the motion is timely. On June 3, 2008, Defendant sent
correspondence to the EEOC seeking resolution of numerous
discovery disputes. On June 26 and July 7, 2008, the EEOC
sent correspondence to Defendant agreeing to supplement
its discovery responses. On July 10, 2008, after the parties
conferred via telephone, the EEOC served supplemental
responses to several of the requests for production and one
of the interrogatories. Defendant filed its motion to compel
on July 18, 2008, 8 days after receiving the supplemental
responses. The Court, therefore does not find that this motion
was filed outside of the 30 day time limitation prescribed by
Local Rule 26.1.H. Pending negotiations for the resolution
of discovery disputes constitutes reasonable cause to file a
motion to compel after the technical expiration of the time

2008 WL 5070145

limits of the rule. *See ABM Financial Services, Inc. v. Express Conso., Inc.,* 2008 WL 1776595, at *2 (S.D.Fla. April 17, 2008) (finding that "the parties' attempts to reach a negotiated resolution to their discovery dispute constitutes reasonable cause"). Having deemed the motion timely, the Court will address each discovery request individually.

"Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party." Fed.R.Civ.P. 26(b)(1). Courts construe this language to permit "open disclosure of all potentially relevant information." *Burns v. Thiokol Chemical Corp.,* 483 F.2d 300, 307 (5th Cir.1973). The scope of discovery is limited, however. The information sought must be relevant and not overly burdensome to the responding party. *Washington v. Brown & Williamson Tobacco Corp.,* 959 F.2d 1566, 1570 (11th Cir.1992) (citing *Trevino v. Celanese Corp.,* 701 F.2d 397, 406 (5th Cir.1983)). Discovery should be tailored to the issues involved in the particular case. *Id.* Local Rule 26.1 .G.3(a) requires that all grounds for objections to discovery shall be stated with specificity. Objections to discovery must be "plain enough and specific enough so that the court can understand in what way" the discovery is alleged to be objectionable. *See Panola Land Buyer's Assn. v. Shuman,* 762 F.2d 1550, 1559 (11th Cir.1985) (objections of overbreadth, undue burden and relevance are too vague "to allow the magistrate and the district court, absent an abuse of discretion, to grant the motion for a protective order. The recitation of expense and burdensomeness are merely conclusory.").

*Interrogatory No. Two:*

  **\*2** Identify every medical doctor, physician, psychiatrist, therapist, or other health care professional of any kind, each Claimant has consulted for the past five years for any physical, mental or emotional condition alleged in the Complaint. For each such health care professional, include the date(s) consulted, the diagnosis made, the treatment, including medication prescribed, the date on which he ceased to be under the care of such health care professional, and the date on which treatment, including use of prescription drugs, ended.

The EEOC responded as follows:

> EEOC objects to the extent the interrogatory requires EEOC to identify every written or
>
> recorded form of all knowledge or information known by each person. Such a request is overly broad, unduly burdensome, harassing, and seeks disclosure of privileged, confidential and statutorily protected information.

They EEOC claims damages for emotional pain and suffering. As a result, Defendant wishes to review the medical history of each claimant to determine if the claimants suffer from any preexisting conditions that may also contribute to any pain and suffering. The information sought in the interrogatory is therefore relevant to a potential damages award. The EEOC asserts that the requested information is statutorily protected, but it fails to identify the applicable statute. In its response, the EEOC stated that it has agreed to identify any health care providers who may have treated Claimants or any element of damages alleged in the Complaint. Although the EEOC promised to supplement this interrogatory, no supplemental information has been forthcoming. The EEOC shall supplement its answer to this interrogatory or abandon its claims for any damages based on pain and suffering.

*Interrogatory No. Three:*

For each Claimant, specify in detail the past and future pecuniary losses Claimant allegedly suffered as a result of the matters alleged in the Complaint, and the method by which such damages have been computed. If the dollar amount is not yet known, state the method or formula by which you contend such amount should be computed, and the time period over which you contend such sum should be computed.

The EEOC specifies that it seeks front pay, back pay, pre-judgment interest, pecuniary and non-pecuniary compensatory damages, punitive damages and injunctive relief as well as litigation costs. The EEOC did not provide any information as to Claimant Wallace, and did not provide the calculation of damages or an estimated amount of damages as to Claimant Baptiste. As to all other Claimants, the EEOC did not provide information as to potential future losses, and did not provide a time period over which future losses should be computed. Defendant must be able to explore the exact method by which Claimants calculate their damages and the exact amount of losses Claimants believe they have suffered. The

EEOC responded, noting that Wallace remained employed with Defendant and that the EEOC therefore cannot seek a backpay award for her. As to Baptiste, the EEOC claimed it did not yet have responsive information, but that it contacted Baptiste on or about July 18, 2008 and is gathering same. The EEOC also claims that the request as to front pay is premature because it depends on future events not yet known to the EEOC. That Wallace still works for Defendant has no bearing on the EEOC's answer except insofar as the EEOC should inform Defendant that it is not arguing that Wallace suffered financial losses. That the EEOC has yet to communicate with Baptiste is not an excuse for delay. The EEOC has provided no other reason for its delay in responding to the interrogatory. It is therefore ordered to supplement its answer.

*Interrogatory No. Four:*

**\*3** Specify in detail the loss of employment benefits, which each Claimant has suffered as a result of the matters alleged in the Complaint, and how such damages have been computed.

The EEOC has not yet calculated the value of lost employment benefits, because it is difficult for it to quantify the value of such a loss. The EEOC notes that it might seek compensation for lost health insurance by way of an emotional distress award, as the inability to seek medical treatment due to lost income can impact an employee's mental health. Although the EEOC has not prepared any calculation of lost benefits as distinct from compensatory damages it advises Defendant that it will seek compensatory damages up to the applicable caps. If the EEOC is still in the process of calculating the value of these benefits, it should so state in its answer. The EEOC is ordered to supplement its answer to this interrogatory.

*Interrogatory No. Six:*

Identify all sources of income of any kind each Claimant has had since their separation from employment with Nordstrom, including, but not limited to, self-employment, other employment, unemployment, disability, worker's compensation, Social Security benefits, pension, annuities, alimony or other court-ordered payments, and the total amount of income received by each Claimant from each source identified.

The EEOC responded as follows:

EEOC objects to this interrogatory on the grounds that it is overly broad, unduly burdensome, harassing, and is not reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding said objections, and without waiving them, EEOC provides information concerning wages earned from subsequent employers.

This interrogatory seeks relevant information as sources of income Claimants earned subsequent to employment with Defendant is relevant to the issue of mitigation of damages and a possible award of back pay. The EEOC notes that not all income from any source is deductible from a backpay award. This information is relevant because such may lead Defendant to the discovery of additional witnesses, as well as test the sufficiency of the representations Claimants may have made in an effort to seek unemployment, which has a direct bearing on a Claimant's credibility. Although "all sources of income" may not be relevant for purposes of calculating a pay award, such is relevant to the discovery and credibility concerns Defendant has raised. The EEOC is accordingly directed to answer Interrogatory No. Six in full.

*Interrogatory No. Seven:*

Identify all efforts made by each Claimant to obtain employment since their separation from employment with Nordstrom. For each, identify the full name of the entity, mailing address, and telephone number with whom each has applied for employment at any time since his or her separation from employment at Nordstrom, including the names of the individuals with whom each has had direct communications, the date on which each applied to each such prospective employer, and the result of each such application. In addition, identify the specific position for which the Claimant applied.

**\*4** The EEOC answered this interrogatory as to only three Claimants. As to Claimants for whom Plaintiff did provide information, the EEOC did not identify the potential employers the Claimants have spoken with, the date the Claimants sought potential employment, the results of the

employment inquiries, and the positions for which each Claimant applied. Defendant claims that this information is relevant as it goes to mitigation of damages. The Court agrees. The EEOC states that it provided a list as to where three claimants sought employment for the period in question. It did not have more specific information about exactly who each Claimant spoke to at each location and/or the specific dates of applications. Furthermore, some Claimants secured alternate employment prior to leaving Defendant's employ and, therefore, the EEOC has no responsive information to disclose. Other Claimants could not recall exactly where they looked for work. Ideally, the EEOC would have included this information in its response to the interrogatory. Nevertheless, the EEOC has agreed to supplement its responses to this interrogatory as it continues to gather supplemental information. The EEOC is directed to provide a complete answer to this interrogatory as it gathers responsive information.

*Interrogatory No. Eight:*

For each Claimant, identify all employers for whom he or she has worked since each ceased being employed by Nordstrom, the dates of such employment, the address of the employer, and the amount of compensation received.

Each Claimant's amount of compensation subsequent to employment with Defendant is relevant to a potential award of backpay. The EEOC failed to provide any information for eight of the 12 Claimants. As to the Claimants for which the EEOC did provide information the EEOC failed to provide the requested dates of employment and the total amount of compensation received. The interrogatory is clear in that it requests the amount of compensation received rather than an individual's rate of compensation. Merely providing a Claimant's particular wage is insufficient, as Defendant is unaware of how often a Claimant worked. The EEOC states that it has provided responsive documents and has agreed to provide responsive information, as discovery continues, but the EEOC still has not provided any supplemental responses. The EEOC is directed to supplement its answers to this interrogatory as it gathers responsive information.

*Interrogatory No. 12:*

If any of the Claimants has had any communications about the facts of this lawsuit with any individual (other than their attorney), identify the name, address and telephone number of each person and, for each, state the approximate date of the communication and the substance of the communication.

The EEOC responded as follows:

> EEOC objects to this interrogatory on the grounds that it is overly broad, vague, harassing, and is not reasonably calculated to lead to the discovery of admissible evidence.

**\*5** This information is relevant because Defendant may which to depose these individuals. The EEOC initially agreed that it would provide this information, but Defendant has yet to receive this information. The Court also notes that this boilerplate objection does not state why the EEOC considers this request "broad, vague, harassment" and "not reasonably calculated to lead to the discovery of admissible evidence." The EEOC is directed to respond to this interrogatory.

*Request for Production No. 13:*

Documents which refer to, relate to, or evidence each full-time or part-time position each Claimant has held subsequent to employment with the Defendant, including, but not limited to, documents relating to job title, salary/rate of job pay, job description, work performed and benefit statements of each such employer for each such Claimant.
The EEOC responded as follows:

> EEOC objects to this request on the grounds that it is overly broad, vague, unduly burdensome, harassing, and is not reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding said objections, and without waiving them, EEOC produces responsive W–2 Forms.

The Court addressed this issue in its August 15, 2008 Order Granting Motion for Protective Order, wherein it ruled that Defendant is entitled to records reflecting an individual claimant's position, title, earnings, compensation and employment benefit information. The EEOC is instructed

to respond to this request for production with regard to those pieces of information.

*Request for Production No. 17:*

Documents indicating, reflecting or relating to medical or psychological treatment and diagnosis of each Claimant by a doctor, physician, psychologist, psychiatrist, counselor or any other health care professional for the past five years. Instead of producing medical records, Plaintiff, they produced for each health care professional, identify, and executed authorization come the release and request for information for each Claimant.

The EEOC responded as follows:

> EEOC Objects to this request on the grounds that it is overly broad, vague, unduly burdensome, and is not reasonably calculated to lead to the discovery of admissible evidence. Moreover, the requested information constitutes harassment, is an unwarranted invasion of the Claimant's privacy, and impermissibly invades the physician-patient of psychotherapy privilege.

Defendant claims that this information is relevant because EEOC seeks recovery for pain and suffering. EEOC agrees to provide the responsive information, but claims it must proceed carefully so as not to divulge private, personal medical information. The EEOC has agreed to supply the requested information, but has yet to do so. The EEOC shall produce the requested documents in a timely manner.

*Request for Production No. 18:*

Documents indicating, reflecting, or relating to any payments by each Claimant for medical care or treatment, including psychological treatment or counseling, by any type of health care professional, including, but not limited to, hospital and doctor bills, canceled checks, receipts and the like, for the past five years.

**\*6** The EEOC Responded As Follows:

> EEOC objects to this request on the grounds that it is overly broad, vague, unduly burdensome, and is not recently calculated to lead to the discovery of admissible evidence. Moreover, the requested information constitutes harassment, is an unwarranted invasion of each of the Claimant's privacy, and impermissibly invades the physician-patient of psychotherapy privilege.

Defendant maintains that he is currently unaware of exactly what comprises each Claimant's request for damages and is therefore entitled to the above information, especially in light of the fact that the EEOC may attempt to seek payments to medical providers as part of each Claimant's claim for damages. The EEOC agrees to provide responsive documents reflecting medical treatment for the past five years, in response to request to produce No. 17, but the demand for proof of payment for all services is, according to the EEOC, overly broad and not reasonably calculated to lead to the discovery of admissible evidence. This information is relevant to the amount of damages each Claimant claims. The EEOC is therefore directed to respond to this interrogatory in full.

Defendant also requests attorney's fees incurred in the bringing of this motion. Pursuant to Fed.R.Civ.P. 37(a)(5)(A), if the motion to compel is granted, the Court must determine if the moving party "made a good faith effort to obtain the disclosure or discovery without court action, or the opposing party's nondisclosure [ ... ] was substantially justified, or that other circumstances make an award of expenses unjust." The EEOC served its initial responses and objections on May 2, 2008 and May 3, 2008, pursuant to an agreement with Defendant. On June 5, 2008, EEOC's counsel advised Defendant that she was resigning from the EEOC effective June 16, 2008 and that this matter would be reassigned to another trial lawyer. On June 16, 2008, a different EEOC trial attorney filed a notice of appearance in this matter. On June 26, 2008, the EEOC advised Defendant that it would provide supplemental responses to several of the interrogatories. The parties continued communication regarding discovery, and the EEOC continued to gather information responsive to the discovery requests up to the

time Defendant filed the instant motion. Despite the delay caused by the change in counsel, the EEOC continued to gather responsive information. Although Defendant contains that it has not received all of the responsive information it requires, the EEOC has demonstrated that it is indeed it working on fulfilling their requests. Accordingly, the request for attorneys' fees is denied. It is hereby

ORDERED AND ADJUDGED that Defendant's Motion to Compel Responses to Defendant's First Set of Interrogatories and Defendant's First Request for Production, filed July 18, 2008 **[DE 37],** is GRANTED IN PART AND DENIED IN PART as explained herein.

DONE AND ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 5070145

---

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

WILLIE STANLEY, LEONATRAE
EDWARDS, and JAJUAN SMITH,

      Plaintiffs,                        CASE NO.: 1:25-cv-21113-JAL

v.

LOOMIS ARMORED US, LLC,

      Defendant.

_____/

### EXHIBIT D - PLAINTIFF'S LIST OF AUTHORITIES

     Plaintiffs, WILLIE STANLEY, LEONATRAE EDWARDS, and JAJUAN SMITH (collectively the "Plaintiffs"), by and through their undersigned counsel, hereby submit their List of Authorities in support of their positions with copies attached, marked as Exhibit D.

     Dated this 9th day of September, 2025.

                            **DEREK SMITH LAW GROUP, PLLC**
                            *Counsel for Plaintiffs*

                            /s/ Daniel J. Barroukh
                            Daniel J. Barroukh, Esq.
                            Florida Bar No. 1049271
                            Derek Smith Law Group, PLLC
                            520 Brickell Key Drive, Suite O-301
                            Miami, FL 33131
                            Tel: (305) 946-1884
                            Fax: (305) 503-6741
                            danielb@dereksmithlaw.com

## <u>PLAINTIFFS' LIST OF AUTHORITIES</u>

*Liles v. Stuart Weitzman, LLC*,
      2010 U.S. Dist. LEXIS 53584 (S.D. Fla. May 6, 2010)……………………………..D-1

*Love v. Northern Tool & Equip. Co.*,
      2008 U.S. Dist. LEXIS 59110 (S.D. Fla. Aug. 1, 2008)……………………………D-2

*Maddox v. Wright,*
      103 F. Supp. 400 (D.D.C. 1952)…………………………………………………. D-3

*Ochoa v. Empresas ICA, S.A.B. de C.V.*,
      2012 U.S. Dist. LEXIS 111177 (S.D. Fla. Aug. 8, 2012)……………………………D-4

*Pendlebury v. Starbucks Coffee Co.*,
      2005 U.S. Dist. LEXIS 36748 (S.D. Fla. Aug. 29, 2005)……………………………D-5

*Ross v. Twenty-Four Collection, Inc.*,
      681 F. Supp. 1547 (S.D. Fla. 1988)……………………………………………..D-6

# *Liles v. Stuart Weitzman, LLC*

United States District Court for the Southern District of Florida

May 6, 2010, Decided

CASE NO. 09-61448-CIV-COHN/SELTZER

**Reporter**
2010 U.S. Dist. LEXIS 53584 *; 93 Empl. Prac. Dec. (CCH) P43,887

DONN LILES, Plaintiff, vs. STUART WEITZMAN, LLC, Defendant.

**Subsequent History:** Magistrate's recommendation at *Liles v. Stuart Weitzman, LLC, 2010 U.S. Dist. LEXIS 151911 (S.D. Fla., May 28, 2010)*

Summary judgment granted by *Liles v. Stuart Weitzman, LLC, 2010 U.S. Dist. LEXIS 59526 (S.D. Fla., June 16, 2010)*

**Prior History:** *Liles v. Weitzman, 2010 U.S. Dist. LEXIS 151631 (S.D. Fla., Apr. 22, 2010)*

## Core Terms

discovery, subpoena, after-acquired, protective order, mitigate, affirmative defense, former employer, admissible evidence, prior employment, terminate, employment record, duces tecum

**Counsel:** **[*1]** For Donn Liles, Plaintiff: Karen Coolman Amlong, William Robert Amlong, LEAD ATTORNEYS, Rani Nair Bolen, Amlong & Amlong, Fort Lauderdale, FL.

For Stuart Weitzman, LLC., Defendant: Jana M. Leichter, LEAD ATTORNEY, Cole, Scott & Kissane, P.A., West Palm Beach, FL; Barry Adam Postman, Cole Scott & Kissane, West Palm Beach, FL.

**Judges:** BARRY S. SELTZER, United States Magistrate Judge.

**Opinion by:** BARRY S. SELTZER

## Opinion

ORDER ON MOTION FOR PROTECTIVE ORDER OR, IN THE ALTERNATIVE, MOTION TO STRIKE DEFENDANT'S MITIGATION AFFIRMATIVE DEFENSE

THIS CAUSE is before the Court on Plaintiff's Motion for Protective Order, or, in the Alternative, Motion to Strike Defendant's Mitigation Affirmative Defense (DE 22) and the Court being sufficiently advised, it is hereby ORDERED that the Motion for Protective Order is GRANTED and the Motion to Strike Defendant's Mitigation Affirmative Defense is DENIED for the reasons set forth below.

Plaintiff Donn Liles brings this action under the Age Discrimination in Employment Act ("ADEA") and the Florida Civil Rights Act of 1992 ("FCRA") against his former employer, Stuart Weitzman, LLC. Plaintiff alleges that Defendant terminated his employment as Chief Information Officer ("CIO") because of **[*2]** his age (60 years) and replaced him with a substantially younger information-technology professional (55 years). Defendant contends that it discharged Plaintiff, among other reasons, for failing to satisfactorily complete the job duties for which he was hired.

On January 11, 2010, Plaintiff served supplemental responses to Defendant's Interrogatories, identifying 47 companies that he had contacted for work as a consultant. On February 11, 2010, Defendant issued subpoenas *duces tecum* to the 28 domestic corporations listed, seeking production of Plaintiff's employment records. [1] According to Plaintiff, before the subpoenas were issued, he had been in regular contact

_____

[1] Plaintiff did not object to these subpoenas. He, however, explains that **[*3]** although Defendant's notice of intent to serve the 28 subpoenas was allegedly served on February 11, 2010, Plaintiff's counsel did not received the notice in the mail until February 16, 2010, and she did not see it until the next day. Because several of the companies responded to the subpoenas as early as February 19, 2010, Plaintiff believes that Defendant must have served the subpoenas at the same time it sent him the notice of intent to serve. According to Plaintiff, he therefore did not have sufficient time to object. Additionally, Plaintiff argues that his non-objection to previous subpoenas does not bar him from objecting to the subject subpoenas.

Daniel Barroukh

EXHIBIT
D-1

2010 U.S. Dist. LEXIS 53584, *3

with these companies, actively seeking employment. After the subpoenas were issued, four of the companies contacted him to inquire "what was going on." Liles Unsworn Declaration P 7 (DE 22-3). Plaintiff states that the remaining 24 companies "are no longer in communication with [him]. Id. He opines that "[b]ecause of the services [sic] of these subpoenas, [his] efforts seeking work have been severely damaged, and [he] is unable to get work." Id. at P 9.

According to Plaintiff, at his March 25, 2010 deposition he mentioned two companies that he had not yet contacted to seek employment - Kikomo Ltd. and World Wide Dreams. Thereafter, Defendant notified Plaintiff that it intended to serve subpoenas *duces tecum* on these two companies. The subpoenas seek essentially all of Plaintiff's employment records. [2]

Plaintiff now moves the Court to enter a protective order prohibiting Defendant from serving the subpoenas on the ground that they are "cumulative, harassing, and defendant's continued fishing expedition will cause more harm than the potential benefit." Motion at 3 (DE 22). Additionally, Plaintiff argues that if Defendant is permitted to serve the subject subpoenas on Kikomo Ltd. and World Wide Dreams (the companies that he has not yet contacted) he fears they too will refuse to communicate [*5] with him. [3]

---

[2] More specifically, the subpoenas *duces tecum* seek production of the following records:

1. Any and all applications for employment.

2. Any and all personnel/employment records.

3. Any and [*4] all references provided.

4. Any and all time, attendance, wage and salary records, payroll records, W-2 forms and tax withholding records.

5. Any and all evaluations or employment performance, names of supervisors and/or managers, job descriptions, job training information, manuals, documentation relating to employee discipline, statements of employer/employee policies, resignation, discharge or termination documents, employment contracts, complaints against the employee, commendations, awards or statement of praise regarding the employee.

6. Any and all documents concerning claims for workers' compensation, medical records, unemployment compensation records and claims, insurance claims.

Subpoenas (DE 22-2).

[3] Plaintiff also argues that the subject subpoenas are untimely because Defendant intended to serve them on April 9, 2010,

Plaintiff's argument that Kikomo Ltd. and World Wide Dreams would not hire him were Defendant permitted to serve the subject subpoenas is premised on the assumption that the other companies from which he has sought employment did not hire him because they received subpoenas. Although Plaintiff opines in his Unsworn Declaration that he is unable to find employment because of the subpoenas served on prospective employers, he has failed to proffer any evidence demonstrating that any company has failed to hire him as a result of the receipt of a subpoena. Indeed, Plaintiff acknowledged at his deposition that he had no evidence that he ever lost a business opportunity because of service of the subpoenas. March 25, 2010 Deposition Transcript at 16-19 (DE 31-2). The Court, therefore, cannot grant Plaintiff's Motion because of any alleged harm. But the Court does finds that a protective order is warranted for another reason. According to Defendant, subpoenas directed to potential employers are relevant to its mitigation affirmative defense. Although [*7] a few of the documents sought may be relevant or likely to lead to admissible evidence, the subpoenas as drafted are extremely overbroad for this purpose. Moreover, only documents after Plaintiff's termination would be relevant to a mitigation defense, yet these subpoenas are not limited in time.

This, however, does not end the Court's inquiry. In response to Plaintiff's Motion for Protective Order, Defendant states that at Plaintiff's deposition, he identified Kikomo Ltd. and World Wide Dreams not as prospective employers (as Plaintiff suggests), but as

---

the last day of the discovery period (which the District Court has previously declined to extend). See March 31, 2010 e-mail from Defendant's counsel to Plaintiff's counsel (DE 32-1) ("We intend to issue the foregoing [subpoenas] on April 9, 2010, in the absence of a protective order or other court mandate restricting same."). Local Rule 26.1.F.2 provides that "[w]ritten discovery requests and **subpoenas seeking the production of documents** must be served in sufficient time that the response is due on or before the discovery cutoff date." (emphasis added). It is unlikely that Defendant could have served the subpoenas on the last day of the discovery period and obtained production of the documents on the same day. It, therefore, appears that the subpoenas are untimely. However, because Plaintiff raised the timeliness issue for the first time in his Reply Memorandum, Defendant has not had an opportunity to respond. The Court, therefore, will not grant Plaintiff's Motion for Protective Order on this ground. The Court notes that upon Plaintiff's filing of [*6] the instant Motion on April 5, 2010, it entered an Order (DE 28) prohibiting Defendant from serving the subpoenas until further Order of the Court.

other companies for whom he had performed information technology services similar to those that he had performed for Defendant. According to Defendant, it intends to serve the subject subpoenas on these companies as former employers. Defendant argues that because Plaintiff previously worked for these companies, "information relative to his performance implementing similar Information Technology (IT) systems [is] discoverable and 'relevant to the claim of defense' of Defendant." Response at 3 (DE 31). As concerns the relevance of the records sought, Defendant states that it "may choose to address certain areas of Liles' demonstrative **[*8]** incompetence relative to his performance at Defendant" or "if documents obtained from these entities indicate that Plaintiff had similar issues with software implementation projects, Defendant may aver that Plaintiff misrepresented his qualifications for employment, which was to implement these IT programs." Id. Although not artfully stated, it appears that Defendant's relevancy argument is two-fold: (1) the records sought may reflect Plaintiff's poor performance in providing IT services for former employers, which would be relevant to Defendant's defense that it discharged Plaintiff for not being able to perform his job functions; and (2) the records sought may reflect that Plaintiff misrepresented his qualifications to Defendant, which would be relevant to an after-acquired evidence defense.

*Federal Rule of Civil Procedure 26(b)(1)* provides that parties may obtain through discovery "any nonprivileged matter that is relevant to any party's claim or defense" and "for good cause, the court may order discovery of any matter relevant to the subject matter involved in the action." *Fed. R. Civ. P. 26(b)(1)*. Further, "[r]elevant information need not be admissible as long as "the discovery **[*9]** appears reasonably calculated to lead to the discovery of admissible evidence." Id. Additionally, where good cause exists, a court may enter a protective order to "protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." *Fed. R. Civ. P. 26(c)(1)*. Such protective order may, *inter alia,* forbid the discovery, limit the scope of discovery, and/or require the discovery to be taken in a different manner than that chosen by the party seeking discovery. See *Fed. R. Civ. P. 26(c)(1)(A-H)*. The scope of discovery under a *Rule 45* subpoena to non-parties is the same as that permitted under *Rule 26*. *Ireh v. Nassau Univ. Med. Ctr., No. CV-06-09 (LDW)(AKT), 2008 U.S. Dist. LEXIS 76583, 2008 WL 4283344, at *5 (E.D.N.Y. Sept. 17, 2008)* ("Any subpoena that is issued to non-parties pursuant to *Rule 45* is subject to *Rule 26(b)(1)*'s overriding relevance

requirement.") (internal quotation marks omitted); *Stewart v. Mitchell Transport, No. 01-2546-JWL, 2002 U.S. Dist. LEXIS 12958, 2002 WL 1558210, at 3 (D. Kan. July 11, 2002)* ("It is well settled . . . that the scope of discovery under a *Rule 45* subpoena is the same as that permitted under *Rules 26(b)* and *34*").

Defendant first contends that it "may choose to address certain **[*10]** areas of Liles' demonstrative incompetence relative to his performance at Defendant." Response at 3 (DE 31). Defendant, however, has cited no authority to support his argument that a plaintiff's employment records from his former employer are relevant (or are likely to lead to admissible evidence) to demonstrate poor performance while employed by the defendant. Moreover, courts considering the issue have held to the contrary. See, e.g., *Sanders v. Dalcraft LLC, No. 3-09-CV-0307-P, 2009 U.S. Dist. LEXIS 41710, 2009 WL 1392602, at *2 (N.D. Tex. May 18, 2009)* (rejecting argument that employment records from plaintiff's former employer "may show performance deficiencies similar to those relied upon by [the defendant] to justify termination"); *Ireh, 2008 U.S. Dist. LEXIS 76583, 2008 WL 4283344, at *5* (ruling that plaintiff's performance during prior employment not relevant to work performed for defendant and that prior employment records not likely to lead to discovery of admissible evidence as such evidence would be inadmissible under *Federal Rule of Evidence 404(a)*); *Maxwell v. Health Center of Lake City, Inc., No. 3:05-CV-1056-J-32MCR, 2006 U.S. Dist. LEXIS 36774, 2006 WL 1627020, at *4 (M.D. Fla. June 6, 2006)* (ruling that plaintiff's performance at previous jobs not **[*11]** relevant nor reasonably calculated to lead to admissible evidence because *Rule 404(a)* would exclude such evidence).

The decision in *Chamberlain v. Farmington Savings Bank, No. 3-06CV-01347 (CFD), 2007 U.S. Dist. LEXIS 70376, 2007 WL 2786421, at *3 (D. Conn. Sept. 25, 2007)* is instructive. In *Chamberlain,* an age and disability discrimination case, the defendant served subpoenas *duces tecum* on the plaintiff's former employers seeking the production of the plaintiff's prior employment records. In response to the plaintiff's motion to quash the subpoenas and for protective order, the defendant argued that the plaintiff's performance history was relevant to its defense that it terminated the plaintiff's employment because of poor performance. In rejecting that argument, the court stated:

> The defendant's argument is unavailing. The court finds that evidence of the plaintiff's performance

history is neither relevant nor admissible for the purpose of showing that the plaintiff performed poorly in his position with defendant. First, the plaintiff's performance history is not relevant to the issues involved in the current case; rather, at issue is the plaintiff's performance in his position with the defendant. Second, the **[*12]** defendant's request for production of documents relating to the plaintiff's performance history is not reasonably calculated to lead to the discovery of admissible evidence. The defendant seeks to discover evidence of the plaintiff's performance history in order to show that he had a propensity for certain performance deficiencies. Such evidence is inadmissible under *Federal Rule of Evidence 404(a)*, which provides that "[e]vidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith. . . ." *Fed. R. Evid. 404(a)*.

Id.

This Court agrees with the reasoning of *Chamberlain*. Accordingly, the Court concludes that Plaintiff's performance history does not provide a sufficient basis for the discovery of his prior employment records.

Defendant next argues that "if documents obtained from [Plaintiff's former employers] indicate that Plaintiff had similar issues with software implementation projects, Defendant may aver that Plaintiff misrepresented his qualifications for employment, which was to implement these IT programs." If by this statement Defendant is arguing that discovery of Plaintiff's prior employment records may **[*13]** assist it in establishing an after-acquired evidence [4] defense, this argument is also unavailing.

In *McKennon v. Nashville Banner Publishing Co., 513 U.S. 352, 115 S. Ct. 879, 130 L. Ed. 2d 852 (1995)*, the Supreme Court recognized the after-acquired evidence defense under which an employee's relief may be limited by evidence of wrongdoing discovered after the

employee's termination; [5] the plaintiff's wrongful conduct must have been of "such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge." *Id. at 362-63*. The McKennon Court cautioned against potential abuse of the discovery process by employers seeking to limit their liability through an after-acquired evidence defense. The Court, however, noted that the lower courts could curb such abuses, stating: "The concern that employers might as a routine matter undertake extensive discovery into an employee's **[*14]** background or performance on the job to resist claims under the [Age Discrimination in Employment Act] is not an insubstantial one," but one that can be deterred by 'invok[ing] the appropriate provisions of the Federal Rules of Civil Procedure." *Id. at 363*. [6]

The Eleventh Circuit has not addressed the scope of discovery permissible to establish an after-acquired evidence defense. At least three district courts in the Eleventh Circuit, however, have considered the issue. In *Premer v. Corestaff Services, L.P., 232 F.R.D. 692 (M.D. Fla. 2005)*, the court stated that although "the after-acquired evidence doctrine provides employers a mechanism to limit an employee's remedies based on evidence found during discovery, it should not be used as an independent basis to initiate discovery." *Id. at 693*. The court noted that "district courts have limited employers' fishing-expedition style discovery" based on

---

[4] "After-acquired evidence refers to facts discovered by an employer after the employer has already fired an employee, which could justify-post-hoc the decision to terminate the employee." *Naylor v. Rotech Healthcare, Inc., No. 1:108-CV-95, 2009 U.S. Dist. LEXIS 120141, 2009 WL 5206005, at *1 (D. Vt. Dec. 23, 2009)*.

---

[5] The McKennon Court ruled that after-acquired evidence should not be used to determine liability because "[t]he employer could not have been motivated by the knowledge it did not have. . . ." *513 U.S. at 360*. Rather, after-acquired evidence may only be used in fashioning the plaintiff's remedy: "neither reinstatement nor front pay is an appropriate remedy" and back pay should be calculated only "from the date of the unlawful discharge to the date the new information was discovered." *Id. at 361-62*.

[6] McKennon involved an employee who was found, after the commencement of her discrimination action under the Age Discrimination in Employment Act, to have violated the defendant employer's policies while working for the defendant (i.e., surreptitiously copying and retaining confidential documents). The Eleventh Circuit, however, has held that the after-acquired evidence doctrine is also applicable to Title VII and Equal Pay Act cases and **[*15]** extends also to an employee's fraud in the application process, not only to an employee's wrongful conduct during employment. *Wallace v. Dunn Constr. Co., Inc., 62 F.3d 374 (11th Cir. 1995)* (en banc).

2010 U.S. Dist. LEXIS 53584, *15

McKennon's concern about employers undertaking extensive discovery into an employee's performance and background to limit liability. *Id. at 693* (citing *Perry v. Best Lock Corp., No. IP 98-C-0936-H/G, 1999 U.S. Dist. LEXIS 23601, 1999 WL 33494858, at \*2 (S.D. Ind. Jan. 21, 1999)* ("The McKennon] Court's comment about potential abuse clearly implies that discovery is not warranted **[\*16]** for the sole purpose of developing a possible after-acquired evidence defense.")). And in *Maxwell v. Health Center of Lake City, Inc., 2006 U.S. Dist. LEXIS 36774, 2006 WL 1627020, at \*5*, the court likewise ruled that the after-acquired evidence doctrine "should not be used to independently initiate discovery." Id. Rather, a defendant "must have some pre-existing basis to believe that after-acquired evidence exists before it can take additional discovery." Id. More recently, in *EEOC v. Jack Marshall Foods, Inc., No. 09-0160-WS-M, 2010 U.S. Dist. LEXIS 172, 2010 WL 55635, at \*2 (N.D. Ala. Jan. 4, 2010)*, on appeal, the district court upheld a magistrate judge's order quashing subpoenas *duces tecum* seeking to obtain employment records from the intervening plaintiffs' former employers. The defendant argued that the records might contain after-acquired evidence, which could limit the plaintiff's damages. The magistrate judge ruled that a defendant cannot seek discovery to assist in establishing an after-acquired evidence defense "in the absence of some basis for believing that after-acquired evidence of wrongdoing will be revealed." Id.; see also *Sanders, 2009 U.S. Dist. LEXIS 41710, 2009 WL 1392602, at \*2* ("Courts generally agree that the after-acquired evidence defense **[\*17]** 'cannot be used to pursue discovery in the absence of some basis for believing that after-acquired evidence of wrong-doing will be revealed.'") (quoting *Chamberlain, 2007 U.S. Dist. LEXIS 70376, 2007 WL 2786421, at \*2)*.

Defendant here has not proffered any evidence suggesting that Plaintiff may have engaged in any wrongful conduct that would provide legitimate grounds for Plaintiff's discharge. Accordingly, the Court will not permit discovery of Plaintiff's prior employment records for the purpose of seeking to find some evidence of wrongful conduct by Plaintiff. Defendant's efforts to obtain the employment records from Plaintiff's former employers on the off-chance that it may find some evidence of wrongdoing is merely a fishing expedition. "District courts need not condone the use of discovery to engage in 'fishing expedition[s]." *Rivera v. Nibco, Inc., 364 F.3d 1057, 1072 (9th Cir. 2004)* (finding magistrate judge's entry of protective order precluding defendant employer from using discovery process to support after-acquired evidence defense proper, noting that "the

McKennon Court did not hold that depositions could be conducted for the purpose of uncovering illegal actions.").

In sum, if the subject subpoenas **[\*18]** *duces tecum* are intended to seek information from prospective employers to support Defendant's mitigation affirmative defense, they are extremely overbroad. And if the subpoenas are intended to seek information showing Plaintiff performed poorly at his former employment to support Defendant's defense of unsatisfactory performance, the records sought are not relevant nor are they likely to lead to admissible evidence. Additionally, because Defendant has failed to demonstrate that it has any basis for believing wrongful conduct by Plaintiff may be revealed by the records sought, it is not entitled to discovery to assist in establishing an after-acquired evidence defense. Accordingly, Plaintiff's Motion for Protective Order is GRANTED.

Plaintiff has additionally moved to strike Defendant's mitigation affirmative defense. [7] He contends that "it appears defendant's strategy [in serving subpoenas on potential employers] is to prevent plaintiff from getting work consulting with companies in the United States." [8] Motion at 8 (DE 22). He argues that "[i]f defendant wishes to pursue its quest to subpoena these two companies on plaintiff's network list, its mitigation of damages affirmative defense **[\*19]** should be stricken." Id. Defendant responds that "while the injured victim has a duty to mitigate damages by being reasonably diligent in seeking substantially equivalent employment the burden of proving lack of diligence is on the employer." Response at 5 (DE 31) (quoting *U.S. E.E.O.C. v. Massey Yardley Chrysler Plymouth, Inc., 117 F.3d 1244, 1251-52 (11th Cir. 1997))*. Defendant argues that in issuing the subpoenas it was properly investigating the adequacy of Plaintiff's mitigation efforts. The Court agrees that Defendant has not engaged in any improper conduct that would justify imposing the harsh remedy of striking an affirmative defense. Accordingly, Plaintiff's Motion to Strike Defendant's Mitigation Affirmative

---

[7] Defendant's fifth affirmative defense states: "The Plaintiff has failed to mitigate his alleged losses, injuries or damages, and, therefore, Defendant is not responsible to the extent that Plaintiff could have mitigated his damages and Plaintiff has barred or diminished his entitlement to damages, if any." Affirmative Defenses P 5 (DE 4).

[8] Plaintiff has not explained why Defendant would want to prevent him from mitigating his damages.

2010 U.S. Dist. LEXIS 53584, *19

Defense is DENIED.

DONE AND ORDERED **[*20]** in Fort Lauderdale, Florida, this the 6th day of May 2010.

/s/ Barry S. Seltzer

BARRY S. SELTZER

United States Magistrate Judge

---

**End of Document**

### *Love v. Northern Tool & Equip. Co.*

United States District Court for the Southern District of Florida, Miami Division

August 1, 2008, Decided; August 1, 2008, Entered

CASE NO. 08-20453-CIV-COOKE/BANDSTRA

**Reporter**

2008 U.S. Dist. LEXIS 59110 *

INGRID LOVE, Plaintiff,v.NORTHERN TOOL & EQUIPMENT COMPANY, INC., Defendant.

**Prior History:** *Love v. N. Tool & Equip. Co., 2007 U.S. Dist. LEXIS 64565 (S.D. Fla., Aug. 31, 2007)*

## Core Terms

love, northern, attorney's fees, backpay, amount in controversy, punitive damages, calculate, estimate, jurisdictional amount, settlement offer, bonus, emotional distress, base salary, notice, front pay, emotional distress damages, unemployment, speculate

**Counsel:**  [*1] For Ingrid Love, Plaintiff: Jerome Alan Pivnik, LEAD ATTORNEY, Pivnik & Nitsche, Miami, FL.

For Northern Tool & Equipment Company, Inc., a foreign corporation, Defendant: Jeremy D. Sosna, LEAD ATTORNEY, Ford & Harrison LLP, Minneapolis, MN; Kevin David Smith, LEAD ATTORNEY, Ford & Harrison, Miami, FL.

**Judges:** MARCIA G. COOKE, United States District Judge.

**Opinion by:** MARCIA G. COOKE

## Opinion

### ORDER ON MOTION TO REMAND

This matter is before me on Plaintiff Ingrid Love's ("Love") Motion to Remand [D.E. 5]. After reviewing the motion and response, I find, for the reasons stated below, that Plaintiff's Motion should be granted and the case should be remanded to the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida.

*I. BACKGROUND*

On August 2, 2007, Love filed suit against Northern Tool & Equipment Company, Inc. ("Northern Tool") in state court. The Complaint alleges that Northern Tool terminated Love from her position as Store Manager of one of its Florida retail stores because she was pregnant, in violation of the Florida Civil Rights Act ("FCRA"), *Fla. Stat. § 760.10*. Love seeks compensatory and punitive damages, including damages for mental anguish, pain and suffering, emotional distress,  [*2] loss of dignity and respect, back pay, front-pay, and lost benefits. Love also requests an award of attorneys' fees under *Fla. Stat. § 760.11*. The Complaint, however, does not state any specific monetary figure for damages sought in the case. The issue here is whether the amount in controversy meets the $ 75,000.00 jurisdictional amount for federal jurisdiction under *28 U.S.C. § 1332*.

This case was previously removed and remanded. After the remand, the parties engaged in discovery. Among other things, Northern Tool served an interrogatory on Love that specifically requested that she provide an itemization of her damages and the factual basis for any damages calculations. According to Northern Tool, Love refused to respond to the interrogatory or provide any specific information about the damages she seeks in the case.

On January 24, 2008, Northern Tool sent Love a letter informing her that it believed that her damages were now in excess of the $ 75,000.00 jurisdictional threshold and would remove the case to federal court unless Love stipulated that her damages did not exceed $ 74,999.00. Later that same day, Love rejected Northern Tool's offer to stipulate that her damages were less  [*3] than the jurisdictional amount and offered to settle the case if Northern Tool agreed to pay her $ 70,000.00, in addition to paying her attorneys' fees. On February 28, 2008, Northern Tool filed a Notice of Removal and on March 18, 2008, Love filed its second motion to remand in this case.

EXHIBIT

D-2

2008 U.S. Dist. LEXIS 59110, *3

## II. LEGAL STANDARD

Under *28 U.S.C. § 1441*, a defendant can remove an action to the United States District Court if that court has original jurisdiction over the action. *28 U.S.C. § 1441(a)*. United States District Courts have original jurisdiction over all civil actions between parties of diverse citizenship where the amount in controversy exceeds $ 75,000.00. *28 U.S.C. § 1332(a)*.

The party that removes the state court action to federal court must show that federal jurisdiction exists. *Williams v. Best Buy Co., 269 F.3d 1316, 1319 (11th Cir. 2001)*. Where the plaintiff has not pled a specific amount of damages, the removing defendant must prove by a preponderance of the evidence that the amount in controversy exceeds the jurisdictional amount. *Id.*

In assessing the amount in controversy, the court should first determine from looking at the complaint whether it is "facially apparent" that the amount in controversy **[*4]** exceeds $ 75,000.00. *Id.* If the jurisdictional amount is not facially apparent from the complaint, the court should look to the notice of removal. *Id.* If the plaintiff challenges the removal by filing a timely motion to remand, the district court's inquiry is limited to the evidence available when the motion to remand was filed, i.e., the notice of removal and accompanying documents. *Lowery v. Alabama Power Co., 483 F.3d 1184, 1213-14 (11th Cir. 2007)*. If the evidence is insufficient to establish that removal was proper or that federal jurisdiction was present, the defendants and the court cannot "speculate in an attempt to make up for the notice's failings." *Id. at 1215*. Additionally, the district court should not grant leave for the defendant to conduct discovery or engage in its own discovery to ascertain the factual basis for jurisdiction. *Id. at 1217*. Thus, "removal statutes are construed narrowly; where plaintiff and defendant clash about jurisdiction, uncertainties are resolved in favor of remand." *Burns v. Windsor Ins. Co., 31 F.3d 1092, 1095 (11th Cir. 1994)*.

## III. DISCUSSION

Northern Tool asserts that it has demonstrated by a preponderance of the evidence that the amount in **[*5]** controversy exceeds $ 75,000.00. The evidence Northern Tool refers to is Love's $ 70,000.00 settlement offer, an affidavit from Northern Tool's Vice President of Human Resources, and its own unsupported calculations of Love's damages. The affidavit attached

to the Notice of Removal states that, during Love's last full year of employment as a Store Manager, she received total gross wages of $ 83,669.72 ($ 47,985.98 in base salary and $ 35,683.74 in bonus earnings). The affidavit further states that the Store Manager who replaced Love received bonus payments equaling $ 11,609.89 during 2007 and $ 5,977.89 to date in 2008.

This evidence, however, does not provide me with any information on which I can calculate Love's attorneys' fees, emotional distress damages, and punitive damages. The only damages I can calculate with any degree of certainty are Love's back pay and front pay, which are not enough to support federal diversity jurisdiction. Although other district courts have estimated damages in FCRA cases, despite the absence of supporting evidence, in determining the amount in controversy, I find that doing so is contrary to the Eleventh Circuit's instruction not to speculate as to **[*6]** the amount of damages when the evidence is insufficient to establish that removal was proper. I explain in more detail below why the evidence before me is insufficient and why this case should be remanded to state court.

### A. Settlement Offer

I disagree with Northern Tool that the $ 70,000.00 settlement offer is sufficient evidence that the case is worth more than $ 75,000.00. I think the settlement offer is evidence that Love believes her case is worth only $ 70,000.00. None of the cases cited by Northern Tool are cases where a settlement offer for less than the jurisdictional amount has been deemed sufficient to show by a preponderance of the evidence that the jurisdictional amount will be met. *See, e.g., Lowery v. Ala. Power Co., 483 F.3d 1184, 1212 (11th Cir. 2007)* (only noting that settlement offers qualify as "other paper" under *§ 1446(b)*); *Addo v. Globe Life & Accident Ins. Co., 230 F.3d 759, 761-62 (5th Cir. 2000)* (settlement offer exceeded $ 75,000.00); *Martin v. Mentor Corp., 142 F. Supp. 2d 1346, 1349 (M.D. Fla. 2001)* (settlement offer was for $ 175,000.00).

### B. Economic Damages

#### i. Back Pay

"Florida courts have held that decisions construing Title VII are applicable when considering **[*7]** claims under the [FCRA] because the Florida Act was patterned after

Title VII." *Brown v. Cunningham Lindsey U.S., Inc., No. 305-141J32HTS, 2005 U.S. Dist. LEXIS 38862, 2005 WL 1126670, at * 3 (M.D. Fla. May 11, 2005)* (citing *MacLean v. City of St. Petersburg, 194 F.Supp.2d 1290, 1301 (M.D. Fla. 2002)).* "Under Title VII, a successful plaintiff is 'presumptively entitled to back pay,' which is calculated from the date of the adverse employment action until the date of judgment." *Id.* (citing *Nord v. United States Steel Corp., 758 F.2d 1462, 1472-73 (11th Cir. 1985).* "[I]n calculating a back pay award, the trial court must determine what the employee would have earned had she not been the victim of discrimination, and must subtract from this figure the amount of actual interim earnings." *Id.* (citing *Richardson v. Tricom Pictures & Prods., Inc., 334 F. Supp. 2d 1303, 1310 (S.D. Fla. 2004)).*

Love earned $ 47,985.98 base salary at Northern Tool at the time her employment was terminated. Plaintiff was unemployed for seven months. Her back pay based on her base salary is $ 27,999.00 (7/12 of $ 47,985.00). Love argues that this amount is subject to a set-off for unemployment compensation. Northern Tool disagrees. In *Brown v. A.J. Gerrard Mfg. Co., 715 F.2d 1549, 1550 (11th Cir. 1983)* [*8] (en banc), the Eleventh Circuit held that "unemployment compensation benefits should not be deducted from Title VII back pay awards." Thus, for purposes of determining the amount in controversy, Love cannot deduct unemployment compensation from her estimated back pay award.

Love further argues that, based on her subsequent employment at Big Lots and CVS and her pending graduation from law school, her claim for economic damages has not increased but, rather, stands to decrease. She argues that, by November 6, 2007, she was already earning more than her salary at Northern Tool. Love worked for Big Lots from July 30, 2007 through September 22, 2007. Her base salary there was $ 38,000.00 and she had bonus potential. Love Dep. at 37-40. Later, Love became employed by CVS on September 24, 2007. Her base pay was $ 50,000.00 and she was entitled to bonuses. Her base pay at CVS was more than her base pay at Northern Tool. Love also points out that she is a law student at FIU and is graduating in the next few months. As such, she expects to earn more as a lawyer than as a General Manager at Northern Tool.

Northern Tool's ninth affirmative defense states: "Plaintiff's Complaint must fail to the [*9] extent that she has failed to mitigate her damages, if any, as required by law." It would, therefore, be proper to consider Love's

earnings and bonus opportunities at Big Lots and CVS in determining the amount of a potential back pay award as well as her earning potential as a lawyer. Neither party, however, has provided information regarding Love's earnings at these other two companies or her earning potential as a lawyer. As a result, I am going to assume that Love would have earned more at Big Lots and CVS (base salary plus bonuses) and as a lawyer than she would have at Northern Tool. This is consistent with the Eleventh Circuit's instruction that all uncertainties are to be resolved in favor of remand. *See Burns v. Windsor Ins. Co., 31 F.3d 1092, 1095 (11th Cir. 1994)* ("where plaintiff and defendant clash about jurisdiction, uncertainties are resolved in favor of remand"). Assuming this is true, Love's back pay award would probably be limited to her lost wages during the seven months she was unemployed, i.e., $ 27,999.00, and a fraction of the bonus compensation that her replacement was paid for the first seven months of 2007, i.e., 7/12 of $ 11,609.89. Based on these amounts, [*10] I calculate an estimated total back pay award of $ 34,771.44 ($ 27,999.00 for base salary plus $ 6772.44 for 2007 bonus).

### ii. Front Pay

"In addition to back pay, prevailing Title VII plaintiffs are presumptively entitled to either reinstatement or front pay." *Brown, 2005 U.S. Dist. LEXIS 388622005, WL 1126670, at *5.* "Front pay and reinstatement are forms of equitable relief." *Id.* "The value of injunctive or declaratory relief for amount in controversy purposes is the monetary value of the object of the litigation that would flow to the plaintiffs if the injunction were granted." *Leonard v. Enter. Rent a Car, 279 F.3d 967, 973 (11th Cir. 2002).* Given that, in determining her front pay, I concluded that Love probably earned more after she left Northern Tool, Love probably would not receive an award for front pay or reinstatement.

### C. Attorneys' Fees

Love first argues, citing to *Ansari v. Bella Auto. Group, Inc., 145 F.3d 1270, 1271 (11th Cir. 1998),* that attorneys' fees are costs and are not included in the amount in controversy. *Ansari* held that attorneys' fees are costs within the meaning of *§ 2310(d)(3)(B),* and excluded from a calculation of the amount in controversy. *Section 2310* governs remedies in consumer disputes. [*11] Love did not sue under *§ 2310.* On the other hand, in *Brown,* a case involving the FCRA, the court stated: "When a statute authorizes the

2008 U.S. Dist. LEXIS 59110, *11

recovery of attorney's fees, a reasonable amount of those fees is included in the amount in controversy." *Brown, 2005 U.S. Dist. LEXIS 38862, 2005 WL 1126670, at *4* (citing *Morrison v. Allstate Indem. Co., 228 F.3d 1255, 1265 (11th Cir. 2000))*.

The issue is whether the amount of attorneys' fees is calculated through the end of the case or terminate at an earlier date for jurisdictional purposes. There is conflicting case law on this point. *See, e.g., Waltemyer v. Nw. Mut. Life Ins. Co., No. 06-597, 2007 U.S. Dist. LEXIS 7769, 2002 WL 419663, at *2 (M.D. Fla. Feb. 2, 2007)* (concluding that only attorneys' fees incurred prior to removal should be included in the amount in controversy); *Brown, 2005 U.S. Dist. LEXIS 38862, 2005 WL 1126670, at *4* (including prospective attorneys' fees in amount in controversy).

Under either approach, Love's attorneys' fees are not substantial enough to meet the jurisdictional amount when aggregated to Love's estimated back pay award. Love's attorney probably did not spend more than ten hours on this case prior to the first removal. I think a reasonable estimate would include two hours to meet with the client, **[*12]** two hours to review the EEOC file and any additional documents the client may have had, and six hours of research into the current state of the law and to draft a one-count, two-page complaint. Plaintiff's counsel has stated that his hourly rate is $ 300.00 per hour. As such, the attorneys' fees incurred in this case prior to the first notice of removal are approximately $ 3,000.00. Even under *Brown's* analysis, the attorneys' fees would only be $ 9,000.00. In *Brown*, the court accepted the plaintiff's representation that she would incur about three times in attorneys' fees through trial what she had incurred in attorneys' fees up to the time of removal. *Brown, 2005 U.S. Dist. LEXIS 38862, 2005 WL 1126670, at *4*; *see also Destel v. McRoberts Protective Agency, Inc., No. 03-62067, 2004 U.S. Dist. LEXIS 6735, 2004 WL 746293, at *3 (S.D. Fla. Feb. 17, 2004)* (tripling attorneys' fees as an estimate of total attorneys' fees that would be incurred in case). The court, although skeptical about the accuracy of that estimate, accepted this calculation because the defendant had not provided a basis for its own estimate of the plaintiff's attorneys' fees and because "all uncertainties are to be resolved in favor of remand." *Brown, 2005 U.S. Dist. LEXIS 38862, 2005 WL 1126670, at *4*. **[*13]** As in *Brown,* Northern Tool has not provided a basis for its own estimate of Love's attorneys' fees. As already stated, even under the standard most favorable to Northern Tool, Love's $ 9,000.00 estimated attorneys' fees are not sufficient to

meet the jurisdictional threshold when aggregated to her estimated $ 34,771.44 back pay award.

### D. Emotional Distress

The FCRA provides: "The court may also award compensatory damages, including, but not limited to, damages for mental anguish, loss of dignity, and any other intangible injuries, and punitive damages." *Fla. Stat. § 760.11(5)*. Courts have considered plaintiffs' claims for emotional distress damages in determining the amount in controversy. *See, e.g., Brown, 2005 U.S. Dist. LEXIS 38862, 2005 WL 1126670, at *5* (concluding that plaintiff's emotional distress and punitive damages further increased the amount in controversy); *Barnes v. JetBlue Airways Corp., No. 07-60441, 2007 U.S. Dist. LEXIS 33276, 2007 WL 1362504, at *2 (S.D. Fla. May 7, 2007)* (concluding that an award for emotional distress could easily match an award for economic damages).

Determining the value of Love's emotional distress claim is a difficult task to undertake without a large amount of speculation. Northerm Tool suggests **[*14]** that I accept, for purposes of determining the amount in controversy, that Love's emotional distress award will equal her award for back pay based on her base salary alone, i.e., $ 27,999.00. Northern Tool does not, however, offer any evidence or point to any underlying facts that might support such an assertion. Instead, it cites to cases where courts have awarded emotional distress damages well in excess of Love's $ 27,999.00 in lost wages without comparing the factual or legal claims made in those cases to Love's claims or explaining the relevance of those awards to the issue at hand. Love, on the other hand, notes that she has not undergone any psychological counseling or medical attention that would make her emotional distress any more significant than the garden variety discrimination claim. A plaintiff need not, however, "introduce evidence of medical treatment to recover for emotional distress . . . under the FCRA." *Brown, 2005 U.S. Dist. LEXIS 38862, 2005 WL 1126670, at *5* (citing *Munoz v. Oceanside Resorts, Inc., 223 F.3d 1340, 1348-49 (11th Cir. 2000))*. Although Love may recover some damages for emotional distress, there is no evidence before me to determine that amount. Under these circumstances, I **[*15]** cannot divine some dollar amount as emotional distress damages to aggregate to Love's back pay damages so that Northern Tool can meet the jurisdictional threshold for federal diversity jurisdiction. *See Lowery, 483 F.3d at 1215* (instructing courts not to

speculate regarding the propriety of removal where the evidence is insufficient to establish that removal was proper).

### E. Punitive Damages

"Where both actual and punitive damages are recoverable under a complaint each must be considered to the extent claimed in determining jurisdictional amount." *Bell v. Preferred Life Assurance Soc'y of Montgomery, Alabama, 320 U.S. 238, 64 S. Ct. 5, 88 L. Ed. 15 (1943)*. Love did not claim a specific amount for punitive damages in her complaint. The FCRA allows for the recovery of punitive damages up to $ 100,000.00. *Fla. Stat. § 760.11(5)*. Northern Tool argues that, since nothing in Love's complaint or discovery responses indicates that she is seeking less than the maximum amount allowable in punitive damages, I should assume that Love is claiming the full amount available, i.e., $ 100,000.00. Northern Tool cites *Awad v. Cici Enter., No. 06-1278, 2006 U.S. Dist. LEXIS 71998, 2006 WL 2850108, at *2 (M.D. Fla. Oct. 3, 2006)*, for the proposition that I should **[*16]** assume that Love is seeking the full amount of punitive damages available. The court in *Awad,* however, decided not to remand based on plaintiff's admission that she was seeking damages in excess of $ 75,000.00, not on the issue of punitive damages. Love has not made the same admission here.

Northern Tool has not introduced any evidence on which to base any calculation of punitive damages in this case. For example, it did not introduce evidence of jury verdicts with respect to punitive damages in similar cases. It also has not explained why the facts in this case would support a large punitive damages award. Under these circumstances, I find that Northern Tool has not met its burden to prove by a preponderance of the evidence that Love will recover $ 100,000.00 or any other amount in punitive damages. If the evidence is insufficient to establish that removal was proper, I cannot "speculate in an attempt to make up for the notice's failings." *Lowery, 483 F.3d at 1215*.

### IV. CONCLUSION

Given Love's willingness to settle the case for $ 70,000.00 and that I was only given sufficient evidence to calculate Love's back pay award and that such award does not meet the jurisdictional amount of $ 75,000.00, **[*17]** I am granting Plaintiff's Motion to Remand [D.E.

5]. This case is closed. All pending motions are denied as moot.

**DONE AND ORDERED** in Miami, Florida, this 1st day of August 2008.

/s/ Marcia G. Cooke

MARCIA G. COOKE

United States District Judge

---

**End of Document**

# *Maddox v. Wright*

United States District Court for the District of Columbia

March 18, 1952

Civ. No. 5102

**Reporter**

103 F. Supp. 400 *; 1952 U.S. Dist. LEXIS 4493 **; 52-1 U.S. Tax Cas. (CCH) P9355; 43 A.F.T.R. (P-H) 19

MADDOX v. WRIGHT et al.

## Core Terms

tax return, income producing, confidential, subpoena, discovery procedure, motion to vacate, civil action, intelligent, returns

**Counsel:** Marie Flynn Maddox, Luther R. Maddox, Washington, D.C., for plaintiff.

Chase & Rubin, James J. Laughlin, Dickson R. Loos, Washington, D.C., for defendants.

**Opinion by:** YOUNGDAHL

## Opinion

[*400] There is authority in certain District Courts for the production of income tax returns. *Reeves v. Pennsylvania Railroad Co., D.C., 80 F.Supp. 107*; *Paramount Film Distributing Corp. v. Ram, D.C., 91 F.Supp. 778*. There is also authority to the contrary.

In *O'Connell v. Olsen & Ugelstadt, 10 F.R.D. 142, 143*, Chief Judge Jones of the United States District Court for the Northern District of Ohio, said the following concerning this issue:

'The Internal Revenue Code, *26 U.S.C.A. § 55*, and regulations issued thereunder provide that tax returns shall be confidential and disclosed only upon application of the plaintiff or his attorney in [**2] fact. No provision is made for the production of such returns upon order of a Federal Court. Until such provision is made, this section of the Court has been and is of the opinion that such returns are, in private civil actions, confidential information between the taxpayer and the Government and should not be open to inspection under *Rule 34, Federal Rules of Civil Procedure*, 28 U.S.C.A. Such a ruling is in accord with previous holdings that documents which have been declared confidential by

Federal department rulings are not open to discovery under *Rule 34*. 2 Moore's Federal Practice 2641. F.N. 1.

'Such a ruling will have no serious consequences as the information desired can be obtained by intelligent use of other discovery procedure.'

I am in accord with the doctrine expressed in this statement. It is my conviction that until the Congress declares otherwise, to require the production of income tax returns in private civil actions would open the door to innumerable abuses. The Court is of the opinion moreover that aggressive and intelligent use of other discovery procedure will disclose the desired information sought to be obtained by the production of the income tax returns.

[**3] [*401] Ordered that the motion to vacate the subpoena duces tecum requiring the production of the income tax returns, Nos. 2 and 3 in the subpoena, is hereby granted, and the motion to vacate requiring the production of bank statements and deposit slips, No. 1 in the subpoena, is hereby denied.

**End of Document**

**EXHIBIT D-3**

# *Ochoa v. Empresas ICA, S.A.B. de C.V.*

United States District Court for the Southern District of Florida

August 8, 2012, Decided; August 8, 2012, Filed

CASE NO. 11-23898-CIV SEITZ/SIMONTON

**Reporter**

2012 U.S. Dist. LEXIS 111177 *

GUADALUPE GALLEGO OCHOA, et al., Plaintiffs, v. EMPRESAS ICA, S.A.B. de C.V., et al., Defendants.

**Subsequent History:** Later proceeding at Ochoa v. Empresas ICA, 2012 U.S. Dist. LEXIS 111182 (S.D. Fla., Aug. 8, 2012)

Motion granted by, in part, Motion denied by, in part, As moot, Dismissed without prejudice by, Motion denied by, As moot *Ochoa v. Empresas ICA, S.A.B. de C.V., 2013 U.S. Dist. LEXIS 149702 (S.D. Fla., Oct. 17, 2013)*

**Prior History:** Ochoa v. Empresas Ica, 2012 U.S. Dist. LEXIS 205743 (S.D. Fla., July 2, 2012)

## Core Terms

discovery, entity, rouge, undersigned, personal jurisdiction, ownership, general jurisdiction, requested material, privacy

**Counsel:** **[*1]** For Guadalupe Gallego Ochoa, an alien, Guadalupe Aranzazu Gayosso Gallego, an alien, Plaintiffs: Roger Steven Kobert, LEAD ATTORNEY, Rafferty Kobert Tenenholtz Bounds & Hess, P.A., Miami, FL; Marc C. Pugliese, Rafferty, Kobert, Tenenholtz, Bounds & Hess, P.A., Miami, FL.

For Empresas ICA, S.A.B. de CV, an alien corporation, Defendant: David B. Esau, LEAD ATTORNEY, Carlton Fields PA, West Palm Beach, FL; Maryann Lio Grahmann, Steven R. Selsberg, LEAD ATTORNEYS, PRO HAC VICE, Sidley Austin, LLP, Houston, TX.

For Pedro Topete Varga, an alien, Defendant: Jared M. Lopez, LEAD ATTORNEY, Miami, FL; Margaret T. Lai, Black Srebnick Kornspan & Stumpf, PA, Miami, FL.

**Judges:** ANDREA M. SIMONTON, UNITED STATES MAGISTRATE JUDGE.

**Opinion by:** ANDREA M. SIMONTON

## Opinion

ORDER GRANTING, IN PART, PLAINTIFFS' MOTION TO COMPEL

This matter came before the Court on Plaintiffs' Motion to Overrule Defendant Pedro Topete Vargas' Objections & Provide Better Responses, and to Compel Production of Documents to Plaintiffs' First and Second Requests for Production of Documents (DE # 45). Defendant Pedro Topete Vargas has filed a Response (DE # 46), and Plaintiffs have filed a Reply (DE # 50). The Honorable Patricia A. Seitz, United States District **[*2]** Judge, has referred discovery in this case to the undersigned United States Magistrate Judge (DE # 49). After a review of the record as a whole and for the reasons stated below, the Motion is granted, in part.

I. <u>BACKGROUND</u>[1]

As context for the parties' jurisdictional discovery dispute, a summary of their positions regarding the Court's personal jurisdiction over Defendant Topete follows.

In the Verified Complaint, in support of personal jurisdiction over Defendant Topete, Plaintiffs assert that Topete is a Mexican national "doing business within this district, this state and/or the United States of America. On information and **[*3]** belief, Topete also owns and/or controls real property, bank accounts and other personal property within this district" (DE # 1 at 2).

_____

[1] The Order Granting, in Part, Defendant's Motions to Quash Subpoenas Duces Tecum ("Order Granting Motions to Quash") contains a detailed summary of the background of this case (DE # 53 at 2-6), which the undersigned incorporates herein by reference. Several issues regarding the proper scope of jurisdictional discovery that are addressed in that Order overlap with issues raised in Plaintiffs' Motion. Accordingly, where indicated below, the undersigned draws from and adopts in this Order some components of the analysis set forth in the Order Granting Motions to Quash.

EXHIBIT
D-4

2012 U.S. Dist. LEXIS 111177, *3

In his Motion to Dismiss[2], Topete asserted that the Court does not have personal jurisdiction over him because exercising jurisdiction over him would offend the *Due Process Clause of the Constitution* (DE # 28 at 20-23). Specifically, the Motion to Dismiss stated that Topete is a Mexican national, "whose contacts with the [Southern District of Florida] are limited to vacations and the occasional business trips, unrelated to his business engagements with Plaintiffs [citation omitted]. Similarly, Topete transmits and receives only scarce correspondence to and from Florida" (DE # 28 at 21). Topete's Declaration, which is attached to his Motion to Dismiss, contained additional statements regarding his contacts with the Southern District of Florida (DE # 28-1). In the Declaration, he stated, "My contacts with the United States are limited to vacations. I do not regularly conduct business in the United States" (DE # 28-1 at 4); but he also stated, "I do not conduct business within this district, the State of Florida, and/or the United States of America" (DE **[*4]** # 28-1 at 3). He further asserted, "I rarely transmit or receive correspondence into and from Florida" (DE # 28-1 at 4). Finally, he contended several entities named in the Verified Complaint's allegations – namely, Viabilis Holdings, Viabilis Infraestructura, S.A.P.I. de C.V. ("Viabilis Infraestructura"), Consorcio de Desarrollo Intercontinental, S.A. de C.V. ("Consorcio"), Corporacion de Desarrollo Intercontinental, S.A. de C.V. ("Corporacion") and Autovia Urbana TT, S.A.P.I. de C.V. ("ATT") do not transact business in the United States (DE # 28-1 at 3).

## II. PLAINTIFFS' MOTION TO COMPEL

### A. Plaintiffs' Position

Plaintiffs seek to compel responses to 20 requests

---

[2] The Court has denied, without prejudice, Topete's Motion to Dismiss, with leave to refile it after the completion of jurisdictional discovery (DE # 52 at 2). The undersigned assumes, however, for purposes of this discovery dispute, that Defendant Topete maintains his contentions as set forth in the Motion to Dismiss.

Topete also moved to dismiss the Verified Complaint on other grounds as well. First, Topete contended that the Verified Complaint fails to state a claim. In this respect, he argued that the federal RICO statutes do not provide for extraterritorial application. In this case, Defendant Topete continued, the alleged enterprise **[*5]** is located in Mexico, and the alleged connections with Miami or the United States are minimal (DE # 28 at 8-11). Next, Topete argued that the factors considered by the Court to determine the appropriate forum counsel in favor of dismissing this case on *forum non conveniens* grounds (DE # 28 at 11-20).

contained in Plaintiffs' First Request for Production of Documents Relating to Jurisdiction to Defendant Pedro Topete Vargas ("First Request for Production") and to 10 requests contained in Plaintiffs' Second Request for Production of Documents Relating to Jurisdiction to Defendant Pedro Topete Vargas ("Second Request for Production"). Plaintiffs generally contend that Defendant Topete, in his Motion to Dismiss, alleged that he has inadequate contacts with this jurisdiction, including through business activities, to be subject to this Court's jurisdiction, yet Topete will not provide the requested information that will allow Plaintiffs to test Topete's claims. While Plaintiffs identify each request, the objection and response to each disputed request, the Plaintiffs group their bases **[*6]** for compelling responses into a few principal arguments, as follows.

Plaintiffs contend that Defendant's general objections to discovery requests fail because they are boilerplate objections, prohibited by rule and court order. Plaintiffs argue that Defendant fails to apply a general objection to a specific request. Plaintiffs point out that objections must be specifically stated and contain a statement of reasons. Otherwise, Plaintiffs conclude, Defendant's objections are meaningless. Finally, Plaintiffs argue that Defendant Topete's claims of burdensomeness fail because Defendant fails to set forth specific information regarding the burden (DE # 45 at 7-8, 14-15).

Plaintiffs also assert that the requested financial account information is not protected from disclosure by statutory or constitutional privacy provisions, despite Defendant's claims. Plaintiffs acknowledge that the general rule in Florida is that discovery of personal financial information is ordinarily limited. Plaintiffs argue, however, that a party's personal financial information and related documents, if relevant to the disputed issues, are subject to discovery (DE # 45 at 4). Plaintiffs continue that Defendant, despite **[*7]** the statements in his Declaration, appears to have had significant business ties to Florida, including as an officer or director for different Florida corporations. Plaintiffs conclude that the information they seek is targeted discovery relating to jurisdictional matters, and that Plaintiffs need the information to test Defendant's claims (DE # 45 at 4-5).

Plaintiffs further state their position in their Reply brief. First, Plaintiffs contend that whether a document is publicly available to Plaintiffs does not affect Defendant's obligation to produce the document if requested (DE # 50 at 2-3). Next, Plaintiffs argue that their requests concerning the organizational structure of

2012 U.S. Dist. LEXIS 111177, *7

Art Rouge[3] are sufficiently clear, and that whether the requested information might also be in the possession of another party is irrelevant to Defendant's production obligations (DE # 50 at 3). With regard to the requests concerning Topete's activities in Florida in connection with Art Rouge, Inc. ("Art Rouge"), Plaintiffs refute Defendant's claim that these requests have already been sufficiently satisfied in response to other requests, and further point out that Defendant fails to specify where and how these [*8] requests were previously satisfied (DE # 50 at 3-4). As for requests regarding Defendant's ties to organized political, social and cultural activities, Plaintiffs argue that such information is highly relevant to shed light on Defendant's general contacts with this forum (DE # 50 at 4-5). Finally, Plaintiffs assert that information regarding Empresas ICA, S.A.B. de C.V.'s ("ICA's") ownership of other corporate entities identified in Plaintiffs' Verified Complaint is relevant to jurisdictional issues because ICA has asserted that it is not subject to personal jurisdiction (DE # 50 at 5).

B. Defendant Topete's Position

At the outset, Defendant Topete complains that, although discovery is currently limited to jurisdictional and *forum non conveniens* issues, Plaintiffs seek to obtain merits discovery (DE # 46 at 1-2). Next, Defendant organizes his objections to the requests into six categories, as set forth below.

The first category focuses on Florida public business filings, specifically, Request Nos. 7 and 14 of Plaintiffs' First [*9] Request for Production. Defendant objects to requests for public filings, arguing that the materials can be obtained directly by Plaintiffs more conveniently and cheaply (DE # 46 at 3). Because Plaintiffs can conduct their own research and easily obtain these documents, Defendant continues, his objection to these requests should be sustained.

The second category concerns the lines of authority and organizational structure of Art Rouge, and is limited to Request No. 18 of Plaintiffs' First Request for Production. Defendant objects to this request for "organizational charts" and related documents concerning control of Art Rouge, stating that the request is vague and more appropriately addressed to Art Rouge. Defendant also states, however, that he does

not possess any responsive documents (DE # 46 at 4).

The third category of requests seeks information relating to Topete's business activities in Florida in connection with Art Rouge, and identifies Request Nos. 19 and 20 of Plaintiffs' First Request for Production. Defendant states that he has already produced documents responsive to these requests pursuant to other requests, and the earlier production should be sufficient to satisfy these [*10] requests (DE # 46 at 4).

The fourth (and largest) category of requests concerns certain financial and bank account information of Defendant Topete and other parties, and related information. This encompasses Request Nos. 22-32 and 41 of Plaintiffs' First Request for Production. Topete acknowledges that Plaintiffs are entitled to learn of the existence of accounts that are owned or controlled by Topete, but Topete argues that the specific information requested, such as balances and transaction history, impinges of Topete's privacy rights and is irrelevant to the jurisdictional issues before the Court (DE # 46 at 5-6).

The fifth category of requests relates to Topete's participation in organized political, social and cultural activities in Florida, identifying Request Nos. 42 and 43 of Plaintiffs' First Request for Production (DE # 46 at 6). Defendant simply argues that these requests are overbroad and seek personal information of Topete (DE # 46 at 6).

The sixth and final category concerns ICA's ownership (primarily, information regarding transactions of equity shares) in Consorcio, Corporacion, Viabilis Infraestructura, ATT, and Operadora Autopista Rio de los Remedios, S.A.P.I. de C.V. [*11] ("OARSA"). This category encompasses Request Nos. 1 to 10 of Plaintiffs' Second Request for Production. Defendant Topete argues that none of the requests concern jurisdictional issues but, instead, seek discovery regarding the merits of the claims. Specifically, Defendant argues that the requests relate to Plaintiffs' allegations in the Verified Complaint that ICA, Topete, and others acquired ownership of some of these entities in furtherance of a scheme to evade Mexican taxes and deprive Plaintiffs of their ownership in some or all of these entities. Thus, Defendant concludes, his objections to all of these requests should be sustained (DE # 46 at 6-7).[4]

---

[3] Plaintiffs have produced documents showing that Topete was the President of Art Rouge, Inc., a Florida corporation, from July 8, 2005, through February 9, 2012.

[4] Plaintiffs also move to compel a response to Request No. 39 of their First Request for Production, which seeks "documents

2012 U.S. Dist. LEXIS 111177, *11

III. ANALYSIS

A. Relevancy of Documents, Generally

As previously set forth in the Order Granting Motions to Quash, although the parties have not directly addressed the issue in their discovery dispute, the undersigned notes that the Court's exercise of jurisdiction over Topete must comport with the *Due Process Clause of the Fifth Amendment of the United States Constitution*. *See Consolidated Dev. Corp. v. Sherritt, Inc., 216 F.3d 1286, 1291 (11th Cir. 2000)*. A defendant's contacts must be sufficient to avoid offending "traditional notions of fair play and substantial justice." *Id.* (citations omitted). The nature of the inquiry regarding such contacts, however, depends upon whether a plaintiff is attempting to assert specific jurisdiction, as opposed to general jurisdiction, over a defendant. *Id.* Specific jurisdiction concerns a party's activities in the forum related to the alleged causes of action, while general jurisdiction is concerned with actions unrelated to a complaint's claims, focusing, instead, on a "showing of continuous and systematic general business contacts **[*13]** between the defendant and the forum state." *Id. at 1291, 1292* (citations omitted).

Defendant Topete's Motion to Dismiss asserted that the Court's exercise of personal jurisdiction over him is unconstitutional because it offends the *Due Process Clause* (DE # 28 at 20). Specifically, Topete argued that the inconvenience that would be imposed upon him outweighs the Court's interests in exercising jurisdiction over him (DE # 28 at 21-23). Although he does not identify the bases in the following terms, Topete appeared to argue that, in terms of general jurisdiction, he lacks the regular contacts with the forum necessary to establish jurisdiction; and, in terms of specific jurisdiction, all the significant activities alleged by Plaintiffs occurred in Mexico, not Florida (DE # 28 at 21-22).

The parties' arguments as to the disputed discovery, nonetheless, implicitly include claims regarding general and specific jurisdiction over Defendant Topete. For example, Defendant Topete argues, in part, that requests concerning his ties to political, social or cultural organizations in Florida are overly broad and are "part of Plaintiffs' campaign to use jurisdictional discovery as a vehicle to engage **[*14]** in the discovery of Topete's personal information" (DE # 46 6). Plaintiffs, on the other hand, have focused on Defendant Topete's other business and social connections with the forum, presumably in an effort to establish a basis for general jurisdiction over Topete. Discovery requests, therefore, that call for information concerning both specific jurisdiction, as well as general jurisdiction over Topete, are relevant to resolving the jurisdictional discovery issues in this case.

In this context, the undersigned turns to the disputed discovery requests.

B. The Specific Requests

At the outset, the undersigned is generally dismayed by Defendant's objections, in several instances throughout the First Request for Production (and especially in response to the Second Request for Production), which either attempt to incorporate as a response vague, boilerplate objections without providing a specific response, or attempt to provide a specific response "without waiving" general objections. This practice is unhelpful and unacceptable, and will not be accepted by the Court going forward.[5]

The undersigned otherwise turns to the merits of the parties' positions. Because the six categories set forth by Defendant provide a useful framework to consider Defendant's objections, regardless of the merits of such objections, the undersigned employs this framework to analyze the objections.[6]

1. First Category – Public Filings

Defendant Topete objects to Request Nos. 7 and 14 of Plaintiffs' First Request for Production because Topete contends that the requested materials are publicly available, and Plaintiffs can obtain them directly more efficiently. Consistent with the undersigned's ruling in the Order Granting Motions to Quash, the undersigned overrules Defendant's objection on this basis. Whether

___

relating to any other corporate entities or businesses in Florida in which you have, or at any time had, an interest." Defendant does not address this item in his Response, nor do Plaintiffs further address the item in their Reply. The record is, therefore, unclear as to whether the parties have resolved their dispute with regard to this item. At any rate, because Defendant does not appear to object to Plaintiff's **[*12]** motion as to this item, Plaintiffs' motion is granted. The documents shall be produced on or before August 23, 2012.

___

[5] By separate order, the undersigned has issued a general order regarding discovery objections to provide the parties **[*15]** more detailed guidance.

[6] The undersigned further notes that Plaintiffs organized their Reply, in part, in accordance with this organizational structure as well.

the documents are available to Plaintiffs through due diligence does not control whether Topete should be compelled to produce them. Moreover, for the reasons stated below (in the Fourth Category) regarding the relevance of Topete's business contacts, through other entities, with this forum, information responsive to these requests **[*16]** would be relevant. Thus, Plaintiffs' Motion to compel responses to Request Nos. 7 and 14 of Plaintiffs' First Request for Production is granted. Defendant Topete shall produce the responsive documents on or before August 23, 2012.

## 2. Second Category – Art Rouge Lines of Authority

Regarding the second category (organization and control of Art Rouge), Defendant's objection, that the meaning of the commonly used term "organizational chart" is unclear, is not well-taken. That objection, however, appears to be contradicted by the following statement later in Defendant's Response: "[I]f any responsive documents do exist, they are not in Topete's possession" (DE # 46 at 4). This is not sufficient, however, because he must produce documents that are under his control as well as those that are in his possession. Since the activities of Topete with respect to Art Rouge, Inc., a Florida corporation, are relevant to the issue of personal jurisdiction, these documents must be produced on or before August 23, 2012, if they are within the control of Topete.

## 3. Third Category – Topete's Art Rouge-Related Activities in Florida

Regarding the third category of requests (Topete's Art Rouge activities in Florida), **[*17]** Defendant states that documents produced in response to earlier requests are responsive to these requests. Defendant, however, does not clarify whether *all* responsive documents have been produced, nor does Defendant identify the earlier relevant requests and the documents responsive thereto that satisfy these requests. Therefore, Defendant shall serve a response to Plaintiffs on or before August 23, 2012, that: (a) states whether all responsive documents to these requests have been produced; (b) provides all additional responsive documents, if any; and (c) states with specificity the earlier requests and related responses that purportedly satisfy these requests. Thus, Plaintiffs' Motion with regard to Request Nos. 19 and 20 of Plaintiffs' First Request for Production is granted.

## 4. Fourth Category – Financial Accounts Records

As to the fourth category of requests regarding privacy in certain banking and financial accounts information, the requests are substantially similar to those served on

third-parties, which were addressed in the earlier Order Granting Motions to Quash. Thus, many of the parties' same respective arguments have been set forth. Therefore, the undersigned adopts and **[*18]** sets forth again the analysis that addresses these objections.

Florida protects an individual's expectation of privacy in financial records. *Winfield v. Div. of Pari-Mutuel Wagering, Dep't of Bus. Regulation, 477 So.2d 544, 548 (Fla. 1985)* (discussing *Fla. Const. art. I, § 23*); *Berkeley v. Eisen, 699 So.2d 789, 790 (Fla. Dist. Ct. App. 1997)* (noting that court orders compelling discovery constitute state action for purposes of constitutional privacy rights). In addition to constitutional protection, *Florida Statutes Section 655.059(2)(b)* requires financial institutions to keep confidential nonpublic account information except upon authorization from the account holder.

Florida's constitutional and statutory protection of personal financial and banking records, however, is not absolute. "A party's finances, if relevant to the disputed issues of the underlying action, are not excepted from discovery...and courts will compel production of personal financial documents and information if shown to be relevant by the requesting party." *Friedman v. Heart Inst. of Port St. Lucie, Inc., 863 So. 2d 189, 194 (Fla. 2003)* (citing various cases). Thus, a party's financial records, while ordinarily **[*19]** not discoverable, are subject to discovery if "the documents themselves or the status [that] they evidence is somehow at issue in the case." *Aspex Eyewear, Inc. v. Ross, 778 So. 2d 481, 481 (Fla. Dist. Ct. App. 2001)*. Similarly, *Section 655.059(2)(b)* permits disclosure of nonpublic records in accordance with *15 U.S.C. § 6802*, which provides for unauthorized disclosure "to respond to judicial process." Courts have interpreted this exception as providing for disclosure pursuant to civil discovery. *See, e.g., Sierra Equity Group v. White Oak Equity Partners, LLC, 672 F. Supp. 2d 1369, 1371 (S.D. Fla. 2009)*.

In Topete's challenge to the Court's personal jurisdiction over him, he asserted that his contacts with the United States are limited to vacations and that he does not conduct business within the Southern District of Florida (DE # 28-1 at 3, 4). Plaintiffs, on the other hand, have provided information to suggest that Topete currently or previously owns and/or manages other Florida businesses (DE # 42 at 4, 6; 42-10) and, thus, has business ties to the forum that he does not acknowledge. Topete, therefore, has placed at issue his business and related contacts with this forum, which are **[*20]** relevant to determining the Court's personal

jurisdiction over him.

Moreover, the undersigned notes that financial records can shed significant light on the relationship between a party and a forum and, thus, whether due process would be offended by exercising jurisdiction over a party. Payments and deposits often are the essence of doing business in a forum. Thus, such records reasonably could lead to evidence of Topete's contacts with this District because they could evidence the type, extent and frequency of Topete's business in this District and, accordingly, offer relevant evidence for resolving the Court's jurisdiction over Topete, a threshold consideration in this case. Such requests, therefore, as they concern Topete's finances, are relevant because "the documents themselves," as well as their content could reasonably shed light on the jurisdictional issue before the Court. *See Aspex Eyewear, 778 So.2d at 481.* Accordingly, Defendant Topete's objections on this basis to discovery Request Nos. 22-32 and 41 of Plaintiffs' First Request for Production are overruled.

The discovery requests made to Defendant Topete, however, also include requests for documents concerning several parties **[*21]** whom Plaintiffs contend are controlled, at least in part, by Topete.[7] Thus, the issue before the Court is whether Plaintiffs have sufficiently alleged that Topete's involvement with a given party is sufficient enough that its records would be relevant to determining Topete's contacts with this forum. As discussed below, with respect to certain parties, Plaintiffs have made sufficient allegations of Topete's involvement in order to warrant discovery of the parties' activities in this forum, which might be revealed in the requested bank records, to the extent that Topete possesses such records. In short, the records could reveal Topete's management or direction of their activities in this forum. With other parties, however, Plaintiffs have failed to demonstrate a sufficient connection to Topete to warrant the discovery at this time. If, however, Plaintiffs can later establish a basis for seeking documents related to these other parties, Plaintiffs may request such records.

a. Viabilis Holdings

As detailed in the allegations of the Verified Complaint, Topete allegedly played a principal **[*22]** role in the formation and management of Viabilis Holdings. Allegations of Topete's involvement in this entity are also supported by Topete's Declaration, in which he states that he is a member of the Board of Directors of Viabilis Holdings, and further contends, apparently on behalf of Viabilis Holdings (and others) that Viabilis Holdings does not "operate, conduct, engage in, or transact any business in the United States" (DE # 28-1 at 2-3). Thus, Plaintiffs have alleged a sufficient basis for seeking discovery to challenge the extent of Topete's contacts with this forum through activities of this entity.

b. Viabilis Infraestructura

Similarly, Plaintiffs have alleged sufficient involvement of Topete with Viabilis Infraestructura. The Verified Complaint alleges Topete's indirect ownership and control of this entity (DE # 1 at 3-4). Topete's alleged control included the ability to understate the entity's earnings through several means (DE # 1 at 12-15). Topete's Declaration also states, presumably on the entity's behalf, the lack of contact of this entity with the forum (DE # 28-1 at 3). Any activities of the entity in the forum, therefore, could be relevant to determining Topete's contacts **[*23]** for jurisdictional purposes.

c. Art Rouge

Plaintiffs have provided evidence to support their claim that Topete served as President of Art Rouge, Inc., a Florida corporation, from July 8, 2005, to February 9, 2012 (DE # 42 at 4; 42-10). As President, Topete could have conducted or controlled any number of business activities in this forum. Thus, records relating to this entity are relevant to determining Topete's contacts for jurisdictional purposes.

d. Galina Kvachnina

Plaintiffs contend that Galina Kvachnina has been, and continues to be, Topete's business partner in Art Rouge (DE # 42 at 6), and they present evidence to suggest that Kvachnina served as an officer and/or director of Art Rouge during different times in its history (DE # 42-10). Even if these allegations were true, the requested materials as they relate solely to Kvachnina are irrelevant; even if they revealed extensive contacts of Kvachnina with the forum, such evidence would not resolve whether Topete had any contact with the forum because Kvachnina's contacts could be independent of Topete's contacts. Therefore, the requests as relating to Kvachnina are irrelevant, and Defendant's objection to the extent a request calls **[*24]** for production of Kvachnina's bank records is sustained.

e. TopTrust

Plaintiffs have also provided evidence to argue that

---

[7] Specifically, the undersigned is referring to Request Nos. 26-31 in Plaintiffs' First Request for Production.

Topete served as the initial director of TopTrust, a Florida corporation, beginning in 2003 (DE # 42 at 4; 42-10). Therefore, similar to Topete's involvement with Art Rouge, records relating to this entity could shed light on Topete's contacts with the forum.

f. Infraestructura Intecil, S.A.

Plaintiffs do not appear to have alleged any connection between Topete and this entity in the Verified Complaint. Upon a review of the record, the undersigned finds that Plaintiffs have failed to sufficiently establish a connection between Topete and this entity to provide for discovery pursuant to these requests. As noted above, if other information discovered during the course of this litigation supports a sufficient connection between Topete and this entity, Plaintiffs may request the information.

To the extent that this Order compels production of documents with regard to this fourth category of requests, Defendant Topete shall produce the requested documents on or before August 23, 2012.

5. Fifth Category – Organized Political, Social and Cultural Activities in Florida

Defendant **[*25]** Topete objects to requests calling for information concerning his involvement with organized political, social and cultural activities in Florida, arguing that these requests are overly broad and inappropriately seek personal information of Topete. Consistent with the Order Granting Motions to Quash, the undersigned finds that the requested materials are relevant to determining Topete's general contacts with this forum, which are relevant to determining whether Topete is subject under general personal jurisdiction principles to the jurisdiction of this Court. Therefore, Defendant Topete shall respond to Request Nos. 42 and 43 of Plaintiffs' First Request for Production on or before August 23, 2012.

6. Sixth Category – ICA's Ownership of Certain Entities

All of the requests in the Second Request for Production seek information concerning the ownership interests of ICA in one or more of several entities (including Consorcio, Corporacion, Viabilis Infraestructura, ATT and OARSA) identified in the Verified Complaint. The requests generally seek information concerning the purchase, sale or transfer of ownership shares in these entities; or meetings, agreements or communications relating thereto. **[*26]** Plaintiffs argue that the requested materials are relevant to jurisdictional discovery because ICA claims (in its Motion to Dismiss) that ICA is not a proper party to this suit, and Topete may have

information relevant to this contention.

The requests contain no geographical specifications or limitations. Moreover, while the undersigned finds above that Plaintiffs have made sufficient allegations of Topete's involvement in some of these entities to warrant discovery of the parties' activities in this forum, the earlier addressed financial records requests were all limited geographically to Florida, as was the undersigned's ruling. Instead, the true intent of Plaintiffs' requests in the Second Request for Production is made evident by their own argument; Plaintiffs argue that the requested information is relevant to test ICA's claims that it is a properly named Defendant in regard to Plaintiffs' allegations, not whether ICA is subject to personal jurisdiction (DE # 50 at 5). Thus, Plaintiffs appear to seek, as Defendant suggests, discovery geared toward the merits of Plaintiffs' claims as opposed to jurisdictional and/or *forum non conveniens* issues. The requested materials may reveal **[*27]** some information relevant to jurisdiction or *forum non conveniens,* but the appropriateness of these requests as written is attenuated. While these requests might help resolve Topete's involvement with these entities, they only indirectly, at best, go to information regarding Topete's or ICA's activities in this forum. Therefore, Plaintiffs' Motion to compel responses to the requests contained in the Second Request for Production is denied.

IV. CONCLUSION

Therefore, upon a review of the record as a whole, it is hereby

**ORDERED AND ADJUDGED** that Plaintiffs' Motion to Overrule Defendant Pedro Topete Vargas' Objections & Provide Better Responses, and to Compel Production of Documents to Plaintiffs' First and Second Requests for Production of Documents (DE # 45) is **GRANTED, IN PART,** as set forth in the body of this Order.

**DONE AND ORDERED** in Miami, Florida, on August 8, 2012.

/s/ Andrea M. Simonton

ANDREA M. SIMONTON

UNITED STATES MAGISTRATE JUDGE

# *Pendlebury v. Starbucks Coffee Co.*

United States District Court for the Southern District of Florida

August 29, 2005, Decided ; August 29, 2005, Filed

CASE NO. 04-80521-CIV-MARRA/SELTZER

**Reporter**

2005 U.S. Dist. LEXIS 36748 *

SEAN PENDLEBURY and LAUREL OVERTON, Plaintiffs, v. STARBUCKS COFFEE COMPANY, Defendant.

**Subsequent History:** Magistrate's recommendation at *Pendlebury v. Starbucks Coffee Co., 2005 U.S. Dist. LEXIS 50935 (S.D. Fla., Dec. 27, 2005)*

**Prior History:** *Pendlebury v. Starbucks Coffee Co., 2005 U.S. Dist. LEXIS 574 (S.D. Fla., Jan. 3, 2005)*

## Core Terms

tax return, discovery, interrogatory, discovery request, internet

## Case Summary

**Procedural Posture**

Defendant employer moved to compel responses to discovery requests in plaintiff employees' Fair Labor Standards Act (FLSA) collective action in which the employees alleged that the employer improperly classified its store managers as exempt from the overtime requirements of the FLSA.

**Overview**

Pursuant to U.S. Dist. Ct., S.D. Fla., R. 26.1.H.1, all motions related to discovery had to be filed within 30 days of the occurrence of grounds for the motion. The employer challenged the employees' April 21, 2005, responses to its discovery requests, yet the employer did not file its motion until July 22, 2005. The motion therefore ran afoul of Rule 26.1.H.1. Even if the court were to consider the motion on the merits, it would still have failed. First, the employees needed not disclose their tax returns. The employer failed to show that it had a compelling need for the tax returns because the information contained therein was readily obtainable through other means. Second, the request for all invoices, statements, or call logs that reflected, inter alia, calls, text messages or other communications to or

from certain communications devices was troubling in scope and had a tenuous connection to the issues in this suit, and the employees had a legitimate expectation of privacy in those types of records. Third, an interrogatory seeking identification of descriptors used by the employees when sending electronic mail or posting communications on internet media swept too broadly.

**Outcome**

The motion was denied.

## LexisNexis® Headnotes

Civil Procedure > Pleading & Practice > Motion Practice > Time Limitations

Civil Procedure > ... > Discovery > Misconduct During Discovery > Motions to Compel

*HN1* See U.S. Dist. Ct., S.D. Fla., R. 26.1.H.1.

**Counsel:** [*1] For SEAN PENDLEBURY, LAUREL OVERTON, on behalf of themselves and all others similarly situated, CYNTHIA A. BROOKS-DELGADO, RICHARD LASKY WEITZMAN, JORGE FIFFE, TIFFANI A. ENYINNAYA, plaintiffs: Daniel R. Levine, Shapiro Blasi & Wasserman, Boca Raton, FL.

For DAVID M. RITTER, SELENA JANELLE PERRY, ABDUL MAKKAWI, STEPHEN E. TULLOCH, CLIFFORD GENTRY, ANGELA Y. WARNER, plaintiffs: Daniel R. Levine, Shapiro Blasi & Wasserman, Boca Raton, FL; Robin Ilene Cohen, Shapiro Blasi & Wasserman, Boca Raton, FL.

For STARBUCKS COFFEE COMPANY, Starbucks Coffee Company dba Starbucks Corp., defendant: Susan Nadler Eisenberg, Akerman Senterfitt Suntrust International Center, Miami, FL; Daniel L. Nash, Nathan J. Oleson, Akin Gump Strauss Hauer & Feld LLP,

EXHIBIT
D-5

2005 U.S. Dist. LEXIS 36748, *1

Washington, DC; Catherine A. Conway, Joel M. Cohn, Akin Gump Strauss Hauer & Feld, Los Angeles, CA.

**Judges:** BARRY S. SELTZER, United States Magistrate Judge.

**Opinion by:** BARRY S. SELTZER

# Opinion

ORDER

THIS CAUSE is before the Court on Defendant's Motion to Compel Responses to Discovery Requests and Incorporated Memorandum of Law (DE 90) and was referred to the undersigned pursuant to *28 U.S.C. § 636*. The Court having considered **[*2]** the Motion and being otherwise sufficiently advised in the premises, it is hereby ORDERED that the Motion is DENIED.

This is a Fair Labor Standards Act collective action in which Plaintiffs allege that Defendant has improperly classified its store managers as exempt from the overtime requirements of the FLSA. On March 1, 2005, Defendant served Plaintiffs with Interrogatories and Document Requests; Plaintiffs responded to those discovery requests on April 21, 2005. See Motion, Ex. 2 (DE 90). On July 22, 2005, Defendant filed the instant Motion, challenging Plaintiffs' responses to two Document Requests and one Interrogatory.

At the outset, the Court notes that Defendant's Motion must be denied as untimely. Pursuant to Local Rule 26.1.H.1, **HN1** "all motions related to discovery, including but not limited to motions to compel discovery . . ., shall be filed within thirty (30) days of the occurrence of grounds for the motion." Here, Defendant challenges Plaintiffs' April 21, 2005, responses to its discovery requests, yet Defendant did not file its Motion until July 22, 2005, more than three months later. Defendant's Motion therefore runs afoul of Local Rule 26.1.H.1. [1]

---

[1] Defendant also has violated Local Rule 26.1.H.2 by failing to "quote verbatim each interrogatory [and] request for production and the response to which objections is *[sic]* taken followed by (a) the specific objections, (b) the grounds assigned for the objection (if not apparent from the objection), and (c) the reasons assigned as supporting the motion, all of which shall be written in immediate succession to one another."

**[*3]** Even if the Court were to consider the Motion on the merits, however, it would still be denied, for the reasons set forth below.

Document Request No. 10: In this Request, Defendant seeks Plaintiffs' federal and state income tax returns for the years 2001-present. Plaintiffs objected to the Request on the grounds that it "is not reasonably calculated to lead to the discovery of admissible evidence as to Plaintiffs' claims or Defendant's defenses. The Request also is overly intrusive of Plaintiffs' privacy and is designed to harass the Plaintiffs." See Motion, Ex. 2 (DE 90). The Court agrees that Plaintiffs need not disclose their tax returns.

There is a split of authority within the federal courts -- including among judges of this Court -- as to whether tax returns are entitled to enhanced protection from discovery. Compare, e.g., *Aliotti v. Vessel Senora, 217 F.R.D. 496,497-98 (N.D. Cal. 2003)*; *Dunkin' Donuts, Inc. v. Mary's Donuts, Inc., 2001 U.S. Dist. LEXIS 25204, No. 01-0392-CIV, 2001 WL 34079319, at * 2 (S.D. Fla. Nov. 1, 2001)*; *Gattegno v. Pricewaterhousecoopers, LLP, 205 F.R.D. 70,71-73 (D. Conn. 2001)*; *Terwilliger v. York Int'l Corp., 176 F.R.D. 214, 216-17 (W.D. Va. 1997)*; **[*4]** *United States v. Bonanno Organized Crime Family of La Cosa Nostra, 119 F.R.D. 625, 627 (E.D.N.Y. 1988)*; *E. Auto Distribs., Inc. v. Peugeot Motors of Am., Inc., 96 F.R.D. 147,148-49 (E.D. Va. 1982)* (holding either that tax returns are privileged or that public policy restricts their disclosure) with *MCI Worldcom Network Servs., Inc. v. Von Behren Elec., Inc., No. 1 :00CV3311JTC, 2002 WL 32166535, at * 4 (N.D. Ga. May 21, 2002)*; *Shearson Lehman Hutton v. Lambros, 135 F.R.D. 195, 198 (M.D. Fla. 1990)*; *Halperin v. Berlandi, 114 F.R.D. 8,11 (D. Mass. 1986)*; *Weiner v. Bache Halsey Stuart, Inc., 76 F.R.D. 624, 627 (S.D. Fla. 1977)* (holding that no privilege attaches to tax returns and that their discoverability turns on relevance. The greater weight of authority, however, has concluded that tax returns are subject to at least some level of heightened protection from disclosure. See *Terwilliger, 176 F.R.D. at 217* (noting that only "a minority of courts have held that the sole inquiry governing discovery of tax returns is whether the information contained [therein] is relevant").

**[*5]** This Court agrees that "income tax returns are highly sensitive documents" that courts should be reluctant to order disclosed during discovery. *Natural Gas Pipeline Co. of Am. v. Energy Gathering, Inc., 2 F.3d 1397, 1411 (5th Cir. 1993)*; see also *De Masi v. Weiss, 669 F.2d 114, 119-20 (3rd Cir. 1982)* (noting

existence of public policy against public disclosure of tax returns); *Premium Serv. Corp. v. Sperry & Hutchinson Co., 511 F.2d 225, 229 (9th Cir. 1975)* (same). For this reason, the Court agrees with those courts that have held that a party seeking the production of tax returns must demonstrate (1) the relevance of the tax returns to the subject matter of the dispute and (2) a compelling need for the tax returns exists because the information contained therein is not otherwise readily obtainable. See, e.g., *Dunkin' Donuts, 2001 U.S. Dist. LEXIS 25204, 2001 WL 34079319, at * 2*; *Terwilliger, 176 F.R.D. at 217*; *SEC v. Cymaticolor Corp., 106 F.R.D. 545, 547 (S.D.N.Y. 1985)*. [2]

**[*6]** Defendant claims that the information contained in the tax returns is relevant because (1) any claimed business deductions on the tax returns would highlight Plaintiffs' management responsibilities and refute Plaintiffs' contention that their primary duty was serving coffee to customers and (2) the returns "could establish whether [Plaintiffs] were working for other employers while claiming to work over 40 hours a week for Starbucks." See Motion at 4 (DE 90). Plaintiffs correctly note, however, that such information easily can be gleaned through interrogatories. Similarly, Defendant could inquire into these areas at depositions or through requests for admissions. Simply put, Defendant has failed to show that it has a "compelling need" for Plaintiffs' tax returns because the information contained therein is "readily obtainable" through other means. *Dunkin' Donuts, 2001 U.S. Dist. LEXIS 25204, 2001 WL 34079319, at * 2*; *Terwilliger, 176 F.R.D. at 217*; *Cymaticolor, 106 F.R.D. at 547*.

Document Request No. 17: In this Request, Defendant seeks "all invoices, statements, or call logs that reflect calls, text messages, electronic mail, or other communications **[*7]** made to or from a cellular telephone, Blackberry, pager, or other portable communications device owned or used by plaintiffs during the period June 2001-present." Plaintiffs objected to the Request on the grounds that it "is not reasonably calculated to lead to the discovery of admissible evidence as to Plaintiffs' claims or Defendant's defenses. The Request also is overly intrusive of

Plaintiffs' privacy and is designed to harass the Plaintiffs." See Motion, Ex. 2 (DE 90).

Defendant asserts that the requested records are relevant because they "could provide information about whether plaintiffs were able to conduct personal business during the hours they were allegedly working for Starbucks." Motion at 6 (DE 90). Defendant further argues that the records would indicate the frequency with which Plaintiffs communicated with other Starbucks employees about work-related issues while away from their Starbucks stores. See id. (DE 90). It is unclear to the Court, however, how such records are reasonably likely to provide the information Defendant seeks; the records will only indicate whether a call or other communication was made, and not the substance of those communications (which **[*8]** may have been wholly unrelated to Plaintiffs' employment). The scope of the Request also is troubling; Defendant has requested records for a span of greater than four years. Given Plaintiffs' legitimate expectation of privacy in these types of records and the tenuous connection, at best, they might have to the issues in this lawsuit, the Court denies Defendant's request. See, e.g., *Longmire v. Ala. State Univ., 151 F.R.D. 414, 418 (M.D. Ala. 1992)* (noting that discovery requests should be carefully scrutinized when they have the potential for "harassment, embarrassment, and unnecessary invasions into [one's] private life"); *Priest v. Rotary, 98 F.R.D. 755, 761 (N.D. Cal. 1983)* ("When a discovery request approaches the outer bounds of relevance and the information requested may only marginally enhance the objectives of providing information to the parties or narrowing the issues, the Court must then weigh that request with the hardship to the party from whom the discovery is sought.'") (quoting *Carlson Cos., Inc. v. Sperry & Hutchinson Co. 374 F. Supp. 1080, 1088 (D. Minn. 1974)*); 10 Federal Procedure, Lawyer's Edition § 26:70 (1994 **[*9]** & Supp. 2005) ("the district courts should not neglect their power to restrict discovery where justice requires protection for a party . . . from annoyance, embarrassment, oppression, or undue burden or expense"). [3]

Interrogatory No. 3: In this Interrogatory, Defendant asks Plaintiffs to identify "all names, identifiers, internet handles,' electronic mail addresses, or other descriptors

---

[2] Defendant appears to agree with this proposition. See Motion at 3-4 (DE 90) (citing Lambros for proposition that discoverability of tax returns turns on relevance, but noting that order compelling production of tax returns generally is appropriate only when "the returns are relevant to the case at hand and the information contained within the documents is not otherwise available").

[3] Defendant may nonetheless inquire whether Plaintiffs conducted personal business during their working hours and whether they communicated with other Starbucks employees about work-related issues while away from their Starbucks stores through interrogatories or at depositions.

used by plaintiffs when sending electronic mail or posting any content, message, or other communication on any chat board, internet web log, internet web site, chat room, text message, or other internet media or electronic communication that relates or refers to Starbucks or their employment with Starbucks." Motion, Ex. 1 (DE90). Defendant argues **[*10]** that it has "observed numerous postings on public internet sites regarding store manager job duties and hours worked," and seeks to discover whether Plaintiffs have made any of those postings. <u>See</u> Motion at 7 (DE 90). It is the Court's opinion, however, that this Interrogatory sweeps too broadly and again infringes on Plaintiffs' privacy rights. Rather than seeking Plaintiffs' (private) e-mail addresses and "internet handles," the Court concludes that Defendant should first establish a foundation for the request by inquiring (through an interrogatory or at a deposition) whether Plaintiffs have, in fact, posted messages concerning store manager duties or hours worked. Only if this question is answered in the affirmative should Plaintiffs then be required to divulge this private information.

For all the foregoing reasons, Defendant's Motion to Compel Responses to Discovery Requests and Incorporated Memorandum of Law (DE 90) is DENIED in its entirety.

DONE AND ORDERED in Fort Lauderdale, Florida, this <u>29th</u> day of August 2005.

BARRY S. SELTZER

United States Magistrate Judge

---

**End of Document**

# *Ross v. Twenty-Four Collection, Inc.*

United States District Court for the Southern District of Florida

March 11, 1988, Decided ; March 11, 1988, Filed

No. 85-3216-CIV

**Reporter**

681 F. Supp. 1547 *; 1988 U.S. Dist. LEXIS 1982 **; 48 Fair Empl. Prac. Cas. (BNA) 1590; 48 Empl. Prac. Dec. (CCH) P38,491

Karen L. Ross, Plaintiff, v. The Twenty-Four Collection, Inc., et al., Defendant

## Core Terms

harassment, sexual harassment, backpay, sexual, non-competition, diligence, resign, constructive discharge, terminate, clothing, buyer, seek employment, severance pay, second year, unwelcome, trip, substantial equivalent, restrictive covenant, per year, mitigate, backpay, buying, salary, sex, reasonable person, unpleasant

## Case Summary

### Procedural Posture

Plaintiff claimant filed suit against defendant former employer and its president, and sought damages for an alleged violation of Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e et seq.*

### Overview

Before her resignation, the claimant worked for the corporation as a buyer. In her complaint against the corporation and its president, the claimant alleged that she had been the victim of repeated sexual harassment by the president and that the president's misconduct had forced her to resign. After a bench trial, the court found that the claimant had been the victim of sexual harassment, which had resulted in her constructive discharge, and that she was entitled to back pay. In reaching its decision, the court found that the claimant was a member of a protected group, that she was subjected o unwelcome sexual harassment, that the harassment was based on sex, that the harassment affected the conditions of her employment, that the president's actual knowledge of the misconduct was imputed to the corporation, and that the sexual harassment created a working condition so difficult that a reasonable person in the claimant's shoes would have felt compelled to resign. The court awarded the claimant back pay because she was unable to find other work due to her non-competition agreement with the corporation and the corporation's willingness and ability to enforce it.

### Outcome

The court entered judgment in favor of the claimant.

## LexisNexis® Headnotes

Education Law > ... > Misconduct & Performance > Sexual Misconduct > Sexual Harassment

Labor & Employment Law > ... > Harassment > Sexual Harassment > General Overview

Labor & Employment Law > ... > Sexual Harassment > Burdens of Proof > General Overview

Labor & Employment Law > ... > Sexual Harassment > Burdens of Proof > Employee Burdens of Proof

Labor & Employment Law > ... > Sexual Harassment > Scope & Definitions > Sexual Harassment

Labor & Employment Law > ... > Sexual Harassment > Employment Practices > Discharges & Failures to Hire

Labor & Employment Law > ... > Harassment > Sexual Harassment > Hostile Work Environment

Labor & Employment Law > Discrimination > Title VII Discrimination > General Overview

Labor & Employment Law > Wrongful Termination > Constructive Discharge > Burdens of Proof

Labor & Employment Law > ... > Constructive Discharge > Statutory Application > Title VII of the Civil Rights Act of 1964

*HN1* Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e et seq.*, prohibits sexual harassment in employment. In order to establish a constructive

EXHIBIT
D-6

681 F. Supp. 1547, *1547; 1988 U.S. Dist. LEXIS 1982, **1982

discharge claim, a an employee must establish two elements: first, that she suffered sexual harassment; and second, that the harassment created working conditions which were so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.

Labor & Employment Law > ... > Harassment > Sexual Harassment > General Overview

Labor & Employment Law > ... > Sexual Harassment > Burdens of Proof > General Overview

Labor & Employment Law > ... > Sexual Harassment > Burdens of Proof > Employee Burdens of Proof

Labor & Employment Law > ... > Sexual Harassment > Scope & Definitions > General Overview

Labor & Employment Law > Discrimination > Title VII Discrimination > General Overview

**HN2** To establish a sexual harassment claim, the plaintiff must establish the existence of five conditions. Those elements are: (1) the employee belongs to a protected group; (2) the employee was subject to unwelcomed sexual harassment; (3) the harassment was based on sex; and (4) the harassment affected a term, condition, or privilege of employment. Finally, if the harassment is alleged to have been conducted by a co-worker or supervisor, the plaintiff must prove respondeat superior.

Criminal Law & Procedure > ... > Crimes Against Persons > Coercion & Harassment > Elements

Labor & Employment Law > ... > Harassment > Sexual Harassment > General Overview

Labor & Employment Law > ... > Sexual Harassment > Burdens of Proof > Employee Burdens of Proof

Labor & Employment Law > ... > Sexual Harassment > Scope & Definitions > General Overview

Labor & Employment Law > ... > Sexual Harassment > Scope & Definitions > Sexual Harassment

Labor & Employment Law > ... > Harassment > Sexual Harassment > Hostile Work Environment

Labor & Employment Law > ... > Harassment > Sexual Harassment > Quid Pro Quo

Labor & Employment Law > Discrimination > Title VII Discrimination > General Overview

**HN3** There are two distinct forms of sexual harassment. "Quid pro quo harassment" occurs when sexual favors are required in exchange for employment benefits. "Hostile environment harassment" exists when unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature, has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment.

Labor & Employment Law > ... > Burdens of Proof > Standards of Proof > Pervasive & Severe Standards

Labor & Employment Law > ... > Sexual Harassment > Scope & Definitions > General Overview

Labor & Employment Law > Discrimination > Title VII Discrimination > General Overview

**HN4** Sexual harassment is actionable if it is so severe or pervasive as to alter the conditions of the victim's employment and create an abusive working environment.

Labor & Employment Law > ... > Sexual Harassment > Scope & Definitions > General Overview

**HN5** The Eleventh Circuit establishes that an employee's psychological well-being is a condition of employment.

Labor & Employment Law > ... > Sexual Harassment > Burdens of Proof > General Overview

Labor & Employment Law > ... > Sexual Harassment > Burdens of Proof > Employee Burdens of Proof

Business & Corporate Compliance > ... > Harassment > Sexual Harassment > Correction & Prevention

Labor & Employment Law > ... > Harassment > Sexual Harassment > Correction & Prevention

Labor & Employment Law > ... > Sexual Harassment > Defenses > Antiharassment Policy

Labor & Employment Law > ... > Sexual Harassment > Employer Liability > General Overview

Labor & Employment Law > ... > Sexual Harassment > Employer Liability > Harassment by Supervisors

Case 1:25-cv-21113-JAL   Document 37-4   Entered on FLSD Docket 09/09/2025   Page 117 of
126

Page 3 of 12
681 F. Supp. 1547, *1547; 1988 U.S. Dist. LEXIS 1982, **1982

Labor & Employment Law > Discrimination > Title VII
Discrimination > General Overview

*HN6* Employers are not automatically liable for sexual
harassment by their supervisors. Instead, a plaintiff
must show that the employer knew or should have
known of the harassment in question and failed to take
prompt remedial action.

Labor & Employment Law > ... > Sexual
Harassment > Employment Practices > Discharges &
Failures to Hire

Labor & Employment Law > Wrongful
Termination > Constructive Discharge > General Overview

*HN7* The issue of constructive discharge is a question of
fact. In making that finding, a court is required to apply
an objective standard.

Labor & Employment Law > ... > Sexual
Harassment > Scope & Definitions > General Overview

Labor & Employment Law > ... > Sexual
Harassment > Employment Practices > Discharges &
Failures to Hire

Labor & Employment Law > Wrongful
Termination > Constructive Discharge > General Overview

*HN8* In the sexual harassment context, in order to find
that a plaintiff was constructively discharged, the court is
required to determine whether on the record a
reasonable person would find that the numerous
unwelcome sexual advances were so unpleasant as to
compel resignation.

Labor & Employment Law > ... > Sexual
Harassment > Remedies > General Overview

Labor & Employment Law > ... > Title VII
Discrimination > Remedies > General Overview

Labor & Employment Law > ... > Title VII
Discrimination > Remedies > Affirmative & Equitable Relief

Labor & Employment
Law > ... > Remedies > Damages > Backpay

*HN9* In awarding damages in a case under Title VII of
the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e*, the
district court must seek to place the injured party in the
position she would have been in absent the

discriminatory actions. Back pay has consistently been
awarded by courts, as of right, where the plaintiff has
been terminated because of discrimination.

Labor & Employment Law > ... > Sexual
Harassment > Remedies > General Overview

*HN10* Given a finding of unlawful discrimination,
backpay shall be denied only for reasons which, if
applied generally, would not frustrate the central
statutory purposes of eradicating discrimination
throughout the economy and making persons whole for
injuries suffered through past discrimination.

Labor & Employment Law > ... > Sexual
Harassment > Remedies > General Overview

*HN11* Back pay includes straight salary as well as
interest, overtime, shift differentials, and fringe benefits.

Labor & Employment Law > ... > Sexual
Harassment > Remedies > General Overview

Labor & Employment Law > ... > Title VII
Discrimination > Remedies > General Overview

Labor & Employment Law > ... > Title VII
Discrimination > Remedies > Affirmative & Equitable Relief

Labor & Employment
Law > ... > Remedies > Damages > Mitigation of Damages

*HN12* Consonant with the important objective of making
the injured party whole, a back pay award under Title VII
of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e*,
shall be limited to proven economic loss. More
particularly, the discriminatee has a duty to minimize
damages by being reasonably diligent in seeking
employment substantially equivalent to the position lost.

Labor & Employment
Law > ... > Remedies > Damages > Backpay & Frontpay

Labor & Employment Law > ... > Sexual
Harassment > Remedies > General Overview

Labor & Employment Law > ... > Title VII
Discrimination > Remedies > General Overview

Labor & Employment Law > ... > Title VII
Discrimination > Remedies > Affirmative & Equitable Relief

681 F. Supp. 1547, *1547; 1988 U.S. Dist. LEXIS 1982, **1982

Labor & Employment
Law > ... > Remedies > Damages > Mitigation of Damages

*HN13* Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e-5(g)*, provides that interim earning or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable.

Labor & Employment Law > ... > Sexual
Harassment > Remedies > General Overview

*HN14* Regarding the issue of whether under a particular set of circumstances, the failure to mitigate may be excused, the desire to work at a specific job is not a substitute for diligently seeking alternative employment. The plaintiff must be available and willing to accept substantially equivalent employment elsewhere. If no other job in the plaintiff's field is suitable, the plaintiff must seek employment in another field.

Labor & Employment Law > ... > Sexual
Harassment > Remedies > General Overview

Labor & Employment
Law > ... > Remedies > Damages > Backpay

*HN15* While an unemployed claimant need not go into another line of work, accept a demotion, or take a demeaning position, she forfeits her right to backpay if she refuses a job substantially equivalent to the one denied.

Labor & Employment Law > ... > Sexual
Harassment > Remedies > General Overview

*HN16* In calculating the amount of back pay owed by the employer, the plaintiff has the burden of proving the amount of damage resulting from the employer's discriminatory acts. Once that showing has been made, the employer has the burden to prove that the plaintiff is not entitled to the full amount of back pay sought. The employer's burden may be met by demonstrating the amount of the plaintiff's interim earnings, or that the plaintiff failed to exercise diligence in seeking employment.

Labor & Employment Law > ... > Sexual
Harassment > Remedies > General Overview

*HN17* Loss of pay shall be determined by deducting from a sum equal to that which the employee would normally have earned for each such quarter or portion thereof, his net earnings, if any, in other employment during that period.

Labor & Employment Law > ... > Conditions &
Terms > Trade Secrets & Unfair
Competition > Noncompetition & Nondisclosure Agreements

*HN18* The only authority the court possesses over the terms of a non-competitive agreement is to determine, as Fla. Stat. Ann. § 542.12(2), provides, the reasonableness of its time and area limitation.

Civil Rights Law > Protection of Rights > Procedural
Matters > General Overview

Civil Rights Law > ... > Procedural Matters > Costs &
Attorney Fees > Reasonable Fees

Civil Rights Law > ... > Procedural Matters > Costs &
Attorney Fees > Statutory Attorney Fee Awards

Labor & Employment Law > ... > Sexual
Harassment > Remedies > General Overview

Labor & Employment Law > ... > Title VII
Discrimination > Remedies > Costs & Attorney Fees

*HN19* Under Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e-5(k)*, the court may, in its discretion, allow the prevailing party to recover reasonable attorney fees as part of the costs.

**Counsel:** **[\*\*1]** Edward Nicklaus, Esq., for Plaintiff.

Richard Lapidus, Esq., for Defendant.

**Judges:** Stanley Marcus, United States District Judge.

**Opinion by:** MARCUS

# Opinion

**[\*1548]** FINAL ORDER, FINDINGS OF FACT, CONCLUSIONS OF LAW

STANLEY MARCUS, UNITED STATES DISTRICT JUDGE

THIS ACTION was brought by Plaintiff Karen Ross, against her former employer The Twenty-Four

681 F. Supp. 1547, *1548; 1988 U.S. Dist. LEXIS 1982, **1

Collection, Inc. ("The Twenty-Four Collection"), and its President, Charles Goldstein, alleging a violation of Title VII of the Civil Rights Act of 1964, *42 U.S.C. § 2000e, et seq. (1982)*. Ross was employed by the Defendants as a buyer of "high fashion" European and American clothing, and alleges that she was the victim of repeated, "sexual harassment" by Mr. Goldstein, and that the consequent working conditions were so intimidating, oppressive, and unpleasant that she was compelled to resign. The facts developed at trial have satisfied this Court that Ms. Ross was indeed the victim of a pattern of sexual harassment, intimidation and abuse, and that this misconduct resulted in her forced resignation.

Plaintiff's Complaint was tried before the Court without a jury, and pursuant to *Rule 52(a), Federal Rules of Civil Procedure*, we make the following Findings of Fact and Conclusions of Law.

I. FINDINGS **[**2]** OF FACT

1. The Plaintiff, Karen Ross, a resident of Dade County, Florida, was employed by the Defendant The Twenty-Four Collection as a buyer initially in 1977 and was terminated in December 1978. She began a second term of employment on November 15, 1982 and worked for The Twenty-Four Collection until her constructive discharge in or about April 1984. The allegations surrounding this lawsuit arise out of Ms. Ross' second period of employment.

2. The Twenty-Four Collection is an employer engaged in an industry affecting commerce within the meaning of §§ 701(b), (g) and (h), of Title VII; *42 U.S.C. §§ 2000e(b)*, *(g)*, *(h) (1982)*; and at all relevant times it has employed more than fifteen persons. The Defendant corporation has been involved in the retail sales of upper-scale women's clothing and related accessories and men's clothing in south Florida, with retail stores in Dade, Broward and Palm Beach Counties.

3. The Defendant Charles Goldstein has served as President and Chief Operating Officer of the Defendant corporation since its inception more than twelve years ago. Goldstein is also a director and majority shareholder of the company.

4. Prior to commencing her employment with **[**3]** the Defendant corporation, Plaintiff had extensive education, training and employment background in merchandising and buying in the fashion industry. The Plaintiff attended Pennsylvania State University where she majored in marketing. Among the relevant jobs she

held are the following: from June 1979 to September 1983, Ross was employed by Saks Fifth Avenue in Phoenix and Pittsburgh as an Assistant Salon Manager, Department Manager for Swimwear, and Assistant Sportsdress Manager; from October 1973 until the end of **[*1549]** 1975, Plaintiff was employed by Sakowitz in Scottsdale and then Houston, holding a position as buyer for all the European sportswear for Sakowitz stores; from March 1976 to May 1977, Ross was employed by Rhodes Southwest in Phoenix as a buyer of contemporary dresses and sportswear.

5. In or about June 1977, Plaintiff took a position with The Twenty-Four Collection as Buyer of European and American clothing. During her initial period of employment, Plaintiff had occasion to travel to various European "high fashion" cities, as well as various fashion centers in the United States buying merchandise. On some of these occasions, Plaintiff was accompanied by Defendant Charles **[**4]** Goldstein, and at least once, Ms. Ross consensually engaged in sexual relations with the Defendant. This initial period of employment was terminated in December 1978.

6. Prior to this initial period, Plaintiff signed an employment agreement with the Defendant corporation which contained a non-competition agreement. Upon her termination in December 1978, Plaintiff went to work as a buyer of American and European women's clothing for a competitor of the Twenty-Four Collection, Cache Stores in Miami, in violation of her non-competition agreement. The Defendant brought suit in the state courts to enforce this restrictive covenant. In *Twenty Four Collection, Inc. v. Keller, 389 So.2d 1062 (Fla. 3d DCA 1980)*, *review denied*, *419 So.2d 1048 (Fla. 1982)*, the Third District Court of Appeal upheld the covenant and enjoined Plaintiff from working for a competitor, but ruled that the covenant could be restricted in time and place in the discretion of the trial court. Thereafter a trial court in the Eleventh Judicial Circuit limited the covenant to one year and to Dade, Broward and Palm Beach Counties. A final judgment enjoining Plaintiff from violating the non-competition agreement for **[**5]** a period of one year was entered on May 7, 1981.

7. Plaintiff left her employment with Cache stores sometime in April 1981.

8. At all times relevant, Plaintiff suffered from and received medical treatment for Crohn's disease, an ailment exacerbated by emotional distress. Defendant Goldstein was aware throughout Plaintiff's employment that she suffered from this illness.

681 F. Supp. 1547, *1549; 1988 U.S. Dist. LEXIS 1982, **5

9. In October 1982, Plaintiff again sought employment as a buyer of women's sportswear with The Twenty-Four Collection, writing a lengthy letter to Mr. Goldstein, in response to an advertisement.

10. Plaintiff was hired again by the Defendant as a buyer of European and American women's clothing on November 15, 1982, a position she held until her resignation in April 1984. Throughout this second period of employment, we believe Plaintiff was subjected to repeated sexual advancements, threats and harassment. We have found Plaintiff's testimony to be credible as to these serious charges, and that this misconduct created an intolerable work environment causing Plaintiff to resign in April 1984.

11. In January 1983, soon after the resumption of her employment with The Twenty-Four Collection, and while on a business trip, **[**6]** the Defendant Charles Goldstein told Ms. Ross that he found her extremely attractive and that he wanted her to spend the night with him. The Plaintiff, then married, refused, being fearful that Defendant's desire for a personal relationship would destroy her business relationship with The Twenty Four Collection. Later, in the office, the Defendant repeated those overtures and again was rebuffed.

12. Sometime in or about March of 1983, while on a business trip to Paris, the Defendant again asked Ms. Ross to spend the night with him. She refused.

13. On another occasion, Plaintiff discovered on her desk a sealed envelope addressed to her, marked "personal and confidential," and containing a newspaper article announcing a seminar concerning "extra-marital affairs without guilt" and $ 7.50 in cash.

14. Several times in the spring of 1983, the Defendant asked Ms. Ross to spend the weekend with him in New York City. Plaintiff again rejected these advances.

**[*1550]** 15. In August 1983, while attending a buying trip in New York City, the Defendant entered Plaintiff's hotel room at the Sherry-Netherland Hotel, wearing a bathrobe, and attempted to climb into Plaintiff's bed. Thereafter, the Defendant **[**7]** continued to make sexually explicit remarks to Ms. Ross, even though these advances were repeatedly rejected. On at least one occasion, the Defendant told Ms. Ross that if she left the employ of The Twenty-Four Collection, it would be the end of her career. Plaintiff's physical and mental health deteriorated markedly, and her treatment for Crohn's disease was exacerbated.

16. On a buying trip to Milan, Italy, the Defendant entered Plaintiff's hotel room and asked her to shower with him. On still another occasion, during a trip to New York sometime in January 1984, the Defendant, wearing a robe in a hotel room, attempted to massage the Plaintiff's neck and body and forced her to lie down with him on the bed. On a third occasion the Defendant gave the Plaintiff a pornographic magazine.

17. In early February 1984, the Defendant asked Ms. Ross to join him on a buying trip in Europe. When the Plaintiff told Goldstein that she did not want to accompany him, the Defendant told her that if she did not go she would be fired from her job. Suffering from severe anxiety Plaintiff refused to go, presented Defendant with a letter from her physician and took a 90-day leave of absence without pay. **[**8]** Plaintiff's health continued to deteriorate throughout the latter period of employment, in substantial measure, we think, because of Defendant's repeated misconduct. Plaintiff again met with Defendant in April of 1984 to talk about her future, and at that time, the Defendant tried to place his arms around her and kiss her on the mouth. Plaintiff left the meeting and terminated her employment with The Twenty-Four Collection.

18. During the period of Plaintiff's employment, from November 15, 1982 until her termination on or about April 11, 1984, pursuant to contract, Ms. Ross was to be paid $ 30,000 during the first year, and at a rate of $ 40,000 per year in the second year of employment. The amount of compensation was to rise to $ 45,000 in the third year and $ 50,000 in the fourth. Additionally, Plaintiff was entitled to one month's severance pay for the first year of employment and two-month's severance pay for the second year. According to Plaintiff, in the second year of her employment, Plaintiff exercised the option of receiving a salary of $ 35,000, with the balance of her remuneration in the form of a $ 200 per week clothing allowance. Therefore, at the time of her constructive **[**9]** discharge, Plaintiff contends that she was being compensated at the rate of $ 45,400 per year. Goldstein testified that during her second year of employment, Ross was paid at the rate of $ 40,000 per year. According to the Defendant, the compensation was divided between a straight salary rate of $ 34,800 per year, and a $ 100 per week clothing allowance. Further, Plaintiff received as part of her compensation $ 700 worth of trade publications per year.  Plaintiff was paid her salary until February 1984.

19. Ms. Ross has not sought employment since the date she left The Twenty-Four Collection.

Case 1:25-cv-21113-JAL   Document 37-4   Entered on FLSD Docket 09/09/2025   Page 121 of 126

Page 7 of 12

681 F. Supp. 1547, *1550; 1988 U.S. Dist. LEXIS 1982, **9

20. On August 14, 1984, the Plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC") of the United States under *42 U.S.C. § 2000e, et seq.*, alleging discrimination because of her sex, female, and by being sexually harassed in violation of Title VII. On or about July 7, 1985, the EEOC issued a notice of Right to Sue to the Plaintiff.

II. CONCLUSIONS OF LAW

1. Plaintiff, Karen Ross, maintains that because of the sexual harassment by Goldstein she was forced to terminate her employment and was, in effect, constructively discharged. It is by now well established **[**10]** that *HN1* Title VII prohibits sexual harassment in employment. *Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986)*; *see also Henson v. City of Dundee, 682 F.2d 897 (11th Cir. 1982)*; *Sapp v. City of Warner Robins, 655 F. Supp. 1043 [*1551] (M.D.Ga. 1987)*. Accordingly, in order to establish her constructive discharge claim, she must establish two elements: first, that she suffered sexual harassment; and second, that the harassment created "working conditions [which] were so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Wardwell v. School Board of Palm Beach County, Florida, 786 F.2d 1554, 1557 (11th Cir. 1986)* (*citing Bourque v. Powell Electrical Manufacturing Co., 617 F.2d 61, 65 (5th Cir. 1980)*; *Young v. Southwestern Savings & Loan Association, 509 F.2d 140, 144 (5th Cir. 1975))* (footnote omitted).

2. *HN2* To establish a sexual harassment claim, the Plaintiff must establish the existence of five conditions.

> These elements are: (1) the employee belongs to a protected group; (2) the employee was subject to unwelcomed sexual harassment; (3) the harassment was based on sex; and (4) the harassment affected a **[**11]** "term, condition or privilege" of employment. Finally, if the harassment is alleged to have been conducted by a co-worker or supervisor, the plaintiff must prove respondeat superior.

*Sapp, 655 F. Supp. at 1049* (*citing Henson, 682 F.2d at 903-05*). Here, we find that the Plaintiff has clearly met this burden.

The Plaintiff, as a woman, is a member of a protected group. The consideration of the other elements requires an analysis of exactly what conduct constitutes harassment. The Supreme Court has recently identified

*HN3* two distinct forms of sexual harassment. "*Quid pro quo* harassment" occurs when sexual favors are required in exchange for employment benefits. *Meritor Savings Bank, FSB, 106 S. Ct. at 2405*. "Hostile environment harassment" exists when

> "unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature[,] . . . has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment."

*Id.* (quoting *29 C.F.R. §§ 1604.11(a)*, 1064.11(a)(3) (1985)).

During trial it was intimated that the Plaintiff suffered *quid pro quo* **[**12]** harassment. However, since we believe that the Plaintiff has fully stated a claim for hostile environment harassment we rest our decision principally on that theory. Ross was the victim of unwelcomed and explicit sexual advances on at least seven discernable occasions. Further, the Defendant subjected the Plaintiff to other conduct of a sexual nature, such as when he gave her a pornographic magazine, and left an article on her desk regarding a "seminar" on "extra-marital affairs without guilt." Clearly, this harassment was based on sex. But for the fact she was female, she would not have been singled out for such treatment. *Henson, 682 F.2d at 903-04*.

*HN4* Sexual harassment is actionable if it is so "severe or pervasive [as] 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Meritor Savings Bank, FSB, 106 S. Ct. at 2406* (quoting *Henson, 682 F.2d at 904*). Examining the totality of the circumstances, *see id. at 2407*; *Henson, 682 F.2d at 904*, we are compelled to find that the harassment suffered by the Plaintiff was both severe and pervasive. The facts of this case reveal a pattern of conduct neither subtle nor oblique. **[**13]** Moreover, *HN5* the Eleventh Circuit has established that an employee's psychological well-being is a condition of employment. *Phillips v. Smalley Maintenance Services, Inc., 711 F.2d 1524, 1529 (11th Cir. 1983)*; *Henson, 682 F.2d at 904*; *Sapp, 655 F. Supp. at 1049*. The evidence has conclusively established that the harassment of the Plaintiff did affect her psychological well-being. Specifically, the testimony revealed that the Plaintiff's emotional distress exacerbated her symptoms of Crohn's disease. The effect of harassment was further evidenced when Ross was unable to board an airplane for a buying trip because she suffered an anxiety attack. Thereafter, she was required to take a leave of absence

681 F. Supp. 1547, *1551; 1988 U.S. Dist. LEXIS 1982, **13

on the advice of her physician because of increased **[*1552]** stress and the exacerbation of her illness because of this anxiety.

This action has been brought against both The Twenty-Four Collection and Charles Goldstein. *HN6* Employers are not "automatically liable for sexual harassment by their supervisors." *Meritor Saving Bank, FSB, 106 S. Ct. at 2408*. Instead, the Plaintiff "must show that the employer knew or should have known of the harassment in question and failed to take prompt remedial **[**14]** action." *Henson, 682 F.2d at 905* (citations omitted); *see also Lewis v. Federal Prison Industries, Inc., 786 F.2d 1537, 1543 (11th Cir. 1986); Sapp, 655 F. Supp. at 1049-50*. Since Goldstein was both the harassing employer and the president and director and majority shareholder of the corporation, there can be no doubt that his actual knowledge of the conduct can be imputed to the corporate defendant.

3. Having found that the Plaintiff suffered sexual harassment by the Defendants, we turn our consideration to whether this environment forced her to resign. *HN7* The issue of constructive discharge is a question of fact. *Wardwell, 786 F.2d at 1557* (*citing Buckley v. Hospital Corporation of America, Inc., 758 F.2d 1525, 1530-31 (11th Cir. 1985))* (other citation omitted). In making this finding, a court is required to apply an objective standard. *Id.* (examine the reasonable person in Plaintiff's position); *see also Yates v. Avco Corp., 819 F.2d 630, 636-37 (6th Cir. 1987). HN8* In order to find that Ross was constructively discharged, we are required to determine whether on this record a reasonable person would find that the numerous unwelcome sexual advances were so unpleasant **[**15]** as to compel resignation. Such a finding is both reasonable and fair. The conditions created by Goldstein made the Plaintiff's "working conditions so intolerable," *Young, 509 F.2d at 144*, that she had no choice but to resign.

4. "*HN9* In awarding damages in a Title VII case, the district court must seek to place the injured party in the position . . . she would have been in absent the discriminatory actions." *Walters v. City of Atlanta,* 803 F.3d 1135, 1145 (11th Cir. 1986) (*citing Albemarle Paper Co. v. Moody, 422 U.S. 405, 45 L. Ed. 2d 280, 95 S. Ct. 2362 (1975); Nord v. United States Steel Corp., 758 F.2d 1462, 1470 (11th Cir. 1985)).* Back pay has consistently been awarded by courts, as of right, where the plaintiff has been terminated because of discrimination. Indeed the Supreme Court has stated that

*HN10* given a finding of unlawful discrimination, backpay should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination.

*Albemarle Paper Co., 422 U.S. at 421* (footnote omitted); *see also Nord, 758 F.2d at 1472; Lewis v. [**16] Smith, 731 F.2d 1535, 1538 (11th Cir. 1984); McCormick v. Attala County Board of Education, 541 F.2d 1094, 1095 (5th Cir. 1976).* Moreover, "*HN11* back pay" has been held to include straight salary as well as "'interest, overtime, shift differentials, and fringe benefits. . . .'" *Cox v. American Cast Iron Pipe Co., 784 F.2d 1546, 1562 (11th Cir. 1986)* (*quoting Pettway v. American Cast Iron Pipe Co., 494 F.2d 211, 263 (5th Cir. 1978)),* cert. denied, 479 U.S. 883, 107 S. Ct. 274, 93 L. Ed. 2d 250 (1986).

*HN12* Consonant with the important objective of making the injured party whole, a back pay award under Title VII should be limited to proven economic loss. *Darnell v. City of Jasper, Alabama, 730 F.2d 653, 656 (11th Cir. 1984); Marks v. Prattco, Inc., 607 F.2d 1153, 1155-56 (5th Cir. 1979).* More particularly, the discriminatee has a duty to minimize damages "by being reasonably diligent in seeking employment substantially equivalent to the position . . . lost." *Walters,* 803 F.2d at 1145. The statute declares in this regard:

*HN13* Interim earning or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable.

**[**17]** *42 U.S.C. § 2000e-5(g) (1982).*

5. Defendants contend that even if the Plaintiff was a victim of sex discrimination **[*1553]** in violation of Title VII, she would not be entitled to recover damages because she had not sought other employment after leaving The Twenty Four Collection. See *Miller v. Marsh, 766 F.2d 490, 491-93 (11th Cir. 1985).* However, the circumstances surrounding her failure to pursue other employment are unique, and not easily applicable to prevailing standards.

681 F. Supp. 1547, *1553; 1988 U.S. Dist. LEXIS 1982, **17

We begin by observing again that Plaintiff had a previous tenure with The Twenty Four Collection. At that time, she had signed a two-year non-competition agreement with the Defendant. After she left their employ, the Plaintiff found other work in the industry. However, The Twenty Four Collection successfully sued to enforce the restrictive covenant. *See* *Twenty Four Collection, Inc., supra.*

When Ross became employed by the Defendant for the second time on November 15, 1982, she signed a virtually identical non-competition agreement. The only term that had been changed was that of duration. The parties created a sliding scale which based the effective duration of the restrictive covenant on her length of employment **[**18]** with the Defendant. [1] After she resigned from The Twenty-Four Collection, Ross believed that she was bound by the non-competition agreement, and therefore did not seek similar employment. Defendants contend that if in fact Plaintiff was constructively discharged due to acts of sexual harassment, then that conduct constituted a breach of the employment contract, and the Plaintiff was no longer bound by the restrictive covenant. *See* *Matter of Thomas, 51 B.R. 653 (Bankr. M.D.Fla. 1985)*; *Troup v. Heacock, 367 So.2d 691 (Fla. 1st DCA 1979)*. In essence, under these facts Defendants claim that the Plaintiff was bound to either relitigate the validity of the non-competition agreement or simply ignore it and seek employment elsewhere.

 **[**19]** Under established caselaw, it is indisputable that Ms. Ross was not diligent in her search for new employment after she resigned from The Twenty Four

---

[1] The employment contract stated *inter alia*,

In the event of the termination, voluntarily or involuntarily, of the undersigned's employment with the EMPLOYER, for any reason, then for a period of two (2) years* from the date of said termination, the undersigned employee will not engage, in any capacity, directly or indirectly, in any business in Dade, Broward or Palm Beach Counties, Florida, similar to the kind or nature of business conducted by the EMPLOYER during the employment.

A handwritten footnote contained the following:

*Non competition agreement period not two (2) years until after 12 months from date.

1-3 months = 6 months

4-12 months = 1 year

Thereafter = 2 years

Collection. The central question as to damages is whether that lack of diligence is excusable because of her reliance upon the non-competition agreement. The Eleventh Circuit Court of Appeals, in a case factually distinct from the one at bar, was presented with **HN14** the issue of whether under a particular set of circumstances, the failure to mitigate may be excused. In *Walters*, 803 F.2d at 1145-46, the defendants were found to have discriminated against the plaintiff on the basis of race on four separate occasions in refusing to name him the Director of Cyclorama, in Atlanta. *Id. at 1139-40*. Since a child, the plaintiff had sought employment at Cyclorama, *id.*, at 1139, and when he was rebuffed he pursued his goal rather than seek alternative employment. *Id. at 1145*. The court found that the desire to work at a specific job, "is not a substitute for diligently seeking alternative employment." *Id.* (*citing* *Miller, 766 F.2d at 492*). Moreover, "'the plaintiff must be available and willing to accept substantially equivalent **[**20]** employment elsewhere.'" *Id.* (*quoting* *Miller, 766 F.2d at 492*). If no other job in the plaintiff's field is suitable, the plaintiff "must seek employment in another field." *Id.*

In determining whether the failure to diligently seek to minimize damages is excusable here, we note initially that the Supreme Court has stated that **HN15** while an "unemployed . . . claimant need not go into another line of work, accept a demotion or take a demeaning position, he forfeits his right to backpay if he refuses a job substantially equivalent to the one . . . denied." *Ford Motor Co. v. E.E.O.C., 458 U.S. 219, 232, [*1554] 73 L. Ed. 2d 721, 102 S. Ct. 3057 (1982)* (footnotes omitted). Accordingly, Ross, immediately after her discharge, was not required to seek work in another field, or in lesser position in the fashion industry simply to mitigate her lost pay. Further, the criteria as cited in *Walters* is inapplicable to this case. First, Ross did not fail to seek alternative employment because she did not desire a different position. She believed that she was legally barred from accepting such employment. Second, Plaintiff was ready and willing to accept comparable employment if such an opportunity had been open to her. Finally, **[**21]** Plaintiff's problem was not merely that other employment in her field was not *suitable* to her, but simply unavailable. Requiring a diligent, though necessarily futile effort to mitigate under these circumstances would be counter to the teaching of *Ford Motor Co.*, and the thrust of *Walters*.

Other Eleventh Circuit precedent does not compel a different conclusion. In *Nord, supra*, the court found that the plaintiff was entitled to back pay for the period she

681 F. Supp. 1547, *1554; 1988 U.S. Dist. LEXIS 1982, **21

had stopped looking for employment, and devoted her time to setting up her husband's practice as a psychologist. "Rather than continue [a] fruitless search she sought to establish secure future employment." *Nord, 758 F.2d at 1471*.

In *Miller, supra*, the plaintiff effectively "removed herself from the labor market by enrolling as a law student on a full-time basis." *Miller, 766 F.2d at 492*. The court found that she was not ready, willing and available to accept substantially similar employment. If the plaintiff had been awarded back pay for this period of unemployment, she would have received a double benefit, in that she would have been paid during a period in which she was preparing for future increased **[**22]** earnings. *Id.* (*citing Taylor v. Safeway Stores, Inc., 524 F.2d 263 (10th Cir. 1975)*). This scenario is distinguishable from *Nord*, because there the plaintiff's search was futile and there was no lost opportunity for present compensation.

In *Smith v. American Service Company of Atlanta, Inc., 796 F.2d 1430 (11th Cir. 1986)*, the plaintiff had actively sought employment for a period of seven months after being discriminated against in a hiring decision by the Defendant. She then enrolled full-time in cosmetology school and worked part-time and continued to look for employment. The court found that it would be consistent with the decision in *Nord* to allow back pay for the period she was enrolled in school. *Id. at 1432*.

Plaintiff's predicament in this case must be considered analogous to those discriminatees who were allowed to recover back pay for the period after which their job search became fruitless. Because of the restrictive covenant and Defendants' apparent willingness and demonstrable ability to enforce it, it would have been futile, we believe, for Plaintiff to seek work in an industry in which she could not legally be employed. This period of inactivity **[**23]** can be likened to the period in *Nord* and *Smith*, wherein the plaintiff prepared for future earnings, while not turning down any alternate source of employment. Ross was required to wait until the non-competition term had expired before she could actually be compensated for work in her chosen field.

Moreover, we find it significant that the operation of the restrictive covenant was wholly within the control of the discriminating Defendants. To find that under these circumstances the Plaintiff had failed to mitigate her damages and therefore is ineligible to recover backpay, would effectively insulate this employer and similarly situated employers from the consequences of their illegal conduct. Further, such a finding would run counter to the policy considerations of Title VII in that the burden would be placed upon the discriminatee to either contest the terms of a non-competition agreement or endure discrimination rather than risk an adverse decision in the "contract" dispute. "Title VII's primary goal, of course, is to end discrimination; the victims of job discrimination want jobs, not lawsuits." *Ford Motor Co., 458 U.S. at 230* (emphasis in the original) (footnote **[**24]** omitted). The Defendants should not be permitted to benefit from the operation of the employment contract, **[*1555]** when their conduct clearly violated Ms. Ross' right to be free from sexual harassment. *See E.E.O.C. v. FLC & Brothers Rebel, Inc., 663 F. Supp. 864, 870 (W.D.Va. 1987)* (where plaintiff lost job because of sex discrimination, could not make car payments and therefore lost her car; defendant could not benefit by claiming that she failed to mitigate damages when she could not accept employment because she could not travel to it).

6. *HN16* In calculating the amount of back pay owed by the defendant, the plaintiff has the burden of proving the amount of damage resulting from the employer's discriminatory acts. Once that showing has been made, the employer has the burden to prove that the plaintiff is not entitled to the full amount of back pay sought. *See Nord, 758 F.2d at 1470*. The employer's burden may be met by demonstrating the amount of the plaintiff's interim earnings, or that the plaintiff failed to exercise diligence in seeking employment. *Id. See generally, Sennello v. Reserve Life Insurance Co., 667 F. Supp. 1498, 1512-15 (S.D. Fla. 1987)*.

In determining the **[**25]** appropriate back pay award, we must determine what Ms. Ross would have earned if she had not been constructively discharged by The Twenty-Four Collection. The Eleventh Circuit has stated that:

> *HN17* Loss of pay shall be determined by deducting from a sum equal to that which [the employee] would normally have earned for each such quarter or portion thereof, [his] net earnings, if any, in other employment during that period.

*Darnell, 730 F.2d at 657* (*quoting National Labor Relations Board v. Seven-Up Bottling Co., 344 U.S. 344, 345, 97 L. Ed. 377, 73 S. Ct. 287 (1953)* (*quoting F.W. Woolworth Co., 90 N.L.R.B. 289, 292-93 (1950)*)) (footnote omitted).

681 F. Supp. 1547, *1555; 1988 U.S. Dist. LEXIS 1982, **25

Plaintiff's term of employment ran from November 15, 1982 through April 11, 1984. Under the terms of the employment contract, Plaintiff was to be paid $ 30,000 for the first year; $ 40,000 for the second year; $ 45,000 for the third year; and $ 50,000 for the fourth year. When Plaintiff left the Defendant's employ, she had completed almost five months of her second year of the contract. Accordingly she received, or had waived by taking leave without pay, approximately $ 20,000 of her salary under the contract for the second year.

As stated by Florida's Fifth [**26] District Court of Appeal in *Twenty Four Collection, Inc., 389 So.2d at 1063*, "HN18 the only authority the court possesses over the terms of a non-competitive agreement is to determine, as the statute [Fla. Stat. Ann. § 542.12(2) (1977)] provides, the reasonableness of its time and area limitation." The trial court in that action subsequently determined that after Ross had worked for the Twenty Four Collection for approximately 18 months, the reasonable application of the non-competition clause would be for a period of one year. The Second Agreement attempts to specifically detail a reasonable non-competition duration term that is dependent upon the length of Plaintiff's employment. Under the new contract, the non-competition agreement would operate for a period of two years after twelve months of service. We specifically find that Plaintiff was entitled to rely upon the newly negotiated terms and that the operative period of the non-competition term was two years. Accordingly, Plaintiff is entitled to back pay for that entire period. There is some dispute as to the rate of Plaintiff's compensation at the time of her discharge. While Ross testified that she was being paid at the annual [**27] rate of $ 45,400, Goldstein stated that she was actually compensated at the rate of $ 40,000 per year as contained in the terms of the written contract. We therefore find it appropriate to base Plaintiff's backpay award upon the terms embodied in the written employment contract. The breakdown of the back pay award is:

Go to table1

Further, under the terms of the contract, the Plaintiff was entitled to two months' severance pay. While the contract is not [*1556] clear on this subject, [2] both Ross and Goldstein testified that they understood the agreement to mean that she was to receive one month's severance pay if she was employed up to one year, and

two month's severance pay if employed between one and two years. Since Plaintiff had worked for more than one, but less than two years, Ross is entitled to two month's severance pay based on her annual rate at the time of her discharge. Severance pay therefore amounts to $ 6,666.66. Further, Plaintiff had received as a fringe benefit, [**28] $ 700 worth of publications related to her employment. No evidence was adduced which bore upon Plaintiff's lost sick pay, health insurance, or other remuneration.

7. HN19 Under Title VII, *42 U.S.C. § 2000e-5(k)*, the Court may, in its discretion, allow the prevailing party to recover "a reasonable attorney's fee as part of the costs." The Defendants are liable to Ross for the costs incurred in this action, including a reasonable attorney's fee. Accordingly it is

ORDERED and ADJUDGED that Defendants, The Twenty-Four Collection, Inc., and Charles Goldstein are liable to Plaintiff in the amount of $ 97,233.32 [3] as well as reasonable costs and attorney fees. It is further

ORDERED and ADJUDGED that Plaintiff shall submit within ten (10) days affidavits pertaining to the fees and costs incurred in this matter.  Defendants shall have ten (10) days thereafter in which to respond to any such affidavits.

[**29] DONE and ORDERED in Miami, Florida, this 11 day        of        March,        1988.

---

2  The compensation and severance pay terms of the employment contract read:Compensation(annual minimum)YearAmountSeverance1301 month2402 "  3452 "  4502 "

3 Back wages =$ 89,166.66Severance pay =6,666.66Fringe benefits =1,400.00TOTAL$ 97,233.32

681 F. Supp. 1547, *1556; 1988 U.S. Dist. LEXIS 1982, **29

**Table1 (**_Return to related document text_**)**

|         |         |                   |   |              |
|---------|---------|-------------------|---|--------------|
|         | 7 months | at $ 40,000/year | = | $ 23,333.33 |
|         | 1 year   | at $ 45,000/year | = | $ 45,000.00 |
|         | 5 months | at $ 50,000/year | = | $ 20,833.33 |
|         |          |                   |   |              |
| TOTAL   | 2 years  |                   | = | $ 89,166.66 |

**Table1 (**_Return to related document text_**)**

---

**End of Document**